**ORAL ARGUMENT REQUESTED**

No. 22-8022

UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

WESTERN WATERSHEDS PROJECT; CENTER FOR BIOLOGICAL
DIVERSITY; UPPER GREEN RIVER ALLIANCE,

*Petitioners - Appellants*,

v.

UNITED STATES BUREAU OF LAND MANAGEMENT; WILLIAM PERRY
PENDLEY, in his official capacity as Deputy Director of the U.S. Bureau of Land
Management,

*Respondents - Appellees*,

and

JONAH ENERGY, LLC; STATE OF WYOMING,

*Intervenors Respondents - Appellees.*

Appeal from the United States District Court for the District of Wyoming
No. 2:19-CV-00146-SWS (Hon. Scott W. Skavdahl)

**RESPONSE BRIEF FOR THE FEDERAL APPELLEES**

TODD KIM
*Assistant Attorney General*

Of Counsel:

PHILIP C. LOWE
Attorney
Office of the Solicitor
U.S. Department of the Interior

THOMAS W. PORTS
SOMMER H. ENGELS
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 353-7712
sommer.engels@usdoj.gov

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................. iii

STATEMENT OF RELATED CASES ........................................................... vii

GLOSSARY ................................................................................................... viii

INTRODUCTION ............................................................................................ 1

STATEMENT OF JURISDICTION ............................................................... 2

STATEMENT OF THE ISSUES..................................................................... 2

STATEMENT OF THE CASE ........................................................................ 3

      A.    Statutory background ..................................................................... 3

           1.    National Environmental Policy Act ................................... 3

           2.    Oil and Gas Leasing on Public Lands................................ 4

                  a.    Federal Land Policy and Management Act ............ 4

                  b.    Mineral Leasing Act ................................................ 5

           3.    2015 Wyoming Sage-Grouse Resource Management
               Plan Amendments ............................................................... 6

      B.    Factual background ........................................................................ 8

           1.    Proposed Project................................................................. 8

           2.    BLM's NEPA analysis ..................................................... 11

                  a.    Scoping and draft EIS............................................. 11

                  b.    Final EIS ................................................................. 12

           3.    2018 Record of Decision ................................................. 16

      C.    Procedural history ........................................................................ 19

i

SUMMARY OF ARGUMENT ...........................................................................21

STANDARD OF REVIEW ..............................................................................23

ARGUMENT ...................................................................................................23

I.      BLM complied with FLPMA and the Sage-Grouse Amendments.....................23

II.     BLM's analysis of the Project's effects on sage-grouse winter concentration areas complied with NEPA. ...............................................32

      A.     BLM carefully considered the Project's effects on sage-grouse and sage-grouse winter concentration areas. ..................................33

      B.     Petitioners' counterarguments are unavailing.................................37

III.    BLM took a hard look at the Project's impacts on pronghorn in compliance with NEPA. ....................................................................44

      A.     BLM considered impacts to pronghorn as well as measures to mitigate those impacts. .................................................................45

      B.     BLM did not have to discuss effects on Grand Teton National Park in further detail. ......................................................52

IV.    Vacatur is not warranted here..................................................................53

CONCLUSION ................................................................................................54

STATEMENT REGARDING ORAL ARGUMENT

CERTIFICATIONS

# TABLE OF AUTHORITIES

## Cases

*Alaska Env't Ctr. v. Lujan*,
    961 F.2d 886 (9th Cir. 1992) ..................................................................37

*Camp v. Pitts*,
    411 U.S. 138 (1973) ..............................................................................43

*Citizens Against Ruining Our Env't v. Bernhardt*,
    923 F.3d 831 (10th Cir. 2019) ...............................................................49

*Citizens' Comm. to Save Our Canyons v. U.S. Forest Serv.*,
    297 F.3d 1012 (10th Cir. 2002) ...............................................................3

*Citizens for Alternatives to Radioactive Dumping v. U.S. Dep't of Energy*,
    485 F.3d 1091 (10th Cir. 2007) .............................................................49

*Coal. on Sensible Transp., Inc. v. Dole*,
    826 F.2d 60 (D.C. Cir. 1987) ...........................................................48, 53

*Colo. Envtl. Coal. v. Dombeck*,
    185 F.3d 1162 (10th Cir. 1999) .........................................................39, 43

*Allied-Signal,Inc. v. U.S. Nuclear Regul. Comm'n*,
    988 F.2d 146 (D.C. Cir. 1993) ..............................................................54

*Conner v. Burford*,
    848 F.2d 1441 (9th Cir. 1988) ..........................................................37, 40

*DOT v. Public Citizen*,
    541 U.S. 752 (2004) ...................................................................27, 28, 43

*Forest Guardians v. U.S. Forest Serv.*,
    495 F.3d 1162 (10th Cir. 2007) .............................................................48

*Friends of Yosemite Valley v. Norton*,
    348 F.3d 789 (9th Cir. 2003) ................................................................37

*Habitat Educ. Ctr., Inc. v. U.S. Forest Serv.*,
    673 F.3d 518 (7th Cir. 2012) ................................................................43

*Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*,
  702 F.3d 1156 (10th Cir. 2012)...................................................................23

*Jicarilla Apache Tribe of Indians v. Morton*,
  471 F.2d 1275 (9th Cir. 1973) .................................................................36

*Lee v. U.S. Air Force*,
  354 F.3d 1229 (10th Cir. 2004).................................................................39

*McCarthy v. Madigan*,
  503 U.S. 140 (1992) .........................................................................28, 52

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ..........................................................................23, 29

*Native Village of Point Hope v. Jewell*,
  740 F.3d 489 (9th Cir. 2014) .................................................................37

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
  551 U.S. 644 (2007) .............................................................................31

*Nat'l Indian Youth Council v. Watt*,
  664 F.2d 220 (10th Cir. 1981) .................................................................36

*New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*,
  565 F.3d 683 (10th Cir. 2009)...............................................................3, 23

*Northern Plains Resource Council v. Surface Transportation Board*,
  668 F.3d 1067 (9th Cir. 2011) .................................................................41

Norton v. S. Utah Wilderness Alliance,
  542 U.S. 55 (2004) ........................................................................4, 5, 31

*Oregon Natural Desert Ass'n v. Jewell*,
  840 F.3d 562 (9th Cir. 2016) .............................................................40, 41

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989) ...............................................................................3

*San Juan Citizens All. v. Stiles*,
  654 F.3d 1038 (10th Cir. 2011)........................................................42, 49, 52

*Sierra Club, Inc. v. Bostick*,
    787 F.3d 1043 (10th Cir. 2015)...................................................................29

*Town of Winthrop v. FAA*,
    535 F.3d 1 (1st Cir. 2008) ............................................................................39

*Utah Env't Cong. v. Richmond*,
    483 F.3d 1127 (10th Cir. 2007)...................................................................54

*Utahns for Better Transportation v. U.S. Department of Transportation*,
    305 F.3d 1152 (10th Cir. 2002)...................................................................50

*Vermont Yankee Nuclear Power Corp. v. NRDC, Inc.*,
    435 U.S. 519 (1978) ............................................................................... 27, 29

*WildEarth Guardians v. BLM*,
    870 F.3d 1222 (10th Cir. 2017)...................................................................54

*WildEarth Guardians v. Conner*,
    920 F.3d 1245 (10th Cir. 2019)...................................................................50

*WildEarth Guardians v. EPA*,
    770 F.3d 919 (10th Cir. 2014).....................................................................23

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008).........................................................................................3

**Statutes**

5 U.S.C. § 704...................................................................................................31

28 U.S.C. § 1291 .................................................................................................2

28 U.S.C. § 1331 .................................................................................................2

30 U.S.C. § 187...................................................................................................5

30 U.S.C. § 226(g)..............................................................................................5

42 U.S.C. § 4321 .................................................................................................2

42 U.S.C. § 4332(2)(C) .......................................................................................3

42 U.S.C. § 4332(C) ........................................................................... 3

43 U.S.C. § 1701 ................................................................................ 2

43 U.S.C. § 1701(a)(12) ..................................................................... 4

43 U.S.C. § 1712(a) ............................................................................ 4

43 U.S.C. § 1712(e) ........................................................................ 4, 24

43 U.S.C. § 1732(a) ..........................................................................24

## Regulations

40 C.F.R. § 1502.1 ............................................................................. 3

40 C.F.R. § 1502.22 ................................................................ 37, 38, 44

40 C.F.R. § 1508.27 ..........................................................................49

43 C.F.R. § 1601.0-6 .......................................................................... 4

43 C.F.R. § 1601.0-5(n) ...................................................................4, 5

43 C.F.R. § 1610.5-3(a) ................................................................. 4, 24

43 C.F.R. § 3120.1-3 ......................................................................... 5

43 C.F.R. § 3120.5-1 ......................................................................... 5

43 C.F.R. § 3120.5-3 ......................................................................... 5

43 C.F.R. § 3162.3-1 ......................................................................... 5

43 C.F.R. § 3162.5-1(a) ...................................................................... 6

75 Fed. Reg. 13,910 (Mar. 23, 2010) .................................................. 6

76 Fed. Reg. 20,370 (Apr. 12, 2011) .................................................11

80 Fed. Reg. 59,858 (Oct. 2, 2015) .................................................... 6

87 Fed. Reg. 23,453 (Apr. 20, 2022) .................................................. 3

## STATEMENT OF RELATED CASES

There are no prior or related appeals under Tenth Circuit Rule 28.2(C)(1).

## GLOSSARY

| | |
|---|---|
| the Amendments | Resource Management Plan Amendments for Greater Sage-Grouse |
| APA | Administrative Procedure Act |
| APD | Application for Permit to Drill |
| App | Appellants' Appendix |
| BLM | Bureau of Land Management |
| CEQ | White House Council on Environmental Quality |
| EIS | Environmental Impact Statement |
| FLPMA | Federal Land Policy and Management Act |
| Jonah | Jonah Energy, LLC |
| MLA | Mineral Leasing Act |
| NEPA | National Environmental Policy Act |
| the Project | Jonah Energy, LLC's Normally Pressured Lance Natural Gas Development Project |
| RMP | Resource Management Plan |
| ROD | Record of Decision |
| SA | Appellees' Joint Supplemental Appendix |
| WGFD | Wyoming Game and Fish Department |

**INTRODUCTION**

Petitioners Western Watersheds Project and Center for Biological Diversity challenge the Bureau of Land Management's ("BLM") approval of a plan of development for Jonah Energy LLC's Normally Pressured Lance Natural Gas Development Project ("the Project"). Specifically, Petitioners assert that the Project does not comply with BLM's resource management plan, in violation of the Federal Land Policy and Management Act ("FLPMA"), and that BLM's programmatic environmental impact statement for the Project did not adequately consider potential effects on pronghorn migration and sage-grouse winter habitat, in violation of the National Environmental Policy Act ("NEPA").

The district court correctly denied the petition. BLM's decision complied with FLPMA because it authorized the Project alternative that would best avoid impacts to wildlife while also allowing development to proceed. The decision likewise complied with NEPA because BLM reasonably considered the Project's potential impacts on the greater sage-grouse, disclosed that the impacts could be significant, and explained how the programmatic environmental impact statement was not the end of the NEPA process here. Rather, BLM will collect additional information, apply an adaptive management approach, and conduct further site-specific reviews before authorizing on-the-ground actions. Finally, BLM adequately evaluated the Project's effects on pronghorn, as well as potential effects to pronghorn in Grand Teton National Park, located around 90 miles northwest of the Project area. This Court should affirm.

1

## STATEMENT OF JURISDICTION

(A)    The district court had subject matter jurisdiction under 28 U.S.C. § 1331 because Petitioners' claims arise under NEPA, 42 U.S.C. § 4321 *et seq.*; and FLPMA, 43 U.S.C. § 1701 *et seq.*

(B)    This Court has jurisdiction under 28 U.S.C. § 1291 because the district court entered a final judgment resolving all of Petitioners' claims. App-I-22.

(C)    The district court entered that judgment on April 13, 2022. *Id.* Petitioners filed their timely notice of appeal on May 10, 2022. *Id.*

## STATEMENT OF THE ISSUES

1.    Whether BLM reasonably complied with its obligations under FLPMA by authorizing the project alternative that would best avoid or reduce impacts to wildlife while allowing development to proceed.

2.    Whether BLM's analysis of effects on sage-grouse complied with NEPA, where the agency conducted an appropriate analysis of those effects at the programmatic stage and reasonably decided to collect additional site-specific information to guide future site-specific reviews.

3.    Whether BLM's analysis of the Project's effects on pronghorn, including Grand Teton pronghorn, satisfied NEPA, where BLM discussed potential effects to pronghorn and pronghorn migration in detail.

## STATEMENT OF THE CASE

### A.    Statutory background

### 1.    National Environmental Policy Act

NEPA seeks to ensure that federal agencies consider the environmental impacts of "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 15-16 (2008). When an agency determines that a particular action may have significant environmental impacts, it must prepare an Environmental Impact Statement ("EIS") that analyzes a range of reasonable alternatives, including a no-action alternative. 42 U.S.C. § 4332(C); 40 C.F.R. § 1502.1.[1]

The requirement to prepare an EIS is intended to ensure that the agency understands and takes a hard look at the environmental impacts of its proposed action and alternatives to that action, but it does not demand a particular substantive result. *Citizens' Comm. to Save Our Canyons v. U.S. Forest Serv.*, 297 F.3d 1012, 1022 (10th Cir. 2002); *see New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 704 (10th Cir. 2009). In the end, NEPA "merely prohibits uninformed—rather than unwise— agency action." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989).

---

[1] The White House Council on Environmental Quality ("CEQ") revised its NEPA regulations in September 2020 and again in April 2022. *See* 87 Fed. Reg. 23,453 (Apr. 20, 2022). The analyses under review were completed before those revisions, however, so this brief cites the regulations that were in effect before September 2020.

### 2.    Oil and Gas Leasing on Public Lands

### a.    Federal Land Policy and Management Act

FLPMA declares it to be the policy of the United States that public lands be managed "in a manner which recognizes the Nation's need for domestic sources of minerals, food, timber, and fiber from the public lands." 43 U.S.C. § 1701(a)(12). FLPMA further directs BLM, acting on behalf of the Secretary, to manage public lands "under principles of multiple use and sustained yield" unless otherwise directed by law. *Id.* § 1732(a). This "multiple use-sustained yield" requirement involves the "enormously complicated task of striking a balance among the many competing uses to which land can be put." *Norton v. S. Utah Wilderness Alliance* ("*SUWA*"), 542 U.S. 55, 58 (2004).

To achieve those aims, BLM must "develop, maintain, and, when appropriate, revise land use plans," 43 U.S.C. § 1712(a), also known as "resource management plans" or "RMPs." RMPs identify (1) land areas designated for limited, restricted, or exclusive use; (2) allowable resource uses and related levels of production or use; and (3) resource condition goals and objectives to be attained. *See* 43 U.S.C. § 1712(a); 43 C.F.R. § 1601.0-5(n)(1)-(3), (5)-(6). RMPs are subject to NEPA as well. 43 C.F.R. § 1601.0-6.

BLM must ensure that its actions conform to the relevant RMP. 43 U.S.C. § 1712(e); 43 C.F.R. § 1610.5-3(a). But an RMP itself does not generally authorize any on-the-ground actions, which BLM usually authorizes through separate project-specific implementation decisions. 43 C.F.R. § 1601.0-5(n). An RMP, in other words, is

"generally a statement of priorities; it guides and restrains actions, but does not (at least in the usual case) prescribe them." *SUWA*, 542 U.S. at 71.

### b.    Mineral Leasing Act

The Mineral Leasing Act ("MLA"), 30 U.S.C. § 187 *et seq.*, directs BLM to offer federal oil and gas resources for leasing and development, and instructs the agency to "determine reclamation and other actions as required in the interest of conservation of surface resources," *id.* § 226(g).

BLM employs a three-stage decision-making process for managing oil and gas leasing and development on the lands it administers. *First,* it issues a RMP assessing the resources in a given area. 43 C.F.R. § 1601.0-5(n). *Second*, BLM identifies parcels eligible for leasing and holds a competitive lease sale. 43 C.F.R. §§ 3120.1-3, 3120.5-1, 3120.5-3. *Third*, after leases are issued, a leaseholder may submit to BLM applications for permits to drill ("APDs"), which describe specific proposed development activities. 43 C.F.R. § 3162.3-1(c). Before approving any APD, BLM must study the proposed activity's environmental impacts under NEPA. *Id.* § 3162.5-1(a). No surface disturbance may occur before BLM completes its site-specific review and approves the lessee's APD. 30 U.S.C. § 226(g); 43 C.F.R. § 3162.3-1.

Sometimes, proposals for oil and gas development presented to BLM include large tracts of public land. In those cases, a project proponent may decide to submit to BLM a plan of development before it submits any APDs. BLM may then prepare a NEPA analysis for that entire development plan. Lessees with approved and analyzed

plans of development must still submit applications and requests to proceed with on-the-ground activities. 43 C.F.R. § 3162.5-1(a). The APDs and applications associated with those activities are subject to individual NEPA reviews and approvals which may "tier" to the programmatic EIS while addressing site-specific impacts that were not addressed or anticipated in that document. BLM may also decide to require additional mitigation activities at the drill-permitting stage.

### 3.    2015 Wyoming Sage-Grouse Resource Management Plan Amendments

The greater sage-grouse is a ground-dwelling bird dependent on the sagebrush-steppe ecosystem of the western United States. The U.S. Fish and Wildlife Service added the sage-grouse to the candidate species list for potential future protection under the ESA in 2010, 75 Fed. Reg. 13,910 (Mar. 23, 2010); App-III-577, but it removed the bird from candidate the list in 2015 after determining that formal federal protection "was no longer warranted," SA-III-734. Among other things, the Fish and Wildlife Service concluded that regulatory mechanisms developed by BLM and the U.S. Forest Service as well as regulatory plans promulged by the States of Wyoming and Montana to reduce the impacts of non-renewable energy development on the sage-grouse would be "sufficient" to "limit potential population level impacts and support the conservation" of the bird. SA-III-734-35; *see* 80 Fed. Reg. 59,858 (Oct. 2, 2015).

These mechanisms included the "Resource Management Plan Amendments for Greater Sage-Grouse" ("the Amendments"), which BLM issued in September 2015 and

which govern the BLM-managed public lands within the Project area. *See* SA-II-421. The Amendments are goals, objectives, land use allocations, and management actions intended to protect and preserve greater sage-grouse and sage-grouse habitat, consistent with the continued management of those lands under multiple use and sustained yield principles. SA-II-424.

Appendix C to the Amendments includes a set of "required design features" to "ensure regulatory certainty and the conservation" of priority sage grouse habitat. App-II-381. These features range from "[e]ncourag[ing] the installation of perch deterrents on existing facilities," *id.*, to treating weeds to prevent their spread, App-II-383, to amending soil to expedite reclamation after drilling is complete, App-II-384. Relevant here, one of the listed design features generally directs BLM to "[a]pply a phased development approach with concurrent reclamation" in sage-grouse priority habitat. App-II-383.

The Amendments instruct BLM to "[i]nclude from" the list of design features and best management practices "those that are appropriate to mitigate effects from the approved action." App-II-381. The document also says BLM may decide not to apply a particular design feature to a project or activity if the feature does not apply, or if BLM's NEPA analysis reveals that an "alternative [design feature], a state-implemented conservation measure, or plan-level protection" provides equal or better protection, or that a specific design feature "will provide no additional protection" to the sage-grouse or its habitat. *Id.*

**B.    Factual background**

**1.    Proposed Project**

In 2010, Jonah's predecessor submitted to BLM for review a plan to expand natural gas development operations on a series of oil and gas leases it holds on 140,859 acres of public, State, and private lands in Sublette County, Wyoming. App-III-618-19, 622; SA-III-644-45. Jonah's proposed plan of development involved "drilling up to 3,500 directionally drilled wells during a 10-year development period at a rate of up to 350 wells per year." App-III-618, 630.

Approximately 96 percent of the Project area is on BLM-administered public lands. App-III-618. Grand Teton National Park is located about 90 miles northwest, *see* SA-IV-986, and the area is bordered to the north and northeast by two other large-scale oil and gas development projects, App-III-546, 550 (identifying the Jonah Infill Development Project and Pinedale Anticline Projects). The Project area has been in development since 1997 at a rate of approximately three new wells per year from single or multi-well pads (55 producing gas wells total), along with associated infrastructure, including roads, electric transmission lines, and wells. SA-III-731-32, 768-70; *see* SA-IV-987 (map).

Disturbance from this existing development covers just under 1,600 acres (just over 1 percent) of the 140,859-acre Project area. App-III-618. The additional disturbance associated with the Project would cover an additional 4,700 or so acres— about 6,300 acres in total, and less than five percent of the total Project area—over the

8

Project's 40-year life. App-III-618, 621; *see* App-III-546 (explaining that the Project will include a 10-year development phase concurrent with a 40-year production phase).

Sage-grouse inhabit the Project area year-round. App-III-685; SA-IV-801-02, 810-18. The Project area includes approximately 48,036 acres of sage-grouse "priority habitat management area," 27,292 acres of officially delineated sage-grouse "winter concentration areas," and ten occupied "leks," or communal breeding areas. App-III-685; SA-III-715-16, 768; *see* App-III-756 (map identifying sage-grouse habitat). Sage-grouse priority habitat management areas are those key to maintaining or increasing sage-grouse populations and include migration or connectivity corridors as well as breeding and brood-rearing habitat. SA-II-425. Winter concentration areas are formally delineated by the Wyoming Game and Fish Department ("WGFD"), the agency responsible for managing the state's wildlife resources. *Id.*; *see* App-III-656; SA-IV-804-07. They are areas with specific habitat characteristics where large numbers of sage-grouse congregate in the winter. SA-II-427.[2]

Pronghorn are present in the Project area too. *See* App-III-627, 656-57, 753. WGFD manages Project area's pronghorn population as part of the Sublette Pronghorn Antelope Herd, also known as "Herd Unit 401," which included around 31,300 individuals in 2014. App-III-656. The Project area is entirely within the Herd Unit 401

---

[2] References to "winter concentration areas" in this brief refer to those areas formally delineated by WGFD. SA-II-427. These areas do not, however, include all winter habitats used by sage-grouse. *Id.*; *see* SA-IV-919.

management area, which covers nearly 6,846,000 acres across Wyoming. *Id.*; *see* SA-IV-985-86; *see* SA-IV-985-95 (maps). Nearly 105,000 acres of the Project area are pronghorn "spring/summer/fall range," and 35,000 acres are yearlong habitat, which is essential for the long-term viability of the pronghorn population. App-III-656.

The Project area also includes three pronghorn "migration routes," those "pathways consistently used by wildlife to make seasonal movements between winter and summer ranges." App-III-657 n.35. WGFD biologists identify migration routes with reference to telemetry data collected from radio-collared animals. *Id.* The first migration route in the Project area bisects the western end from north to south, the second ends at the northernmost tip of the analysis area, and the third bisects the eastern end of the analysis area. App-III-657; *see* SA-IV-994 (map identifying pronghorn migration routes).

WGFD distinguishes migration routes from "migration corridors," which are "areas of the landscape that a substantial portion of the herd or herd segment uses consistently to move between seasonal habitats." App-III-657 n.35. WGFD makes the official designation of these migration corridors, and the designation reflects that the area "warrants limitations of human use" for conservation purposes. Wyoming Executive Order No. 2020-1, Appx. B (Feb. 13, 2020). No migration corridors are present in the Project area, but the nearby region does include important migratory habitat, including a migration corridor that leads to Grand Teton National Park. *See*

App-III-657. This corridor is sometimes called the "Path of the Pronghorn." *See, e.g.*, SA-IV-994 (map delineating "Path of Pronghorn").

## 2.     BLM's NEPA analysis

BLM prepared a programmatic EIS to "decide whether to approve, approve with modification, or deny" Jonah's proposed plan of development. App-III-619 (describing Project's purpose and need). The "programmatic-level [EIS] does not identify or analyze site-specific locations for development." SA-III-737-38; App-III-578 (discussing EIS's "programmatic" scope). Instead, it explains the parameters within which future development could proceed to allow "BLM to make future decisions that approve, modify, or deny anticipated permits for Federal natural gas exploration and development" in the Project area. SA-III-715; *see* SA-III-737-38.

### a.     Scoping and draft EIS

The programmatic EIS included substantial public input from the start, beginning in 2011, when BLM held several meetings and collected more than 1,200 comments from the public. SA-II-644; App-III-619; *see* 76 Fed. Reg. 20,370 (Apr. 12, 2011). Through this "scoping process," BLM identified twenty-nine "issue statements" that described concerns it would address during the NEPA process, including one specific to wildlife and wildlife habitat with special focus on sage-grouse and pronghorn. App-III-619-20; SA-III-730-31.

BLM then developed a range of alternatives for consideration and prepared a preliminary draft EIS in 2013 for review by cooperating agencies and other entities,

including the U.S. Environmental Protection Agency, the State of Wyoming (and a variety of state agencies, including WGFD), and the towns, counties, and conservation districts in the Project area. SA-III-690 (identifying cooperating agencies); SA-III-730 (discussing interagency coordination); SA-IV-870 (discussing coordination with the U.S. Fish and Wildlife Service). BLM then released a draft EIS in 2016 that further refined Project alternatives and accounted for the adoption of the Amendments. SA-III-730-31, 868. It sought public comments on the draft. *Id.*

### b.     Final EIS

After considering public comments, BLM released a final EIS in June 2018. *See* SA-III-691-713. The EIS evaluated four alternatives in detail: the proposed action alternative, a no-action alternative, and two other action alternatives: A and B. App-III-572-74, 630-54; SA-III-728-56.

Proposed action alternative. Under the proposed action alternative, Jonah could drill up to 3,500 wells across a 140,859-acre area during a ten-year development period. App-III-573, 630. Consistent with state guidance and the Amendments, Jonah would construct an average of at most one well pad every 640 acres in sage-grouse priority habitat management areas and four pads every 640 acres outside those areas. Jonah would use "multi-well pads," which means the company would develop up to 64 wells from each pad. *Id.*

No-action alternative. This alternative analyzed the environmental impacts if BLM were to deny approval of the proposed Project. App-III-622; SA-III-740-45.

Under this alternative, BLM would deny Jonah's application related to the Project writ-large, but Jonah's leases would remain valid, and federal oil and gas resources could be developed on an individual-lease basis through the submittal and review of APDs, as has occurred since 1997. SA-III-740.

Action Alternative A. BLM developed Alternative A to address sensitive wildlife resources identified during scoping and the alternatives development process. SA-III-728-29, 746-55; App-III-631-39. Under this alternative, Jonah would still drill up to 3,500 wells, but development would occur in three phases across seven development areas. App-III-631, 635-37; SA-IV-988-89 (maps). The development area boundaries were drawn based on the distribution of sensitive wildlife habitats, the location of existing oil and gas units, and other resources and landscape features. App-III-631. Applicable resource protection measures would vary depending on the area being developed. *See* SA-III-750-55.

Action Alternative B. Alternative B was BLM's preferred alternative and the alternative ultimately selected in the ROD. SA-III-729-30; App-III-640-52. Unlike the density and development limits in restrictions in Alternative A, which were based mostly on protecting habitat for sensitive species, the restrictions in Alternative B were intended to conserve a broader range of resource values—including wildlife habitat, visual resources, and other natural features—while "focusing development in the least environmentally sensitive areas." SA-III-729, 755.

Under this alternative, Project activities would be divided into three regional "development areas," each with its own development prescriptions. Specific density, activity, and timing restrictions would apply to each development area. App-III-623; *see* App-III-752 (development areas map).

Development area 1 would cover about 27 percent of the Project area and have an average of one disturbance (for example, a well pad, road, or other facility) per 640 acres to protect sage-grouse winter concentration areas, big game habitat, water features, and other natural resources. App-III-645-46. Development area 2 would cover about 39 percent of the Project area and would include development at a density of up to four disturbance locations every 640 areas. App-III-646. Development area 3 would cover about 34 percent of the Project area and include sage-grouse priority management habitat, as well as other wildlife habitat. App-*Id.* Development in this area would be limited to a density of one disturbance, not exceeding 32 acres, every 640 acres. *Id.*

The EIS also studied two sage-grouse "development scenarios" for Alternative B specific to potential development in winter concentration areas. *See* App-III-554-56, 623, 641-43, 719-22. Development scenario 1 incorporated current guidance and direction for sage-grouse winter concentration areas established by the Amendments and the State of Wyoming. App-III-623; *see, e.g.*, App-III-777-89 (State of Wyoming Executive Order 2015-4, *Greater Sage-Grouse Core Area Protection*). Namely, surface disturbing and other disruptive activities in designated sage-grouse winter concentration areas would be prohibited from December 1 to March 14. App-III-642. BLM explained

that these "strategies" were "found to provide sufficient regulatory mechanisms to limit potential population level impacts and support the conservation of" sage-grouse. SA-III-734-35.

Development scenario 2 provided "additional protection measures that could be applied if determined necessary based on study results in appropriate review of site-specific applications." App-III-554. In addition to the timing restrictions associated with development scenario 1, development scenario 2 would also require development to be "phased from east to west" in designated winter concentration areas; power lines in those areas would be buried, where feasible; surface disturbance in winter concentration areas would not exceed 32 acres every 640 acres; and above-ground facilities would be centralized to locations outside winter concentration areas, where feasible. App-III-555-56, 642-43.

The EIS also included extensive discussions of the Project's potential effects on sage-grouse and sage-grouse habitat under each alternative. App-III-658-63, 684-89; SA-IV-989 (map depicting sage-grouse habitats in the Project area); SA-IV-991-92 (sage-grouse habitat maps specific to Alternatives A and B). Direct effects to sage-grouse identified in the EIS included an increase in accidental mortality due to human activity and development, and a decrease in chick survival rates close to development and production activities. App-III-685. Other effects included a "[d]ecreased quantity of suitable breeding, wintering, and foraging habitat" during development, long-term disturbance associated with the presence of permanent facilities, a "[d]ecrease in or

degradation of seasonal habitats, including lek sites and wintering areas," increased habitat fragmentation, and increased predation. App-III-685-86.

The EIS described the Project's potential effects on pronghorn as well. App-III-656-57, 696-98. BLM recognized that potential adverse impacts could include "permanent displacement from seasonal habitat," and "disruption of migration routes, especially in areas outside" sage-grouse priority habitat management areas. App-III-653. Pronghorn would also likely experience mortalities from vehicular collisions due to increased traffic, as well as habitat fragmentation and loss, and increased avoidance and displacement of existing habitat. *Id.* As explained in more detail below in Part III, BLM also studied the Project's potential effects on pronghorn migration both within and outside the Project area, explaining that Project activities could adversely impact migration but also acknowledging that those effects could be mitigated as the Project proceeds. App-III-656-57, 673-76; *see* SA-IV-994 (identifying pronghorn migration routes within the Project area).

### 3.    2018 Record of Decision

In August 2018, BLM issued a Record of Decision ("ROD") memorializing its selection of Alternative B with the two different sage-grouse development scenarios described above. App-III-547. With the ROD in place, Jonah "can submit APDs and related [rights-of-way] for as many as 3,500 natural gas wells, associated infrastructure and ancillary facilities, resulting in up to 350 wells site-specifically approved per year during the approximate 10-year development period." *Id.*; *see* App-III-571. It may also

seek authorization to construct up to 11 facilities designed to separate and store liquids from the natural gas stream ("regional gathering facilities"), as well as up to 38.6 miles of new powerlines, 205 miles of pipelines, 205 miles of roads, and 15 miles of water pipelines. App-III-559-62, 563.

Specific locations for these facilities remain to be determined, App-III-599-62, 563, but the ROD sets some parameters. Regional gathering facilities, for example, must be constructed in the "most densely drilled" parts of the Project area, and within a three-mile radius of well pad clusters. App-III-559. New pipelines will be located next to new or existing access roads in a combined 100-foot-wide construction corridor, and new roads will share that corridor whenever possible. App-III-560-61.

In total, the ROD approved the parameters for up to 5,874 acres of short-term disturbance and up to 1,741 acres of long-term disturbance. App-III-547. None of this disturbance will occur, however, until Jonah submits the necessary APDs and applications for rights of way and BLM prepares appropriate environmental reviews. App-III-547, 570-71. These reviews may, in turn, result in the imposition of additional terms, conditions, mitigation measures, and conditions of approval. App-III-547; *see, e.g.*, App-III-571 ("This ROD does not authorize site-specific construction, maintenance, or use of new wells, pads, pipelines, roads, transmission lines or other facilities on BLM-administered lands."); *id.* ("BLM will require site-specific environmental review and approval of such applications prior to initiation of surface-disturbing activities."); App-III-547 ("Prior to any Project-related operations occurring

17

on public lands other than casual use, required applications must be submitted to and considered by the BLM as part of the requirements set forth for APDs and [rights-of-way].”); SA-III-720 (explaining APD process).

Before any development occurs, moreover, BLM will collect additional research on winter concentration areas to inform its reviews of Jonah's APDs. App-III-688. That research is currently underway and BLM has approved no on-the-ground disturbance in winter concentration areas to date. Once the research has been gathered, the ROD allows BLM to review proposals to conduct “limited development,” which, if authorized, BLM will study to “better understand the impacts of developing in” winter concentration areas. App-III-554, 574. BLM will decide via that limited development study whether to apply the additional suite of sage-grouse protection measures identified in “scenario 2,” including phasing in designated winter concentration areas and restrictions on the placement of various facilities. App-III-555; *see supra* pp.14-15.

The ROD also identified a series of resource protection measures from the Amendments that will apply to the Project as a whole. App-III-552-57. In addition to the density restrictions described above, BLM also restricted the timing of ground-disturbing activities and their distance from sage-grouse leks. App-III-552-57. In priority habitat management areas, for example, no surface occupancy or surface-disturbing activities may occur within a 0.6 mile radius of the perimeter of occupied sage-grouse leks. App-III-552. No surface disturbing or disruptive activities may occur in those areas between March 15 and June 30 each year to protect sage-grouse breeding,

nesting, and early brood rearing habitat. *Id.* Outside priority habitat managements areas, occupancy and disturbance may occur no closer than 0.25 miles from occupied leks, and seasonal restrictions in breeding, nesting, and rearing habitat will apply within two miles of occupied leks. *Id.*

The mitigation measures BLM studied were intended to "provid[e] a net conservation gain to the" affected species both on and offsite. SA-III-736-37; *see also* SA-IV-856-6; 7App-III-565-70, 587-616. BLM also plans to take an "adaptive management" approach to "address[] and respond[] to unintended negative impacts to sage-grouse and its habitat before consequences become severe or irreversible." SA-III-737. Further mitigation measures will also be developed and required during the still-to-come APD review process. SA-III-688; App-III-570-71, 610.

## C.    Procedural history

In April 2018, before BLM issued the ROD at issue here, Petitioners sued BLM in the District of Idaho to challenge a collection of oil and gas leasing policies and actions that allegedly affect the habitat of the greater sage-grouse. *See Western Watersheds Proj., v. Zinke,* Case No. 1:18-cv-187-REB (D. Idaho filed Apr. 30, 2018). The State of Wyoming and Jonah intervened to defend BLM's actions.

In July 2019, the District of Idaho severed all claims related to the Project and transferred them to the District of Wyoming. App-I-15. After Petitioners successfully moved to supplement the administrative record, *see* App-I-88-105, they filed the amended petition for review at issue in this case challenging the ROD, App-I-23-30.

In April 2022, the district court denied the petition and affirmed BLM's ROD. App-I-201-47. Specifically, it held that BLM complied with FLPMA, rejecting Petitioners' assertion that BLM failed to ensure the Project complied with the Amendments. App-I-243-46. The court recognized that "[u]nder the 2015 RMP, the BLM did not need to implement phased development if analysis showed there were better site-specific conditions." App-I-244 (citing SA-IV-1023). BLM considered phased development when it studied Alternative A, but it ultimately decided to select Alternative B, which "more closely aligned with the purpose and needs of the project." *Id.* (citing App-III-576).

The court also recognized that there would be additional opportunities to mitigate impacts to sage-grouse, in compliance with the relevant RMP. App-I-244-45. Indeed, BLM plans to apply appropriate required design features from the 2015 RMP during its review of site-specific APDs. *Id.* As a result, BLM's decision not to proceed with a phased or paced alternative at the programmatic stage was consistent with the relevant RMP. App-I-245-46.

The court also disagreed with Petitioners' contention that BLM had not adequately considered the Project's effects on sage-grouse winter concentration areas under NEPA. App-I-236-43. It concluded that these arguments were sufficiently identified during administrative proceedings, App-I-236-38, but held that they were meritless because BLM had indeed taken a hard look at the Project's effects on sage-grouse, App-I-238-43. The agency described the information available to it, identified

additional data it could collect, explained how it would do so, and described the measures it would take to limit impacts in the interim. *Id.* Because BLM "made an informed decision based on the available data," it complied with NEPA. App-I-242.

The court also rejected Petitioners' assertion that BLM failed to consider the Project's impacts on pronghorn migration, specifically the Path of the Pronghorn. App-I-226-31. It recognized that the EIS "did consider the potential adverse impacts to pronghorn," including effects on the pronghorn's winter migration and the fact that the Project would likely displace or disrupt migration. App-I-228, 230. The agency did not need to use the term "Path of the Pronghorn" to "demonstrate it adequately considered important migratory routes." App-I-229. This appeal followed.

## SUMMARY OF ARGUMENT

The district court correctly concluded that Petitioners' challenges under both FLPMA and NEPA lack merit. This Court should affirm.

1.     The district court correctly rejected Petitioners' FLPMA arguments. BLM evaluated a formal phased alternative and reasonably explained its decision not to proceed with that alternative. Although the Project alternative that BLM approved did not include formal phasing, it included other features designed to achieve the same benefits. Further, BLM's approval of the Project at the programmatic level does not preclude it from requiring phasing when it considers whether to authorize future site-specific development.

2.      As required by NEPA, BLM took a hard look at the Project's potential effects on sage-grouse and sage-grouse winter concentration areas. The agency summarized the existing scientific evidence relevant to possible impacts on wintering sage-grouse, evaluated impacts based on the available data and research, recognized the limits of that evidence, stated the relevance of additional information it would like to gain before authorizing more than limited development, and explained how it would study that development to inform future site-specific reviews. That analysis suffices at this programmatic stage of review, and BLM's plan to collect additional site-specific information before authorizing site-specific development was reasonable.

3.      BLM's analysis of the Project's potential effects on pronghorn and pronghorn migration in the broader region also complied with NEPA. BLM evaluated the effects on pronghorn within a reasonable region and with reference to standards and guidelines set forth by WGFD, the state agency responsible for managing the relevant pronghorn population. Although BLM studied those effects at a higher level of generality than Petitioners' would have preferred, the record adequately addresses effects to the specific populations and migration patterns of interest to Petitioners. Likewise, BLM adequately addressed impacts to the broader region, considering effects to recreational interests and Grand Teton National Park where appropriate.

For those reasons, the district court correctly denied the petition, and that decision should be affirmed.

## STANDARD OF REVIEW

This Court's review of the district court's legal conclusions on summary judgment is de novo. *See Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs,* 702 F.3d 1156, 1164-65 (10th Cir. 2012).

The Court reviews BLM's compliance with NEPA and FLPMA under the deferential standard of the Administrative Procedure Act ("APA"). *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 704, 713 (10th Cir. 2009). This Court "will not disturb an agency action unless the agency 'relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.' " *WildEarth Guardians v. EPA*, 770 F.3d 919, 927 (10th Cir. 2014) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

## ARGUMENT

### I.    BLM complied with FLPMA and the Sage-Grouse Amendments.

Petitioners first argue that BLM erred by failing to apply a design feature requiring phased development and concurrent reclamation in sage grouse priority habitat without demonstrating that an exemption applied. Opening Brief at 42-49. Because BLM considered the phased development approach discussed in the

Amendments and reasonably explained why that approach would not be appropriate at the programmatic stage, the district court correctly rejected this argument, App-243-46.

FLPMA directs BLM to "manage the public lands . . . in accordance with [its] land use plans," including RMPs, 43 U.S.C. § 1732(a), *see id.* § 1712(a); 43 C.F.R. § 1610.5-3(a), and BLM complied with FLPMA by incorporating all appropriate design features requirements from the Amendments into its Project approval decision. As noted above at p.7, Appendix C to the Amendments provides a list of around 90 "required design features" and "best management practices" for "certain activities in greater sage-grouse habitat" and directs BLM to include in its project approval "those that are appropriate to mitigate effects." App-II-381. One of these design features describes a "phased development approach with concurrent reclamation." App-II-383.

Crucially, not all of these required design features must be implemented for every project. The Amendments expressly provide that BLM must include only those design features "that are appropriate to mitigate effects from the approved action." App-II-381. Petitioners do not dispute that BLM need not apply a particular design feature if it determines that "[a]n alternative [required design feature], a state-implemented conservation measure, or plan-level protection" will "provide equal or better protection for [sage-grouse] or its habitat." *Id.* Nor must BLM include a particular design feature or practice if "[a] specific [required design feature] will provide no additional protection to [sage-grouse] or its habitat." *Id.*

Here, BLM reasonably concluded that formal phasing would not be appropriate at the programmatic stage after considering phased development both informally and formally. During the informal NEPA scoping process, for example, BLM considered a "paced development" alternative that would have analyzed a range of development paces "including 22 percent, 36 percent, 75 percent, and 100 percent of the development proposed in the Proposed Action." SA-III-756. BLM eliminated this alternative from further study after determining that "lower paces of development may not be technically or economically feasible." *Id.*

BLM then formally considered a phased alternative in the final EIS—Alternative A. As explained above at p.13, Alternative A divided the Project area into seven development areas and evaluated the Project's effects if development were to proceed in phases, with only portions of each development area being developed at any one time. App-III-631, 635-37; *see* SA-IV-988 (map identifying development areas); SA-IV-989 (map identifying sage-grouse priority habitat within development areas).

BLM decided not to proceed with Alternative A, however, after concluding that Alternative B would "best avoid or reduce impacts to sensitive resources while still allowing for recovery of natural gas and condensate resources." App-III-576. Alternative B as currently authorized—that is, with sage-grouse development scenario 1—does not include strictly phased development, but it is structured to "incentivize development in less environmentally sensitive areas." App-III-548. It also prohibits ground-disturbing activities throughout priority habitat management areas and within

25

two miles of occupied leks or lek perimeters outside the priority habitat management area from March 15 to June 30 to protect sage-grouse breeding and rearing. App-III-552.

BLM's decision does not preclude it from requiring phasing, as appropriate, when it reviews Jonah's APDs. App-III-554 (explaining that BLM will "apply appropriate required design features identified in the [Amendments] as Stipulations/Conditions of Approval (COA)/Terms and Conditions" as applicable); App-III-610 (confirming that BLM will apply "additional appropriate mitigation" and "appropriate required design features"); SA-III-576, 608 (similar). This approach is consistent with the Amendments, which recognize that "the applicability and overall effectiveness of" each design feature "cannot be fully assessed until the project level when the project location and design are known," and explain that "site-specific circumstances" may dictate whether and how particular features apply. App-II-381; *see* SA-IV-906 (similar); *see also* SA-III-688 (recognizing that required design features may be applied at the APD stage too).

No matter which development scenario applies and which measures are incorporated as the Project is implemented, Project activities will be subject to interim reclamation requirements intended to "restore habitat, visual, and forage function on those portions of the disturbed area not needed for production operations for the life of the well(s) and facilities or until final reclamation is initiated." SA-III-641; *see* SA-III-641-43. For example, Jonah must stabilize work sites and facilitate soil retention and

seeding in disturbed areas, even if the areas may be needed for future planned operations. App-III-595. It must also "reclaim each disturbed area as soon as possible" and conduct re-seeding prior to the next growing season. *Id.* Abandoned sites "must be satisfactorily rehabilitated . . . in accordance with a plan approved by BLM." *Id.* In short, even though Alternative B currently includes no formal phasing requirement, the Project area will not be in development all at once.

Petitioners argue that BLM's approach violated the Amendments, Opening Brief at 42-49, but they seek to hold the agency to a standard mandated by neither the Amendments nor FLPMA. Petitioners construe the Amendments to require BLM to include each of the 90 listed design features in a Project approval unless BLM makes a specific finding that a particular feature does not apply to the activity or that another conservation measure provides equal or better protection. Opening Brief at 43, 45-46 (referencing the "exemption criteria"). That argument is both forfeited and incorrect.

Petitioners have forfeited their argument that BLM allegedly erred in failing to make a discrete finding because they did not raise this argument in comments to the agency. To preserve claims for future litigation, parties who object to agency actions must structure their participation in the administrative process in a way that "allow[s] the agency to give the issue meaningful consideration." *DOT v. Public Citizen*, 541 U.S. 752, 764 (2004) (citing *Vermont Yankee Nuclear Power Corp. v. NRDC, Inc.*, 435 U.S. 519, 553 (1978)). The issue exhaustion rule "serves the twin purposes of protecting

administrative agency authority and promoting judicial efficiency." *McCarthy v. Madigan*, 503 U.S. 140, 145 (1992).

Petitioners submitted hundreds of pages of comments and studies to BLM, but none of Petitioners' comments faulted BLM for failing to make a particular finding that the phased-development design feature does not apply. App-I-264-69; App-II-460-64, 490-509; SA-II-445-98; SA-III-555-74. The closest *any* comment came to requesting a specific finding was a comment from the National Wildlife Federation suggesting that BLM should "require a greater degree of sequential development" in Alternative B. SA-III-576 (line 141). BLM responded that it was considering a phased development plan as Alternative A and further stated that the agency could further consider phased development during site-specific permitting. *Id.* ("Additional analysis of delineation and development would be conducted during site-specific permitting.").

The district court erred when it rejected BLM's forfeiture defense after concluding that Petitioners' argument fell under the exception for those flaws "so obvious there is no need for a commentator to point them out." App-I-238 (citing *Public Citizen*, 541 U.S. at 765). As the district court saw it, "BLM was already aware of the need to comply with FLPMA and contemplated this independently." *Id.* This capacious interpretation of the obviousness exception cannot be right. If identifying an agency's need to comply with a statute were enough to preserve a party's ability to raise all specific failures in subsequent litigation, the exhaustion rule would have no force. At least *some* level of specificity is required. *See Public Citizen*, 541 U.S. at 764 (requiring

"particular objections"). Further, any error BLM committed here was hardly obvious, since the district court itself proceeded to confirm that BLM in fact complied with its statutory obligations. App-I-243-46.

In any event, Petitioners misconstrue the Amendments. The relevant portion of the Amendments says only that BLM's NEPA analysis should "demonstrate" that an alternative design feature, state-implemented conservation measure, or plan-level protection will provide sufficient protection, and it simply instructs BLM to include those features it deems appropriate to mitigate the approved action's effects. App-II-381. BLM is not obligated to spend limited agency resources making specific findings for each of the 90-odd design features listed in Appendix C, and its application of its own RMP was reasonable here.

Petitioners' reference to the standard of review in APA cases, Opening Brief at 45-46, does not show otherwise. To be sure, an agency must "examine the relevant data and articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. But that standard does not require the agency to make specific findings or to describe its rationale in minute detail along the way, and courts may not impose procedural requirements above and beyond those mandated by statute. *Vermont Yankee*, 435 U.S. at 543-44. The bottom line for purposes of APA review is whether the agency's path can be "reasonably discerned." *Sierra Club, Inc. v. Bostick*, 787 F.3d 1043, 1061 (10th Cir. 2015). Here, the record provides ample support for BLM's decision not to select

Alternative A or otherwise require phased development as part of its Project-level approval.

Regardless, as described above, BLM evaluated phased development in its study of Alternative A, and it explained why it decided not to adopt that alternative in the ROD. It also confirmed that the approved Project would protect the sage-grouse using other measures. *See supra* pp.14-15, 25-26; App-III-576 (confirming that Alternative A would "best avoid or reduce impacts to sensitive resources while still allowing for recovery of natural gas and condensate resources"); *see also, e.g.,* App-III-552-57, 608-10, 645-47; SA-III-734-37. The agency was not obligated to adopt the phasing measure once it concluded that another alternative would protect sensitive resources while also advancing other important interests.

The pre-decisional documents cited by Petitioners, *see* Opening Brief at 42-44, also do not help them. One of the documents is a BLM chart prepared early in the Project design process identifying applicable design features and asking Jonah to explain whether they were included in the Project, and, if not, why not. App-I-282. The header for the document explained that "[t]here are legitimate reasons why a [design feature] may not be part of the Proposed Action," and provided a few example reasons. *Id.* The document further explained that if Jonah viewed a particular measure as "impractical," then it had to explain its rationale in further detail. *Id.*

This document was plainly not a formal interpretation of the Amendments and does not create a legally binding standard. It is not even a final agency decision. And

because BLM did not reject the formal phased alternative (Alternative A) as impractical, *see* App-I-287 (confirming that "phasing can be accomplished"), the document does not support Petitioners' suggestion that BLM somehow ran afoul of its own standards. Opening Brief at 43-44. If the document has any relevance at all, it would only be to confirm that the design features do not always apply.

Petitioners also assert that BLM ultimately "relied on an improper factor" when it decided not to proceed with phased development because a BLM employee sent an email to his team in 2015 stating that he had been told the land use plan's design features were "discretionary." Opening Brief at 47 (citing II-App-322-23). The employee's statement is accurate: BLM is not required to implement phased development in all circumstances. SA-IV-1023; *see SUWA*, 542 U.S. at 56.

More to the point, this informal discussion in an email sent three years before the ROD was signed was not the basis for the agency's final decision, as Petitioners contend. The ROD explains that BLM adopted Alternative B—and not a formal phased development alternative—because Alternative B would "best avoid or reduce impacts to sensitive resources while still allowing for recovery of natural gas and condensate resources." App-III-576. It says nothing about the phased development design feature being "discretionary." Thus, the email is not relevant here. *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 659 (2007) ("The federal courts ordinarily are empowered to review only an agency's *final* action, *see* 5 U.S.C. § 704, and the fact that a preliminary determination by a local agency representative is later overruled at a higher

31

level within the agency does not render the decision-making process arbitrary and capricious.").

Finally, Petitioners fault the district court for concluding that BLM may require phasing when it reviews APDs and other requests to conduct on-the-ground activities. Opening Brief at 49. The district court did not err. To be sure, Petitioners cite two related documents in which BLM identified design features that the agency could apply at the site-specific development stage, and neither said BLM would require phasing. App-I-282-99. But the relevant documents were prepared years before BLM selected Alternative B and signed the Project ROD, and they do not say the specific design features identified for potential inclusion at the APD stage were intended to be exclusive. *Id.* Thus, the district court correctly recognized that BLM could still require phasing in its site-specific authorizations. App-I-244-46; *see* App-III-552 (ROD identifying measures to be applied but confirming that the list is not exclusive); App-III-554, 610; SA-III-576, 608 (recognizing that other features may be added during site-specific permitting).

## II.  BLM's analysis of the Project's effects on sage-grouse winter concentration areas complied with NEPA.

BLM took a hard look at impacts to sage-grouse and sage-grouse winter concentration areas and proceeded appropriately based on the available information. BLM also recognized that additional information may be useful, and it explained that it

would obtain that information before authorizing any on-the-ground development. Thus, the district court correctly held that BLM satisfied NEPA. *See* App-I-238-43.

Petitioners seize upon BLM's prudent judgment as supposed proof that the agency lacked adequate baseline information and erred in authorizing the Project at even a programmatic level. Opening Brief at 49-59. Because BLM's analysis contained sufficient detail to warrant approving the Project and BLM otherwise explained how it would obtain additional site-specific information before approving site-specific development, the district court correctly rejected these assertions.

A.    **BLM carefully considered the Project's effects on sage-grouse and sage-grouse winter concentration areas.**

BLM compiled and included substantial information in the EIS about sage-grouse and sage-grouse habitat in the relevant analysis area, contrary to Petitioners' assertions. Starting with habitat, the EIS recognized that the Project area included 48,036 acres of sage-grouse priority habitat and 27,292 acres of sage-grouse designated winter concentration areas. App-III-685; SA-III-715-16. It clearly identified these areas on maps of the Project area as well. *See, e.g.*, App-III-756; SA-IV-991-95. BLM explained that the Project would also cause the quantity of suitable breeding, winter, and foraging habitats to decrease. App-III-685. Habitat quality would decrease too, at least until Jonah conducts the required reclamation. *Id.* These changes would affect the bird's ability to obtain cover and food. *Id.* BLM explained that the proposed action could have substantial direct effects on sage-grouse too, including "accidental mortality due to

increased human activity, traffic, and equipment," and a "[d]ecrease in Sage-Grouse chick survival rates close to development and production activities." App-III-684-85. Other potential effects included "[d]iminished health . . . because of long-term physiological stress" and "[i]ncreased predation." App-III-686.

The EIS also included discussions specific to winter concentration areas. BLM recognized that winter concentration areas are an "important resource for resident and seasonal Sage-Grouse populations" in the region, and it described research indicating that wintering sage-grouse avoid areas that (1) have high densities of infrastructure; (2) are within 1.9 km of infrastructure; and (3) have high levels of human activities. App-III-688. Sage-grouse near an energy development Project in the Powder River Basin in Wyoming and Montana, for example, avoided areas with otherwise suitable winter habitat due to development. *Id.*

BLM forthrightly acknowledged that the proposed action would "result in development, human activity, and short-term and long-term surface disturbance" within winter concentration areas. App-III-687. And it explained that the loss of sagebrush in even a small area can result in a decline in sage-grouse populations if that loss occurs "within a relatively large portion of suitable wintering habitat." *Id.* Thus, the Project "could increase the likelihood of displacement and abandonment" of sage-grouse from winter concentration areas. *Id.*

BLM further explained that the Project's seasonal timing restrictions would limit impacts in sage-grouse winter concentration areas to a degree. App-III-687-88. As

explained above at pp.14-15, any surface-disturbing and disruptive activities during the development phase—that is, the first ten years of the Project, as contemplated in the ROD—would not be allowed in designated winter concentration areas between December 1 and March 14. App-III-642. BLM noted, however, that additional direct impacts could result during the production stage of the Project, which is expected to last for a total of 40 years. App-III-687-88.

This careful analysis illustrates how BLM appropriately evaluated and disclosed the Project's potential effects at a "programmatic level," based on the available information. *See* SA-III-737-38; *see* SA-IV-823 (reiterating that the "EIS provides a large scale, 'big-picture' level of analysis, as in most cases the exact locations of development and surface disturbance are unknown"). BLM acknowledged, however, "there is limited research" on sage-grouse use of the designated winter concentration areas in the Project area and that "potential impacts on Sage-Grouse resulting from development" in the Project's area's winter concentration areas areas is "not well understood." App-II-374; App-III-688. BLM therefore decided to collect additional site-specific information to inform its future reviews of site-specific activities. *Id.*

This data collection will occur in phases, beginning with the collection of "additional research . . . to better inform the appropriate level of development, potential impacts, and appropriate mitigation in these areas." App-III-688; *see* App-III-553-54, 574; SA-III-739. BLM will then review APDs and authorize some "limited development in winter concentration areas." App-III-554. That limited development will be

35

"conducted so as to provide for new information gathering to inform future site-specific application review" and to "better understand the impacts of development" in those areas. *Id.* BLM will apply what it learns to its review of APDs received after that initial stage of limited development. *Id.* (explaining that "[t]he results of the study, current information available at the time of site-specific permitting, and current guidance at the time of site-specific permitting will inform BLM's understanding of impacts and subsequent development in Winter Concentration Areas" for site-specific reviews).

In sum, BLM evaluated the information available on sage-grouse and decided to authorize the Project at a programmatic level, while generating additional information to inform future site-specific analyses. That decision complied with NEPA, and no more is required at this initial programmatic stage. NEPA does not impose "a requirement that complete information concerning the environmental impact of a project must be obtained before action may be taken." *Jicarilla Apache Tribe of Indians v. Morton*, 471 F.2d 1275, 1280 (9th Cir. 1973); *see, e.g.*, *Nat'l Indian Youth Council v. Watt*, 664 F.2d 220, 226 (10th Cir. 1981) (holding that agency complied with NEPA where it approved project, required ongoing monitoring, and did not consider alternative of delay to allow additional pre-development study). If that were the case, "it is doubtful that any project could ever be initiated." *Jicarilla Apache*, 471 F.2d at 1280.

This is especially true when an agency studies a plan like this one, where authorization will not immediately result in any on-the-ground development, and any

future development will be preceded by further analyses which can be informed by additional data. *See, e.g.*, *Native Village of Point Hope v. Jewell*, 740 F.3d 489, 496-97 (9th Cir. 2014) (holding that agency complied with NEPA because additional information was not necessary at leasing stage and would be gathered at later stages of review); *see also, e.g.*, *Friends of Yosemite Valley v. Norton,* 348 F.3d 789, 800-01 (9th Cir. 2003) (distinguishing between degree of analysis required at the "programmatic level" and the "site specific" approval level); *N. Alaska Env't Ctr. v. Lujan*, 961 F.2d 886, 891-92 (9th Cir. 1992) (similar); *Conner v. Burford*, 848 F.2d 1441, 1447-48 (9th Cir. 1988) (similar).

## B.    Petitioners' counterarguments are unavailing.

Petitioners assert that BLM had to do more, even at this early programmatic stage. Opening Brief at 49-57. These arguments are unavailing.

Most of Petitioners' arguments rely on 40 C.F.R. § 1502.22, a CEQ regulation that tells agencies how to prepare NEPA analyses when essential information is incomplete or unavailable. If the incomplete information is both "relevant to reasonably foreseeable significant adverse impacts" and "essential to a reasoned choice among alternatives," then the agency "shall include the information" in the EIS so long as the overall costs of obtaining it are not exorbitant. *Id.* § 1502.22(a). If the information "cannot be obtained because the overall costs of obtaining it are exorbitant or the means to obtain it are not known," then the agency should summarize other relevant evidence, and include an evaluation of the project's impacts "based upon theoretical approaches or research methods." *Id.* § 1502.22(b).

BLM complied with its regulatory obligations here. It acknowledged that specific information about impacts to sage-grouse winter concentration areas in the Project area could be developed further. App-III-687-89; *see* 40 C.F.R. § 1502.22. It then explained that it would collect additional information before authorizing broad site-specific development in future phases. App-III-553-54, 574, 688. BLM did not conclude that there were "key gaps in its understanding of Winter Concentration Areas," or that additional baseline information was "necessary," as Petitioners assert, Opening Brief at 50, 53. Instead, the agency recognized that additional information would help it analyze proposals to conduct Project activities in those areas when BLM reviews them and explained how BLM would generate that additional information. App-III-688.

The fact that a BLM biologist proposed a study in 2015 to collect additional data about sage-grouse use of the Project area is not proof that BLM lacked "baseline data" or that the information was otherwise "essential to a reasoned choice" among alternatives at this juncture, Opening Brief at 50-52, *see id.* at 57 (citing App-II-466-75). The proposal suggested, for example, using "bird location data, as determined by radio-telemetry" (versus aerial flock counts) to "advance the resolution of mapping" habitats in the area, including winter concentration areas. App-II-467. It also proposed to collect additional information about use of the Project area by birds outside the Project area, as well as sage-grouse "geophagy" (the consumption of soil), which the proposal noted "has not been documented in" the Project area but is likely to occur. *Id.*

The study proposal simply confirms that the information available to BLM when it prepared the programmatic EIS could have been further refined. That is often the case with NEPA analyses. And the fact that BLM could have collected additional, more sophisticated, information about sage-grouse use of winter concentration areas does not mean that it lacked baseline information or that it had to conduct additional studies before approving the Project. "An []EIS is not, after all, a research document." *Town of Winthrop v. FAA*, 535 F.3d 1, 13 (1st Cir. 2008).

Indeed, this Court made that same point in *Lee v. U.S. Air Force*, 354 F.3d 1229, 1244 (10th Cir. 2004). There, plaintiffs argued that existing studies cited in the defendant agency's EIS were "outdated and insufficient," and asserted that the agency had to "conduct[] a contemporary study" before proceeding with the action under review. *Id.* The Court disagreed, reasoning that agencies "must use the best available scientific information when assessing environmental impacts," but that they need not carry out their own studies. *Id.* (internal quotation marks omitted); *see Colo. Envtl. Coal. v. Dombeck,* 185 F.3d 1162, 1172 (10th Cir. 1999) (upholding agency's NEPA analysis in similar circumstances after holding that it "constitute[d] a reasonable, good faith presentation of the best information available under the circumstances"). As the district court correctly put it here, "BLM made an informed decision based on the available data." App-I-242.

Moreover, Petitioners' assertions that BLM had to collect additional information before issuing the ROD rely on speculation about what might happen once the Project's

elements are reviewed and approved at the site-specific level. *See* Opening Brief at 54-55. Petitioners fear the Project will cause "marked declines in local and regional sage-grouse populations," speculate that no restriction on development will be "sufficient to maintain viable populations of sage-grouse," and predict that "by the time BLM has obtained reliable" data, it will be too late to modify its plans. *Id.*

Again, these concerns improperly lump BLM's programmatic approval—the action under review—with site-specific analyses BLM has not yet conducted. Indeed, "the unique impacts of development in these sites," Opening Brief at 57, are exactly the sorts of impacts suited for forthcoming site-specific analyses. Petitioners' speculation that those future analyses will be inadequate does not undermine the analysis presently under review. Indeed, the Court "cannot assume that government agencies will not comply with their NEPA obligations in later stages of development." *Conner*, 848 F.2d at 1448. Plus, BLM's Project-level approval does not preclude it from requiring Jonah to undertake additional mitigation measures or modify its activities at the APD stage to reflect additional information gleaned from forthcoming analyses. *See* App-III-547.

Petitioners rely on *Oregon Natural Desert Ass'n v. Jewell*, 840 F.3d 562 (9th Cir. 2016), *cited in* Opening Brief at 52, to suggest that BLM's analysis was inadequate, but that case is distinguishable on both procedural and factual grounds. There, the Ninth Circuit held that the Department of the Interior's analysis of a wind-energy project violated NEPA because it did not collect sufficient baseline information about potential effects on wintering sage-grouse. *Id.* at 569-71. There, unlike here, no future site-specific

NEPA analyses were planned, and so no analysis could be deferred to facilitate the collection of that information. *See id.*

The Ninth Circuit further held the agency's NEPA analysis arbitrary and capricious because the final EIS "did not report on *any* observations of the [project] site surveying winter sage-grouse us of the area" and thus assumed sage-grouse were absent. *Id.* at 569. Here, however, BLM provided detailed information about the location and extent of sage-grouse habitat within the Project area and in the surrounding area, sage-grouse use of that area, potential direct and indirect effects to sage-grouse, and how the Project could be modified to avoid or mitigate those effects.

The Ninth Circuit's decision in *Northern Plains Resource Council v. Surface Transportation Board*, 668 F.3d 1067, 1084 (9th Cir. 2011), cited in Opening Brief at 53, is similarly distinguishable. The NEPA analysis under review in that case was supposed to address the site-specific effects of a railroad construction project. The court held that analysis's discussion of effects on sage-grouse inadequate because "the only data the [agency] collected was the number of acres of potential sage-grouse habitat" in the project area. *Id.* Here, by contrast, BLM collected substantial information about sage-grouse habitat in the Project area, identified those areas on a map, and explained how they would be affected under a variety of possible development scenarios. As the district court put it, "BLM here relied on substantially more data than the Board in *Plains Resource Council.*" App-I-243 n.21.

Petitioners' argument that BLM suddenly modified its approval to allow full development to proceed concurrently with the planned studies, *see* Opening Brief at 54-55, is incorrect. As explained above, BLM will not process any APDs until it collects at least some additional research, and after that, App-III-688, it will process APDs for only "limited development" that will be "conducted so as to provide for new information winter concentration areas," App-III-554. Even if the EIS could have included more detail on the different sorts of planned analyses, that level of detail was not required by NEPA. Likewise, that BLM at one time considered deferring all development in designated winter concentration areas until additional information could be gathered is no "admission that it could not properly weigh the Project's impacts" or otherwise identify "appropriate development scenarios or mitigation options," as Petitioners assert, Opening Brief at 54. BLM reasonably decided to use a different approach after reviewing comments on the draft EIS. *See* App-III-554, 641; SA-II-515-16, 918-19.

Petitioners' remaining arguments are also unavailing. Petitioners fault BLM for "fail[ing] to establish that it could not collect the missing information," Opening Brief at 57 (capitalization altered), but BLM was under no obligation to explain a conclusion it did not draw. BLM did not say it could not collect additional site-specific information about sage-grouse; instead, it said it *would* collect additional information, and it would use that information to inform future site-specific analyses. What specific information to collect in its forthcoming analyses, moreover, is for the expert agency to decide. *San*

*Juan Citizens All. v. Stiles*, 654 F.3d 1038, 1045 (10th Cir. 2011). Petitioners' assertion that BLM had to do more to comply with the regulations, Opening Brief at 49-57, adopts the same sort of strict reading of § 1502.22(b) that courts have rejected. *See, e.g.*, *See Colo. Envtl. Coal.*, 185 F.3d at 1172-73 ("Congress did not enact [NEPA] to generate paperwork or impose rigid documentary specifications."); *Habitat Educ. Ctr., Inc. v. U.S. Forest Serv.*, 673 F.3d 518, 532 (7th Cir. 2012).

Moreover, Petitioners' reliance on the Braun declaration for the proposition that a study was both technologically and economically feasible, Opening Brief at 58 (citing App-I-44), is misplaced. If Petitioners wanted BLM to conduct the field study referenced in that declaration, then they should have presented that information to BLM during the NEPA process. *See supra* pp.26-27. The cited declaration was submitted not during the NEPA process, but instead for the first time in the district court. BLM cannot be faulted for failing to consider information that was not presented to it, *Public Citizen*, 541 U.S. at 764, nor can it be faulted for failing to consider studies not in the administrative record, *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam) (confirming that APA review is based on the "administrative record already in existence, not some new record made initially in the reviewing court").[3]

---

[3] The district court allowed Petitioners (over Respondents' objection) to supplement the record with that declaration to "address the alleged procedural failures" by BLM, App-I-99, but not to challenge the substance of BLM's decision.

Nor was BLM obligated to "apply theoretical approaches or research methods generally accepted in the scientific community" to "forecast" the Project's site-specific effects on sage-grouse. Opening Brief at 58 (capitalization altered). This language comes from subsection (b) of 40 C.F.R. § 1502.22, which applies only when an agency decides not to collect additional information "because the overall costs of obtaining it are exorbitant or the means to obtain it are not known." *See id.* (explaining that in such a case, the agency should attempt to apply theoretical approaches). Here, BLM explained that it *would* collect additional site-specific information and explained how it would do so, and so this provision does not apply. And again, the Braun declaration does not undermine BLM's analysis. *Contra* Opening Brief at 58. If Petitioners wanted BLM to consider specific studies or use particular analytical methods, it should have informed the agency. *See supra* pp.26-27.

## III. BLM took a hard look at the Project's impacts on pronghorn in compliance with NEPA.

Petitioners next contend that BLM failed to take a hard look at the Project's effects on the pronghorn subpopulation found in Grand Teton National Park. Opening Brief at 59-69. They also assert that this analytical failure prevented BLM from analyzing and disclosing potential harms to the Park writ large, including its ecology, wildlife, and recreational values. *Id.* at 67-69. The district court correctly held that BLM took a hard look at the Project's potential effects on pronghorn and appropriately considered any cumulative impacts within Grand Teton National Park as well. *See* App-I-226-31.

44

### A.    BLM considered impacts to pronghorn as well as measures to mitigate those impacts.

BLM's EIS contains detailed information about the relationship between the Project area and pronghorn habitat. Most of the Project area includes spring, summer, and fall range for the pronghorn, covering around 104,822 acres. App-III-656. The eastern portion of the Project area includes about 15,350 acres of winter or yearlong pronghorn range, and 20,688 additional acres of winter or yearlong habitat are located throughout the north-central portion of the Project area, with additional smaller areas along the Project area's southwestern boundary. *Id.*; *see* SA-IV-990 (map). "Habitats associated with the analysis area are important to pronghorn year-round, including during migration, when large herds of the species" move long distances between seasonal ranges. App-III-657; *see* App-III-673 (similar).

Working with WGFD, Wyoming's wildlife agency, BLM studied direct and indirect effects to the pronghorn within not only the Project area, but also within a one-mile buffer zone. App-III-656. The final EIS refers to this region as the "general wildlife analysis area." *Id.* But BLM did not confine its analysis to those areas; the EIS discussed cumulative impacts to pronghorn far beyond that region as well. *See* SA-IV-844-46 (identifying cumulative impact analysis areas and rationales); SA-IV-994 (pronghorn cumulative impact analysis area map).

Even though the Project area does not include any WGFD-designated migration corridors, App-III-657 n.35; *see supra* pp.10-11, BLM recognized that "[p]ronghorn

radiomarked in the Grand Teton National Park do use the winter ranges within the Project Area." App-III-657. The agency also recognized that pronghorn in the analysis area "make some of the longest seasonal migration movements documented for the species." *Id.* Indeed, the final EIS referenced several studies that recorded seasonal movements between Grand Teton National Park and the Upper Green River Basin of between 72 and 160 miles. *Id.*

The Project area does include migration routes, and BLM ensured that the Project's design protected key migration routes. For example, portions of the big game "crucial winter range and migration routes" in the Project area were included in development area 1—the 38,384-acre part of the Project area with the most substantial limits on development density. App-III-546-47, 645, 755. BLM also explained that, despite these protections, the Project could result in "[d]ecreased or degraded . . . seasonal habitats (including migration routes) that are important in supporting local and regional wildlife populations." App-III-673. These sorts of degradations "are of particular concern for pronghorn due to the presence of crucial winter range within the general wildlife analysis area and the presence of migration routes" connecting that crucial winter range with "other pronghorn habitats in the analysis area and the region." App-III-674.

Given other nearby development, moreover, BLM recognized that pronghorn currently "exhibit high utilization of the Project Area, particularly the southeastern portion, which is predominantly undeveloped." *Id.* Disrupted migration "could prevent

46

herds from reaching high quality forage in the northern portions of the analysis area," resulting in "physiological stresses and the expenditure of greater amounts of energy to reach resources beyond the analysis area." *Id.* BLM further explained that development in "crucial winter range and migration routes could also eliminate the herd's migration memory and break the tradition of migration to the most suitable winter habitats," which would "reduc[e] the viability of pronghorn Herd Unit 401 in perpetuity." *Id.*

BLM committed to working with WGFD, Jonah, and stakeholders to "better understand and, if possible, preserve migration routes in the project area." App-III-674. Jonah also agreed to "avoid activities and facilities that create barriers to the seasonal movements of all big game, including pronghorn." *Id.*; *see also* App-III-713-15, SA-IV-914-16 (discussing mitigation). These additional restrictions and measures would be implemented during the site-specific permitting process. App-III-674; *see* SA-III-608. Potential mitigation measures discussed in the programmatic EIS included installing fencing, SA-IV-910; App-III-608; limiting the number of disturbances allowed in particular areas and the density of those disturbances, SA-IV-914-15; and imposing timing limits that prevent Jonah from conducting any activities or using the surface of big game winter habitat (including pronghorn habitat) between November 15 and April 30 and in birthing areas between May 1 and June 30, SA-IV-915-16. Jonah also agreed to avoid activities in crucial habitats when practicable. *Id.*

This analysis complied with NEPA. The agency explained why it analyzed the Project's effects at the Herd 401 level, and why it studied the geographic area it did. It

identified the different sorts of pronghorn habitat within the Project area, as well as migration routes, and it analyzed and disclosed the Project's potential effects on those areas. It also identified potential mitigation measures and explained how Project activities could be further modified at the site-specific permitting sage. "NEPA does not require that an agency discuss every impact in great detail; it simply requires a reasoned evaluation of the relevant factors." *Forest Guardians v. U.S. Forest Serv.*, 495 F.3d 1162, 1172 (10th Cir. 2007). BLM fulfilled that mandate here.

Petitioners assert otherwise. Opening Brief at 61-67. They contend that BLM gave short shrift to "unique concerns" particular to the Grand Teton herd—a 300-individual subset of Herd Unit 401—evaluated the Project's impacts within an unreasonably constrained geographic area, and otherwise "ignored" concerns raised by the Park Service and the public. *Id.* These arguments miss the mark.

BLM's decision to study impacts to pronghorn within Herd Unit 401 was reasonable. *Contra* Opening Brief at 52. That is the unit level identified by WGFD, the entity responsible for managing the pronghorn population in the State of Wyoming, and the Project area and additional one-mile buffer zone fall entirely within the WGFD's Herd Unit 401 management area. App-III-656. Petitioners wanted BLM to address a specific subset of Herd Unit 401, but it was ultimately up to BLM to identify the appropriate unit of analysis, and its decision to use the same unit of analysis used by the WGFD was reasonable and entitled to deference. *Coal. on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 66 (D.C. Cir. 1987) (recognizing that these sorts of "line-drawing

decisions . . . are vested in the agencies, not the courts"); *see San Juan Citizens All.*, 654 F.3d at 1045 (confirming that agency decisions that "involve technical or scientific matters within the agency's area of expertise" are entitled to deference (citation omitted)).

That BLM did not refer to the "Grand Teton Herd" specifically, moreover, did not prevent it from discussing the effects of concern to Petitioners. BLM acknowledged that pronghorn radiomarked in the Grand Teton National Park use winter ranges in the Project area. App-III-657. It also explained that development in the Project area could affect the pronghorn's "migration memory" and affect its "tradition of migration to the most suitable winter habitats," App-III-674; *see* App-III-657 (recognizing importance of analysis area for long-distance pronghorn migration); App-III-673-74 (referencing impacts both in the local area and in the region more broadly). BLM did not need to use specific terms in its analysis, and any suggestion that it erred in failing to do so is simply flyspecking. *Diné Citizens Against Ruining Our Env't v. Bernhardt*, 923 F.3d 831, 852 (10th Cir. 2019) (distinguishing between "flyspecks" and material NEPA violations); *Citizens for Alternatives to Radioactive Dumping v. U.S. Dep't of Energy*, 485 F.3d 1091, 1098 (10th Cir. 2007).

Petitioners further err in suggesting that BLM had to discuss in its NEPA analysis the "intensity" or "severity" of the Project's effects. *See* Opening Brief at 60, 62-64 (citing 40 C.F.R. § 1508.27). But the regulation to which Petitioners refer does not mandate that agencies include specific references to "intensity" or "severity" when

discussing the impacts of a particular project, as Petitioners assert. Instead, the cited regulation requires agencies to consider those elements to "determine whether the effects of a proposed action on the human environment are significant enough to require an EIS instead of a [finding of no significant impact]." *WildEarth Guardians v. Conner*, 920 F.3d 1245, 1261 (10th Cir. 2019). Because BLM prepared an EIS here, the regulation mandates nothing more.

Next, this case is readily distinguishable from *Utahns for Better Transportation v. U.S. Department of Transportation*, 305 F.3d 1152, 1179-80 (10th Cir. 2002), *modified on reh'g*, 319 F.3d 1207 (10th Cir. 2003). *Contra* Opening Brief at 62, 65, 66. There, the agency's NEPA analysis was held inadequate because the agency evaluated impacts of a highway project on wildlife within only 1,000 feet of the relevant right-of-way. *Id.* The agency's decision to define the zone of analysis so narrowly had scant support in the record and also prevented the agency—by its own admission—from considering the relevant project's effects on migratory birds. 305 F.3d at 1180. The analysis area under review here was far broader, and it did not prevent BLM from discussing effects on pronghorn at all, much less from discussing effects beyond the area's boundaries. *See* SA-IV-844-46, 994.

BLM's analysis was also consistent with comments submitted during the scoping process from the National Park Service. *Contra* Opening Brief at 26-27, 61-65. Those comments explained that the "annual migration of the pronghorn between Jackson Hole and the Green River basin represents the longest terrestrial animal migration event

in the lower 48 states," noted that pronghorn from Grand Teton National Park use the Project area, and said the Park Service "would like the upcoming [EIS] to consider identifying thresholds at which impacts to ungulate populations [like pronghorn] are significant" to "predict potential impacts and guide development of alternatives that minimize such impacts." App-I-262. It further opined that doing so would be "feasible" given existing research. *Id.*

The letter did not, as Petitioners assert, express concern that the "Project had the potential to eliminate the Path of the Pronghorn and extirpate the Grand Teton Herd," Opening Brief at 61. To be sure, the Park Service explained that development in the region "may" prevent pronghorn from returning to Grand Teton National Park each year. App-I-262. But the letter was submitted at the scoping stage and thus could not opine on the Project specifically. And BLM's later EIS showed that it took the Park Service's letter seriously. It acknowledged the importance of the region to seasonal pronghorn migration and expressly stated that pronghorn from Grand Teton National Park use the Project area. App-III-657, 673. It identified and studied alternatives that included restrictions intended to limit impacts to pronghorn migration. App-III-546-47, 645. It explained that impacts could nevertheless be significant, and it described how the impacts could be mitigated. App-III-713-15; SA-IV-914-15. This was consistent with the Park Service's letter and with NEPA's procedural requirements.

Petitioners also suggest that BLM "ignored" or otherwise "disregarded" a request from the Park Service to analyze effects on the Grand Teton Herd specifically,

Opening Brief at 63-64 (citing App-I-261-22), but that request does not appear in the Service's letter. Thus, the cases Petitioners cite for the proposition that BLM's analysis should be invalidated for failing to address relevant comments from a sister agency, *see* Opening Brief at 65, are inapposite.

**B.    BLM did not have to discuss effects on Grand Teton National Park in further detail.**

Petitioners also assert that BLM failed to consider not only the Project's effects on the area's pronghorn population, but also "downstream" indirect impacts on Grand Teton National Park that would result from effects on the pronghorn. Opening Brief at 67-69. Here, Petitioners mention general "recreational and ecological effects," *id.* at 67, effects on native predators, and effects on the "Park's wildlife diversity and scenic landscape," *id.* at 67-68.

Any argument that the Service failed to consider recreational effects beyond those associated with effects on pronghorn, or in greater detail than BLM already did, is undeveloped and thus forfeited here. *See San Juan Citizens All.*, 654 F.3d at 1056. And because these arguments were not presented to BLM during the administrative process, they are forfeited for that reason too. *See McCarthy*, 503 U.S. at 145.

To be sure, the Petitioners urged BLM to consider the Path of the Pronghorn and effects on pronghorn that may move between the Park and the Project area, *see* SA-III-607-10, and they also explained that the Path of the Pronghorn is referenced on local tourism websites, SA-III-610. BLM made clear that the Project could affect

migration, and it explained the nature of those effects. It did not need to articulate specifically that its discussion of effects on migration in the region included Grand Teton National Park in any further detail. As with any NEPA analysis, it is "always possible to explore a subject more deeply and to discuss it more thoroughly." *Coal. on Sensible Transp.*, 826 F.2d at 66. Whether to do so, however, is up to the expert agency preparing that analysis. *Id.*

In any event, BLM considered the Project's potential effects on pronghorn in Grand Teton National Park. As explained above, it recognized that pronghorn that migrate to and can be found within the Park are also found within the Project area and could be affected by Project activities. App-III-657; *see supra* pp.45-47. More generally, BLM explained that the Project could affect visual resources and that people traveling on U.S. Highway 191, located within five miles of the Project Area, "would probably observe project-related facilities," which "could affect the aesthetic quality of their trip." SA-IV-834. "Background views" for users of nearby recreational areas could also be affected, *id.*, and Project activities "could diminish the recreational setting and recreational opportunities" and "tourism-related expenditures" in the area, SA-IV-835; *see* SA-IV-824-83 (discussing recreational impacts). That level of analysis is sufficient.

## IV. Vacatur is not warranted here.

Finally, Petitioners assert that if this Court decides to reverse the district court's judgment, then it should also remand with instructions to vacate the Project ROD and EIS. Opening Brief at 69-70.

Remand with vacatur may be this Court's "typical" remedy in NEPA cases, Opening Brief at 70, but it is not a mandatory remedy. This Court has recognized the difference between asking whether the court "may grant vacatur of" an agency's decision "or if [it] *must . . . do so.*" *WildEarth Guardians v. BLM*, 870 F.3d 1222, 1239 (10th Cir. 2017) (emphasis added). Indeed, "the decision whether to vacate depends on the seriousness of the order's deficiencies . . . and the disruptive consequences of an interim change that may itself changed." *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993); *Utah Env't Cong. v. Richmond*, 483 F.3d 1127, 1140 (10th Cir. 2007) (remanding without addressing vacatur).

BLM's review and approval of the Project complied with both FLPMA and NEPA. But if the Court disagrees, then it should remand to the district court without vacatur to determine the proper remedy. *See, e.g.*, *WildEarth Guardians*, 870 F.3d at 1240 (refusing to vacate where district court "might fashion some narrower form of injunctive relief"). Any error the court might find in BLM's analysis would not necessarily invalidate the agency's entire approval of the Project, and the Respondents should be given an opportunity to present additional evidence on the consequences of vacatur and the current status of on-the-ground activities.

## CONCLUSION

For these reasons, the district court's judgment should be affirmed.

Respectfully submitted,

s/ Sommer H. Engels
TODD KIM
*Assistant Attorney General*

THOMAS W. PORTS
SOMMER H. ENGELS
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice

January 24, 2022
90-1-4-15974

## STATEMENT REGARDING ORAL ARGUMENT

Although BLM defers to the Court's judgment in this matter, it believes that

oral argument will assist the Court in resolving this appeal.

**CERTIFICATIONS**

The foregoing brief complies with Federal Rule of Appellate Procedure 32(a)(7)(B) and Circuit Rule 32 because it is 12,975-words long according to the count of Microsoft Word, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

The type size and typeface comply with Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in Garamond, a proportionally spaced typeface, in size 14-point font.

I further certify that all privacy redactions have been made, and that this electronic submission was scanned for viruses with the most recent version of the Microsoft Defender virus scanning program and is free of viruses.

s/ Sommer H. Engels
SOMMER H. ENGELS

Counsel for Federal Appellees