**CASE NO. 22-8022**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT**

---

WESTERN WATERSHEDS PROJECT, *et al.,*
*Plaintiffs-Appellants*

v.

UNITED STATES BUREAU OF LAND MANAGEMENT, *et al.,*
*Respondents-Appellees*

and

STATE OF WYOMING, *et al.,*
*Respondent-Intervenors-Appellees*

---

On Appeal from the United States District Court for the District of Wyoming
The Honorable Scott W. Skavdahl
Case No. 2:19-cv-146-SWS

---

**APPELLEE STATE OF WYOMING'S OPENING BRIEF**

---

TRAVIS S. JORDAN
D. DAVID DEWALD
Senior Assistant Attorneys General
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, Wyoming 82002
(307) 777-7895
travis.jordan@wyo.gov
david.dewald@wyo.gov

*Counsel for Intervenor-Respondent-
Appellee, State of Wyoming*

**ORAL ARUGMENT REQUESTED**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... iv

STATEMENT OF PRIOR OR RELATED APPEALS.......................................... vii

GLOSSARY OF ABBREVIATIONS, ACRONYMS, AND INTIALISMS........ viii

JURISDICTIONAL STATEMENT ....................................................... 1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ........................... 1

STATEMENT OF THE CASE.................................................................. 2

    I.      Facts Relevant to Issues Submitted for Review.................................. 2

          A.    The Project Area ........................................................... 3

          B.    Wyoming's Management of Sage-Grouse and Pronghorn........ 3

          C.    Facts Relevant to the Sage-Grouse Claims.............................. 5

                1.    Sage-Grouse RMPA Provisions ..................................... 5

                2.    Sage-Grouse WCAs...................................................... 7

          D.    Facts Relevant to the Pronghorn Claims.................................. 9

                1.    Pronghorn Migration ..................................................... 9

                2.    Pronghorn Crucial Winter Habitat................................. 12

    II.     Relevant Procedural History ................................................. 13

    III.    Ruling Presented for Review.................................................. 13

A.     The Bureau's Hard Look at Impacts on Pronghorn ................. 14

B.     The Bureau's Range of Alternatives for Protecting Pronghorn .................................................................................. 15

C.     The Bureau's Hard Look at Impacts on Sage-Grouse ............. 16

D.     The Bureau's Decision Complied with the Sage-Grouse RMPA ...................................................................................... 17

SUMMARY OF ARGUMENT ............................................................. 17

STANDARD OF REVIEW ................................................................... 19

ARGUMENT ......................................................................................... 20

I.     The Bureau's decision complied with FLPMA ................................. 20

A.     The Bureau's Obligations Under the Sage-Grouse RMPA ..... 20

B.     The Bureau properly rejected the phased development alternative ............................................................................... 21

C.     The Bureau explained the exploratory nature of the Project and adopted rigorous reclamation requirements ...................... 25

D.     The District Court did not rely on a post-hoc rationalization ............................................................................ 26

II.     The Bureau took a hard look at impacts to sage-grouse WCAs ........ 29

A.     The Bureau complied with 40 C.F.R. § 1502.22(a) ................ 30

B.    The Bureau complied with 40 C.F.R. § 1502.22(b) ............... 33

III.   The Bureau's pronghorn analysis complied with NEPA .................. 38

A.    The Bureau took a hard look at impacts to pronghorn populations ................................................................ 38

1.    The Bureau's scope was not arbitrary ........................... 40

2.    The Bureau adequately considered impacts in both a local and regional context ........................................... 44

3.    The Project does not implicate the Section 1508.27(b) intensity factors ........................................... 50

4.    The Bureau considered development thresholds for pronghorn habitat ............................................................ 54

B.    The Bureau took a hard look at the indirect impact to pronghorn migrations ................................................. 56

CONCLUSION .................................................................... 58

STATEMENT OF COUNSEL AS TO ORAL ARGUMENT .............................. 60

CERTIFICATE OF COMPLIANCE .................................................... 61

CERTIFICATE OF SERVICE ............................................................ 62

ADDENDUM ........................................................................ 63

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Evans*,
   350 F.3d 815 (9th Cir. 2002) ................................................................58

*Anderson v. Evans,*
   371 F.3d 475 (9th Cir. 2004) ................................................................58

*Ark Initiative v. Tidwell*,
   64 F.Supp.3d 81 (D.D.C. 2014) ..........................................................56

*Biodiversity Conservation All. v. BLM*,
   No. 09-CV-08-J, 2010 WL 3209444 (D. Wyo. June 10, 2010) ........................54

*Colo. Env't Coalition v. Dombeck*,
   185 F.3d 1162 (10th Cir. 1999) ..................................................... 27, 30, 34, 57

*Comm. to Preserve Boomer Lake Park v. U.S. Dep't of Transp.*,
   4 F.3d 1543 (10th Cir. 1993) ...............................................................36

*Custer Cnty. Action Ass'n v. Garvey*,
   256 F.3d 1024 (10th Cir. 2001) ...........................................................23

*Diné Citizens Against Ruining Our Env't v. Klein*,
   747 F.Supp.2d 1234 (D. Colo. 2010).....................................................44

*Earth Island Inst. v. U.S. Forest Serv.*,
   697 F.3d 1010 (9th Cir. 2012) .............................................................24

*Forest Guardians v. U.S. Forest Serv.*,
   495 F.3d 1162 (10th Cir. 2007) ...........................................................24

*Friends of the Wild Swan v. Weber*,
   767 F.3d 936 (9th Cir. 2014) ...............................................................43

*Fund for Animals v. Norton*,
   281 F.Supp.2d 209 (D.D.C. 2003).........................................................58

*Hillsdale Env't Loss Prevention v. U.S. Army Corps of Eng'rs*,
   702 F.3d 1156 (10th Cir. 2012) ................................................. 19, 50, 51

*Idaho Sporting Cong., Inc. v. Rittenhouse*,
 305 F.3d 957 (9th Cir. 2002) ...............................................................40

*Inland Empire Pub. Lands Council v. U.S. Forest Serv.*,
 88 F.3d 754 (9th Cir. 1996) ................................................................41

*Klamath Siskiyou Wildlands Ctr. v. Grantham*,
 424 F. App'x 635 (9th Cir. 2011) .......................................................51

*Kleppe v. Sierra Club*,
 427 U.S. 390 (1976).............................................................................45

*Lindberg v. U.S. Forest Serv.*,
 132 F.Supp.3d 1255 (D. Or. 2015) ....................................................52

*Lujan v. Nat'l Wildlife Fed'n*,
 497 U.S. 871 (1990).............................................................................19

*N.M. ex rel. Richardson v. BLM*,
 565 F.3d 683 (10th Cir. 2009) ...................................................... 19, 40

*N. Plains Res. Council v. Surface Transp. Bd.*,
 668 F.3d 1067 (9th 2011) ...................................................................30

*Norton v. S. Utah Wilderness All.*,
 542 U.S. 55 (2004)...............................................................................21

*Oceana v. Bureau of Ocean Energy Mgmt.*,
 37 F.Supp.3d 147 (D.D.C. 2014)........................................................34

*Powder River Basin Res. Council v. BLM*,
 37 F.Supp.3d 59 (D.D.C. 2014)..........................................................49

*Rags Over the Arkansas River, Inc. v. BLM*,
 77 F.Supp.3d 1038 (D. Colo. 2015)............................................. 30, 33

*San Juan Citizens All. v. Stiles*,
 654 F.3d 1038 (10th Cir. 2011) .................................................... 43, 45

*Sierra Club v. U.S. Forest Serv.*,
 857 F.Supp.2d 1167 (D. Utah 2012)...................................................33

*Theodore Roosevelt Conservation P'ship v. Salazar,*
   605 F.Supp.2d 263 (D.D.C. 2009) ........................................................26

*Trout Unlimited v. U.S. Dep't of Agric.,*
   320 F.Supp.2d 1090 (D. Colo. 2004) ...................................................30

*Utah Shared Access All. v. Carpenter,*
   463 F.3d 1125 (10th Cir. 2006) ...........................................................21

*Utahns for Better Transp. v. U.S. Dep't of Transp.,*
   305 F.3d 1152 (10th Cir. 2002) ................................................... 42, 43

*WildEarth Guardians v. Bernhardt,*
   501 F.Supp.3d 1192 (D.N.M. 2020) ....................................................36

*WildEarth Guardians v. Conner,*
   920 F.3d 1245 (10th Cir. 2019) ...........................................................53

*WildEarth Guardians v. Nat'l Park Serv.,*
   703 F.3d 1178 (10th Cir. 2013) ...........................................................24

*WildEarth Guardians v. U.S. Forest Serv.,*
   828 F.Supp.2d 1223 (D. Colo. 2011) ...................................................37

**Statutes**

Wyo. Stat. Ann. § 23-1-103 ......................................................................3

**Regulations**

40 C.F.R. § 1502.14 ................................................................................27

40 C.F.R. § 1502.14 (2018) ............................................................. 25, 27

40 C.F.R. § 1502.22 (2018) ....................................................... 34, 35, 36

40 C.F.R. § 1508.8 (2018) .......................................................................41

40 C.F.R. § 1508.27 (2018) ................................... 38, 44, 45, 50, 52, 58

43 C.F.R. § 1601.0-5 (2003) ...................................................................22

43 C.F.R. § 1601.0-5 (2017) ...................................................................22

## STATEMENT OF PRIOR OR RELATED APPEALS

There are no prior or related appeals pursuant to 10th Cir. R. 28.2(C)(3).

# GLOSSARY OF ABBREVIATIONS, ACRONYMS, AND INITIALISMS

Administrative Procedure Act........................................................ APA

Density Disturbance Calculation Tool...............................................DDCT

Development Area ....................................................................DA

Environmental Impact Statement.................................................. EIS

Federal Land Policy and Management Act....................................FLPMA

Final Environmental Impact Statement ............................................. FEIS

General Habitat Management Area ...............................................GHMA

National Environmental Policy Act...............................................NEPA

Priority Habitat Management Area...............................................PHMA

Record of Decision...................................................................ROD

Required Design Feature............................................................RDF

Resource Management Plan........................................................RMP

Sublette Herd Unit ........................................................ Herd Unit 401

United States Bureau of Land Management....................................Bureau

Western Watersheds Project, Upper Green River Alliance, and Center
for Biological Diversity .........................................................The Alliance

Winter Concentration Areas .........................................................WCAs

Wyoming Game and Fish Department ...........................................WGFD

Wyoming Sage Grouse Resource Plan Amendments.................sage-grouse RMPA

# JURISDICTIONAL STATEMENT

The Alliance challenged the Bureau's decision under NEPA, FLPMA, and the APA before the United States District Court for the District of Wyoming. (Case No. 2:19-cv-00146-SWS, ECF_15, ¶ 13). The District Court had jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702. On April 5, 2022, the District Court issued an opinion and order affirming the Bureau's decision on all claims. (App.-I-247)[1]. The District Court entered its judgment on April 13, 2022. (App.-I-248–49). The Alliance filed a notice of appeal from the order, opinion, and judgment on May 10, 2022. (App.-I-250–51). Thus, the Alliance filed a timely appeal from a final district court judgment that disposed of all their claims. This Court has jurisdiction over the appeal under 28 U.S.C. § 1291.

# STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

I.  Whether the Bureau complied with FLPMA when it authorized the Project alternative that best avoided and reduced impacts to wildlife while allowing development to proceed.

II. Whether the Bureau's decision complied with NEPA when it identified WCAs within the Project Area, analyzed the impacts on sage-grouse winter

---

[1] Citations to the Appellants' Appendix filed on October 28, 2022 are cited as: App.-Vol. #-page #.

habitat, and reasonably decided to collect additional information to inform future site-specific actions.

III.    Whether the Bureau's pronghorn analysis (including the Grand Teton pronghorn within Herd Unit 401) satisfied NEPA when it discussed the Project's potential impacts to pronghorn and known migration bottlenecks.

## STATEMENT OF THE CASE

## I.    Facts Relevant to Issues Submitted for Review

The Bureau's decision to authorize the Project impacts a broad range of natural resources. (SA-III-719)[2]. This appeal involves questions about how the Bureau's action will affect sage-grouse and pronghorn. (*See* Alliance Br. at 14-15). The Alliance alleges that: (1) the Bureau authorized development within sage-grouse habitat without adequately explaining why it rejected a phased development approach with concurrent reclamation in violation of FLPMA; (2) the Bureau violated NEPA when it decided to conduct future studies on sage-grouse WCAs; and (3) the Bureau's review of pronghorn within Herd Unit 401 did not adequately consider potential impacts to a subset of pronghorn that migrate to Grand Teton National Park. (Alliance Br. at 38-40). The following facts from the administrative record are relevant to these issues.

---

[2] Citations to the Joint Appendix filed by the Federal Appellees, the State of Wyoming, and Jonah Energy LLC are cited as: SA-Vol.#-Page #.

## A.    The Project Area

The Normally Pressured Lance Natural Gas Development Project is located in Sublette County, Wyoming approximately thirty-five miles south of Pinedale. (App.-III-618). The Project Area encompasses 140,859 acres situated almost entirely on lands and minerals managed by the Bureau. (*Id.*). The Project Area is characterized by gently rolling sagebrush habitat. (App.-III-627).

The Bureau's purpose and need for the FEIS was to respond to Jonah Energy's proposal to develop existing oil and gas leases within the Project Area. (SA-III-717). The Project Area is largely unexplored. (App.-III-621). Therefore, Jonah Energy proposed drilling delineation wells to gain a better understanding of where natural gas resources are located to inform future development within the Project Area. (*Id.*).

## B.    Wyoming's Management of Sage-Grouse and Pronghorn

The State of Wyoming, through the WGFD, manages sage-grouse and pronghorn within the Project Area and region. (App.-III-656; SA-IV-801). WGFD manages wildlife for the purpose of providing "an adequate and flexible system" for the protection of wildlife. Wyo. Stat. Ann. § 23-1-103.

WGFD developed management practices to address the adverse effects of oil and gas development on wildlife resources in Wyoming, including on federal lands. (*See* SA-I-70). The WGFD practices were derived from scientific literature and prepared by a group of senior wildlife biologists with decades of experience working

with energy-related issues. (*Id.*). WGFD shared these practices with the Bureau during the early stages of the Project. (SA-I-65–68).

The management practices for protecting wildlife in areas with oil and gas development focus on maintaining the functionality of habitat. (SA-I-71). WGFD maintains habitat functionality through a policy of avoidance and minimization and emphasizes maintaining big game crucial winter range. (*Id.*). WGFD also protects big game migration corridors. (*See* SA-I-77–78).

Separately, the State developed its own plan to protect sage-grouse habitat across the State. (*See, e.g.*, App.-III-777–790). The Wyoming Core Area Strategy for sage-grouse, adopted through a series of executive orders, prioritizes the management of geographic areas containing core sage-grouse habitat. (App.-III-781). The Wyoming Core Area Strategy affects approximately fifteen million acres of sage-grouse core population areas, including WCAs. (*Id.*). In September 2015, the Bureau adopted the sage-grouse RMPA that incorporates similar conservation measures as those included in the Wyoming Core Area Strategy. (*See* SA-IV-1043). The Bureau's sage-grouse RMPA provided a "flexible landscape approach" for protecting sage-grouse habitat on Wyoming's federal lands. (*Id.*).

The Bureau's decision to authorize the Project relies on these frameworks for protecting both pronghorn and sage-grouse. Specifically, the Bureau relied on the WGFD management practices for big game management, Wyoming's sage-grouse

Core Area Strategy, and the Bureau's 2015 sage-grouse RMPA. (*See* App.-III-621;

SA-III-728; App.-III-672; App.-III-674).

### C. Facts Relevant to the Sage-Grouse Claims

In the FEIS, the Bureau used sage-grouse management tools adopted by

Wyoming's Core Area Strategy and the Bureau's sage-grouse RMPA to evaluate the

potential sage-grouse impacts. (SA-III-734). The FEIS incorporated density, timing,

and distance protection measures into each of its alternatives. (App.-III-552). The

Bureau also identified sage-grouse WCAs in the Project Area and determined that

additional research on sage-grouse winter habitat was necessary to inform future

site-specific activities. (SA-III-739).

### 1. Sage-Grouse RMPA Provisions

The sage-grouse RMPA created a layered management approach that offers

the highest level of protection for the most valuable sage-grouse habitat. (SA-IV-

1013). Land use restrictions in the sage-grouse RMPA limit or eliminate new surface

disturbance in PHMAs and minimize disturbance in GHMAs. (*Id.*). Areas identified

as PHMA are Bureau-administered lands with the highest value for maintaining

suitable sage-grouse populations and include winter concentration areas and

connectivity corridors. (App.-III-767). GHMAs are Bureau-administered lands

where some special management applies to sage-grouse such as occupied seasonal

or year-round habitat outside of PHMAs. (*Id.*).

Similar to the Wyoming Core Area Strategy, the sage-grouse RMPA implements a density cap for oil and gas development, allowing an average of one oil and gas facility per 640 acres. (SA-IV-1015). Oil and gas operations within PHMA are also subject to timing limits. (SA-IV-1016). For example, surface-disturbing activities are prohibited in PHMA between March 15 through June 30 to protect sage-grouse breeding, nesting, and early brood rearing habitat. (*Id.; see also* SA-IV-1020).

The sage-grouse RMPA has minimum specifications for oil and gas development within certain sage-grouse habitat known as required design features. (SA-IV-1042). RDFs are a recommended management practice. (SA-IV-1023). The sage-grouse RMPA recognizes that there are instances when the Bureau cannot apply RDFs until the project design is known. (SA-IV-1021).

RDFs are also subject to site-specific considerations and may not apply to some projects. (SA-IV-1023). If the Bureau deviates from an RDF, the sage-grouse RMPA requires that the Bureau demonstrate at least one of the following conditions in the NEPA analysis associated with the project:

- A specific RDF is documented to not be applicable to the site-specific conditions of the project/activity (e.g., due to site limitations or engineering considerations). Economic considerations, such as increased costs, do not necessarily require that an RDF be varied or rendered inapplicable.

- An alternative RDF, a state-implemented conservation measure, or plan-level protection is determined to provide equal or better protection for [sage-grouse] or its habitat.

- A specific RDF will provide no additional protection to [sage-grouse] or its habitat.

(SA-IV-904).

The Bureau incorporated RDFs from the sage-grouse RMPA into the FEIS, as appropriate. (SA-III-726). This appeal involves the RDF that reads "[a]pply a phased development approach with concurrent reclamation." (App.-II-383).

## 2. Sage-Grouse WCAs

The sage-grouse RMPA recognizes WCAs are designed to provide sage-grouse access to sagebrush under a variety of winter conditions. (SA-IV-1022). The sage-grouse RMPA generally prohibits oil and gas activity within WCAs from December 1 through March 14. (SA-IV-1020).

The Bureau identified 27,292 acres of sage-grouse WCAs in the Project Area. (SA-IV-814). The Bureau also explained in the FEIS that limited research exists on how sage-grouse use these WCAs. (SA-III-739). The Bureau relied on winter surveys and sage-grouse radio-collar data from 2005 through 2011 to identify where sage-grouse were observed within the Project Area. (SA-IV-815). Winter survey data revealed that sage-grouse use areas outside WCAs in the winter but the travel paths and movements between WCAs was not well known. (*Id*.) (citing Millspaugh et al. 2013).

7

The Project Area is "an anomaly" that requires additional research because the sage-grouse habitat is made up of sage-stabilized sand dunes within a badlands framed basin. (App.-II-467). The Governor's Sage-Grouse Implementation Team asked the Wyoming Chapter of the Wildlife Society to review the protocol developed by WGFD and the Bureau for mapping WCAs in the Project Area. (App.-II-348; *see also* SA-II-343). The Wildlife Society convened a Committee of wildlife professionals from state and federal government, the private sector, and academia to review the protocol for mapping WCAs in the Project Area. (App.-II-347–48). The Committee published its recommendations in April 2013 and supported the Bureau's continued use of aerial sage-grouse surveys given cost constraints. (SA-II-259). The Committee recommended using the existing scientifically accepted resource selection function model and refining it for the Project Area. (App.-II-467; SA-II-260).

The ROD explained that the same parties that reviewed the methodology for studying WCAs will coordinate the future studies. (App.-III-554). In the FEIS, the Bureau also relied on the Committee's 2013 analysis for mapping sage-grouse WCAs. (*See* SA-IV-815; SA-IV-886). In addition to applying the development limitations for WCAs adopted in the sage-grouse RMPA, the Bureau will use the additional studies to inform future actions within WCAs. (SA-III-739; SA-IV-819).

### D.    Facts Relevant to the Pronghorn Claims

In the FEIS, the Bureau focused on evaluating potential impacts to pronghorn within both the Project Area and within Herd Unit 401. (App.-III-656). Herd Unit 401 is a WGFD-designated pronghorn population within a 6,845,707 acre area that stretches north from Interstate 80 to the Upper Hoback and Upper Gros Ventre drainages. (*See id.*). Consistent with WGFD practices, the Bureau's FEIS considered impacts to pronghorn migration bottlenecks and crucial winter habitat. (*See* App.-III-666; App.-III-674). The Bureau also adopted measures for protecting pronghorn outlined in governing RMPs. (*Compare* SA-IV-840 *with* SA-IV-1003).

### 1.    Pronghorn Migration

WGFD's strategy for protecting big game migration focuses on minimization and avoidance. (SA-I-71; SA-II-435). This strategy includes protecting big game bottlenecks and known migration corridors. (*See* SA-I-77–78).

WGFD prescribes no surface occupancy limits for narrow migration corridors known as "bottlenecks." (SA-I-77). Bottlenecks are corridors less than 0.5 miles in width. (*Id.*). For broader migration corridors that exceed 0.5 miles in width, WGFD recommends maintaining options for animal movement and avoiding the creation of new bottlenecks. (*Id.*). Minimization in broader corridors includes limiting well density and avoiding the construction of fences or other impediments to migration. (SA-I-77–78).

Multiple RMPs governing the Project Area (including the Pinedale Resource Management Plan (2008a) and the Green River Resource Management Plan (1997a)) similarly prioritize the protection of big game bottlenecks. (SA-III-724). For example, the Pinedale RMP prescribes no surface occupancy limits within known migration bottlenecks. (SA-IV-1009). In particular, the Pinedale RMP seeks to protect the free movement of big game animals at Trapper's Point and the south end of Fremont Lake. (SA-IV-1008). Neither the Trapper's Point nor Fremont Lake bottlenecks identified in the Pinedale RMP are located in the Project Area. (*Compare* SA-IV-1011 *and* SA-IV-1010; *with* SA-IV-985). In fact, the Bureau concluded in the FEIS that the Project would not result in adverse impacts to big game bottlenecks because there are no bottlenecks within or immediately adjacent to the Project Area. (SA-IV-836).

The Bureau also acknowledged that no WGFD-designated pronghorn migration corridors are located in the Project Area. (App.-III-657; *see also* SA-II-435). WGFD defines a migration corridor as an area where a substantial portion of the herd or herd segment consistently move between seasonal habitats. (*Id.*). Migration corridors are distinguishable from a migration route, which WGFD defines as a specific path used consistently by an individual animal to make seasonal movements. (SA-II-434–35). Migration routes are not an official WGFD-designation, but the Bureau used the term "migration route" in its FEIS to identify

10

pronghorn migration pathways consistently used by wildlife to make seasonal movements between winter and summer ranges. (App.-III-657).

Based on WGFD comments to the draft EIS, the Bureau revised its terminology in the FEIS to accurately reflect the distinction that WGFD makes between migration corridors and migrations routes. (*See* SA-II-434; SA-IV-920; App.-III-657). Relying on the expert opinions of WGFD biologists and on telemetry data collected from radio-collared animals, the Bureau identified three pronghorn migration routes that either terminated in or bisected the Project Area. (*See* App.-III-657; SA-IV-990). One pronghorn migration route bisects the western edge of the Project Area. (App.-III-657; *see also* SA-IV-990). The other two pronghorn migration routes terminate at the northernmost tip and in the eastern portion of the Project Area. (*Id.*).

Consistent with the WGFD recommendations, the Bureau incorporated "avoidance" measures into each alternative in the FEIS. (SA-IV-909). Specifically, the FEIS incorporated protection measures that require Jonah Energy to avoid activities that create barriers to the seasonal movement of big game. (SA-IV-909). The Bureau's resource protection measures in the FEIS are consistent with existing RMPs which require the Bureau to facilitate wildlife movement. (*See* SA-IV-1003–04).

## 2.    Pronghorn Crucial Winter Habitat

Pronghorn occupy the Project Area year-round. (App.-III-656). The Bureau identified approximately 20,668 acres of crucial pronghorn winter habitat in the Project Area. (*See id.*). In the early stages of planning the Project, WGFD emphasized the importance of protecting crucial winter habitat. (SA-I-82). The Bureau's direct impact analysis on pronghorn in the FEIS focused on the respective seasonal winter habitats within the Project Area. (*See* App.-III-656).

Within critical pronghorn winter habitat, WGFD recommends limiting oil and gas development to 1-4 wells with less than twenty acres of surface disturbance per square mile. (SA-I-73; SA-I-75). The preferred alternatives in the FEIS follow WGFD recommendations. (*See* SA-IV-837–38). Specifically, DA 1 contains the pronghorn migration route that the Bureau identified in the western portion of the Project Area. (SA-IV-837; *see also* SA-IV-990). The seasonal stipulations in the preferred alternative that prohibit surface-disturbing activity between December 1 and March 14 will minimize any potential impacts to this pronghorn migration route during the wintering period. (App.-III-674).

The preferred alternative prohibits the development of new wells in pronghorn crucial winter range from November 15 through April 30. (App.-III-674). The Bureau also explained that seasonal protections for sage-grouse WCAs are expected to minimize potential impacts from the proposed action to overlapping pronghorn

migration routes during the wintering period. (*Id.*; *also compare* SA-IV-990 *and* SA-IV-992).

## II.    Relevant Procedural History

The Alliance filed a complaint in the United States District Court for the District of Idaho on April 30, 2018, challenging several pending Bureau actions involving oil and gas development in sage-grouse habitat, including the Project. (Case No. 1:18-cv-187-REB, ECF_1). The State moved to intervene as a defendant under Fed. R. Civ. P. 24(a)(2). (*Id.*, ECF_13). The District Court in Idaho granted the State's intervention as a matter of right on August 21, 2018. (*Id.*, ECF_54).

The Alliance's claims relating to the Project were subsequently severed and transferred to the United States District Court for the District of Wyoming on July 10, 2019. (Case No. 2:19-cv-000146-SWS, ECF_1). The Alliance filed an amended petition for review on February 19, 2020. (App.-I-023).

On April 5, 2022, the District Court issued an opinion and order upholding the Bureau's decision. (App.-I-201). The substance of the court's opinion and order is addressed in the Ruling Presented for Review section.

## III.    Ruling Presented for Review

The Wyoming District Court opinion and order sets forth the ruling presented for review in this appeal. (App.-I-201–247). The District Court affirmed the Bureau's ROD and the analysis in the FEIS. (*Id.* at 247).

13

The District Court addressed four main issues: (1) whether the Bureau adequately considered impacts to the Path of the Pronghorn and Grand Teton National Park; (2) whether the Bureau considered a reasonable range of alternatives for protecting pronghorn migratory routes; (3) whether the Bureau's decision took a hard look at the Project's impacts on sage-grouse populations; and (4) whether the Bureau's decision complied with the 2015 sage-grouse RMPA. These issues are currently before this Court on appeal with the exception that the Alliance does not challenge the District Court's order affirming the Bureau's range of alternatives for protecting pronghorn and their migrations.

### A.    The Bureau's Hard Look at Impacts on Pronghorn

In rejecting the Alliance's NEPA claims, the District Court determined that the Bureau considered the potential adverse impacts to pronghorn because the FEIS explained that impairments to migration routes or crucial winter range could reduce the viability of the pronghorn herd. (App.-I-228) (citing App.-III-674). The District Court also recognized that the Bureau differentiated between migration corridors and individual migration routes. (*Id.*) The FEIS explained that there are no WGFD-designated pronghorn migration corridors in the Project Area. (*Id.*). In this respect, the Bureau followed WGFD's guidance but the FEIS still considered the impacts to the three individual migration routes that transect or terminate within the Project Area. (App.-I-229).

14

The District Court also determined that the Bureau considered the indirect impacts to pronghorn. (*Id.*). The FEIS explained that indirect impacts may include "decreased or degraded seasonal habitats (including migration routes) that are important in supporting local and regional wildlife populations." (*Id.*) (citing App.-III-673). Furthermore, the Bureau discussed the documented pronghorn movement between Grand Teton National Park and the Upper Green River Basin in the FEIS. (App.-I-230) (citing App.-III-657). The Bureau also explained that U.S. Highway 191, located beyond the reach of the Project Area already may be a complete barrier to migration. (*Id.*). In sum, the District Court determined that the FEIS mentioned several times that migration routes could face either degradation or decreased use. Here, the District Court concluded that the Bureau adequately considered the relevant factors and took a hard look at impacts to the pronghorn that resulted from the Project. (App.-I-230–31).

## B.    The Bureau's Range of Alternatives for Protecting Pronghorn

The District Court also rejected the Alliance's claim that the Bureau violated NEPA when it did not evaluate a "buffer zone" alternative in the FEIS to protect pronghorn migratory routes. (App.-I-235–36). The District Court determined that the Bureau considered, in-detail, Alternative A that was designed for protecting "focus species" such as pronghorn. (App.-I-234) (citing SA-III-751–51). Additionally, the applicable RMPs do not require "buffer zones" but instead

prescribe seasonal timing limitations and prohibitions on surface occupancy along big game migration routes and bottlenecks. (App.-I-234) (citing SA-IV-1006). The District Court determined that the ROD reflected the applicable measures for protecting pronghorn migration routes. (App.-I-235–36). In this appeal, the Alliance does not challenge the District Court's ruling with respect to the Bureau's range of alternatives. (Alliance Br. at 14-15).

### C.    The Bureau's Hard Look at Impacts on Sage-Grouse

The District Court also rejected the Alliance's argument that the Bureau violated NEPA when it failed to collect adequate baseline data on WCAs. (App.-I-242–43). The District Court determined that the Bureau properly recognized the gaps in the research on sage-grouse WCAs, summarized the research that was available, and imposed restrictions on development while additional studies are conducted. (App.-I-239). The District Court also disagreed with the Alliance that the unavailable sage-grouse information was essential to the Bureau's decision. (App.-I-240). In light of the unavailable data, the District Court concluded that the Bureau properly relied on sage-grouse protections in applicable RMPs and deferred action until more research was conducted. (App.-I-240–41). The District Court then acknowledged that the Bureau adequately explained the potential impacts of the Project on WCAs and made an informed decision using the data that was available. (App.-I-242).

### D.     The Bureau's Decision Complied with the Sage-Grouse RMPA

The District Court determined that the Bureau did not violate FLPMA when it considered a phased development alternative and then provided an adequate reason for selecting a different option. (App.-I-245). The District Court recognized that the sage-grouse RMPA allows the Bureau to deviate from the phased development RDF based on site-specific conditions. (App.-I-244). The District Court then acknowledged that the Bureau not only gave considerable weight to the phased development alternative but also briefly explored, and rejected, a paced development option. (*Id*.). The Bureau explained that it did not adopt the phased development approach because the preferred alternative better met the purpose and need for the Project. (App.-I-244–45). Finally, the District Court identified that the Bureau explained that several site-specific variables warranted the decision not to adopt phased development for the Project. (App.-I-245). Accordingly, the District Court concluded that the Bureau did not violate FLPMA when it found phased development was not warranted. (App.-I-245–46).

### SUMMARY OF ARGUMENT

1.     The Bureau considered an alternative in the FEIS dedicated to phased development and provided a reasonable explanation for rejecting it. The Bureau's purpose for the Project and the exploratory nature of the development warranted the decision, and therefore, the Bureau complied with the phased development RDF in

17

the sage-grouse RMPA and did not violate FLPMA. The Bureau also adopted concurrent reclamation standards for the Project consistent with the RDF.

2.    The Bureau took a hard look at the Project's impacts on sage-grouse WCAs. The Bureau delineated 27,292 acres of WCAs within the Project Area using nearly a decade worth of existing data and modeling endorsed by an outside group of scientists. The Bureau also used existing data to explain that the Project will have adverse impacts on sage-grouse winter habitat. Finally, the Bureau complied with 40 C.F.R. § 1502.22(b) (2018) because it acknowledged that certain information about WCAs was unavailable, explained its relevance, summarized the literature that was available, and relied on accepted scientific research to guide its decision.[3]

3.    The Bureau considered the potential direct and indirect impacts to pronghorn and their migration routes within the Project Area and Herd Unit 401. The Bureau identified migration routes within the Project Area and explained that the Project did not impair any migration bottlenecks. The Bureau's analysis of Herd Unit 401 considered the subset of pronghorn that migrate seasonally to Grand Teton National Park and the Bureau's decision did not trigger the "context" and "intensity" factors in 40 C.F.R. § 1508.27.

---

[3] The Council on Environmental Quality amended 40 C.F.R. part 1500 effective September 14, 2020. All references to part 1500 in this brief cite the applicable NEPA regulations effective in 2018 when the Bureau published its FEIS and ROD.

## STANDARD OF REVIEW

The APA governs the review of the NEPA and FLPMA claims in this appeal. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990) (citing 5 U.S.C. § 702). This Court's task is to determine whether the Bureau's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *N.M. ex rel. Richardson v. BLM*, 565 F.3d 683, 704 (10th Cir. 2009) (citation and internal quotation marks omitted). "An agency's decision is arbitrary and capricious if the agency (1) entirely failed to consider an important aspect of the problem, (2) offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise, (3) failed to base its decision on consideration of the relevant factors, or (4) made a clear error of judgment." *Id.*

This Court reviews the district court decision de novo. *Id.* at 704-05. This Court's "inquiry under the APA must be thorough, but the standard of review is very deferential to the agency. A presumption of validity attaches to the agency action and the burden of proof rests with the parties who challenge such action." *Hillsdale Env't Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1165 (10th Cir. 2012) (citations and internal quotation marks omitted).

19

# ARGUMENT

## I.     The Bureau's decision complied with FLPMA.

The Alliance argues that the Bureau's rejection of a phased development alternative violated FLPMA. (Alliance Br. at 42). This Court should reject the Alliance's argument for three reasons. First, the Alliance overstates the Bureau's obligations with respect to the sage-grouse RMPA. The RDFs in the sage-grouse RMPA expressly anticipates site-specific discretion. (*See* SA-IV-1023). Second, the Bureau considered an alternative dedicated to phased development and rejected it because a phased approach did not meet the Bureau's purpose and the preferred alternative protected a broader range of natural resources. (*See* App.-III-547; App.-III-574; App.-III-576). Third, the Alliance improperly assumes that the Bureau can only comply with the sage-grouse RMPA by adopting a phased development alternative. Here, the Bureau met the phased development RDF by adopting concurrent reclamation measures for the Project. (*See* SA-IV-907).

### A.     The Bureau's Obligations Under the Sage-Grouse RMPA

The Alliance argues that RDFs are "obligatory" and that the Bureau can only meet the standard under extremely "narrow criteria." (Alliance Br. at 47). But the Alliance's rigid interpretation conflicts with the phased development RDF in the sage-grouse RMPA.

The plain language of the sage-grouse RMPA acknowledges that at the project level "some RDFs may not apply." (SA-II-426). For example, the sage-grouse RMPA explains that "the applicability and overall effectiveness of each RDF cannot be fully assessed until the project level when the project location and design are known." (*Id.*). The environmental analysis accompanying the sage-grouse RMPA reinforces the argument that site-specific details precede the application of RDFs. (SA-IV-1019) ("The BLM will continue to … consider and apply RDFs or other management protocols contained in other planning documents after appropriate site-specific analysis."). The Bureau's obligation to implement phased development is not "obligatory" because the sage-grouse RMPA clearly provides the Bureau with the discretion to deviate from RDFs based on site-specific conditions. (*See* SA-IV-1023) (describing RDFs as "recommended management practices."). Accordingly, the Alliance incorrectly argues the Bureau "relied on an improper factor" when it acknowledged that it had discretion with respect to the phased development RDF. (Alliance Br. at 47).

The Bureau certainly cannot dismiss the phased development RDF. *See Utah Shared Access All. v. Carpenter*, 463 F.3d 1125, 1129 (10th Cir. 2006) ("FLPMA prohibits the BLM from taking actions inconsistent with the provisions of RMPs."). Conversely, the phased development RDF cannot commit the Bureau to a particular course of action. *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 56 (2004)

(finding a land use plan "is not a final implementation decision on actions which require further specific plans, process steps, or decisions under specific provisions of law and regulations.") (citing 43 C.F.R. § 1601.0-5(k)(2003))[4]. Here, the Bureau did not ignore the RDF, it considered an alternative dedicated to phased development and explained why it did not adopt it as the preferred alternative. (App.-I-244).

### B.    The Bureau properly rejected the phased development alternative.

Early in the scoping process, the Bureau recognized a need to consider phased development as a possible design feature. (*See* SA-III-727). As the Alliance acknowledges, the Bureau and Jonah Energy engaged in significant discussions in 2014 about the feasibility of a phased development approach. (*See* Alliance Br. at 44-45). However, the Alliance's recitation of the facts only tells part of the story. In early 2015, Jonah Energy expressed that it was amenable to the Bureau's consideration of a phased development approach that took into consideration operational needs for developing the Project Area. (SA-I-229). At this point, no consensus existed as to whether phased development was feasible. (SA-I-232).

In September 2015, the Bureau published its final sage-grouse RMPA that included the phased development RDF. (*See* App.-III-766; SA-IV-1023). The Bureau continued to consider Jonah Energy's concerns about the feasibility of a phased development plan. (*See* SA-I-236; App.-II-334). Some Bureau staff even

---

[4] Regulation currently codified, in identical form, at 43 C.F.R. § 1601.0-5(n)(2017).

questioned the viability of phased development for the Project. (SA-239–40) (Email from J.D. Chase, Wyoming State Office, Chief, Reservoir Management Group, stating phased development "may not be ideal."). Ultimately, the Bureau went forward with developing a draft phased development alternative also known as Alternative A. (*See* SA-II-346–47).

The Bureau included the phased development alternative in its FEIS. (App.-III-631–32). Although the Bureau considered a phased development approach, it decided that Alternative B best met the purpose and need for the Project. (App.-III-547; App.-III-576). The Bureau explained that, under Alternative B, Jonah Energy can submit site-specific applications for drilling subject to "required design features, Conditions of Approval (COAs), terms and conditions, and mitigation measures" which may be applied during site-specific permitting. (App.-III-547). The Bureau also explained that it selected Alternative B over the phased development approach because the development limitations in Alternative B protect "a broader range of resources." (App.-III-574).

Courts employ the rule of reason to guide the agency's choice of alternatives. *Custer Cnty. Action Ass'n v. Garvey*, 256 F.3d 1024, 1040 (10th Cir. 2001). "NEPA does not require that an agency give any particular weight to environmental considerations. That is, it merely prohibits uninformed — rather than unwise —

agency action." *Forest Guardians v. U.S. Forest Serv.*, 495 F.3d 1162, 1172 (10th Cir. 2007) (citation and internal quotation marks omitted).

The Bureau's decision to adopt Alternative B as the preferred alternative was reasonable in light of the defined purpose and need for the proposed action. *See WildEarth Guardians v. Nat'l Park Serv.*, 703 F.3d 1178, 1183 (10th Cir. 2013) ("Alternatives that do not accomplish the purpose of an action are not reasonable[.]") (citation omitted); *see also Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1022 (9th Cir. 2012) (finding an agency's selection of a preferred alternative need only be reasonable). The purpose for the proposed action was to respond to Jonah Energy's proposal to develop natural gas resources underlying Jonah Energy's federal leases within the Project Area. (SA-III-717).

The Alliance also contends that the administrative record does not support the Bureau's decision to reject the phased development alternative. (Alliance Br. at 47-48). However, the Alliance's own account of the Bureau's extensive deliberations over the viability of phased development contradicts this argument. (*See* Alliance Br. at 44-45). The Bureau acknowledged in the FEIS that the rate of development for the proposed action depends largely on variables outside of Jonah Energy's control, including production success, engineering technology, economic factors, commodity processes, the availability of appropriate equipment, and regulatory constraints. (App.-III-630). Moreover, the Bureau's decision to adopt Alternative B

was also based on a wider range of environmental concerns that extend beyond just sage-grouse. (*See* App.-III-547; *see also* App.-III-640). Accordingly, the Bureau's explanation for not selecting a phased development approach was reasonable. *See* 40 C.F.R. § 1502.14(e).

### C.    The Bureau explained the exploratory nature of the Project and adopted rigorous reclamation requirements.

The Alliance's argument that the administrative record does not support a finding that any applicable RDF exemption applied relies on an erroneous assumption that the Bureau can only fulfill its obligations under the sage-grouse RMPA by adopting a phased development alternative. (*See* Alliance Br. at 47-48). In the FEIS, the Bureau explained that the Project will require initial delineation wells to determine the location of natural resources in previously unexplored portions of the Project Area. (*See* App.-III-621). Jonah Energy raised this concern early in the Bureau's decision-making process and noted that at the exploratory stage of development, a truly phased development scenario was not practical or feasible. (SA-I-225–26). The ROD reflects the Bureau's decision to apply RDFs to site-specific authorizations as the extent of recoverable mineral resources becomes known. (App.-III-547; App.-III-610).

The phased development RDF also requires concurrent reclamation. (SA-IV-1025). The administrative record again refutes the Alliance's argument that the Bureau did not provide a valid rationale for meeting the requirements of the phased

development RDF. (Alliance Br. at 45). All of the action alternatives considered by the Bureau require Jonah Energy to revegetate unused exposed soils within one growing season. (*See* SA-IV-907). Specifically, the Bureau's preferred alternative, Alternative B, adopted standards identified in its Reclamation, Monitoring, and Weed Management Plan. (App.-III-647). The Bureau's requirements for reclamation and limiting surface disturbance fulfilled its obligation under the sage-grouse RMPA. *Cf. Theodore Roosevelt Conservation P'ship v. Salazar*, 605 F.Supp.2d 263, 282-83 (D.D.C. 2009) (finding the Bureau did not violate its obligations under FLPMA by adopting limits on surface disturbance, timing stipulations, and requiring accelerated reclamation).

### D.    The District Court did not rely on a post-hoc rationalization.

The Alliance argues that the District Court cited an "unrelated" passage in the FEIS when it concluded the Bureau's decision complied with the RDF standards in the sage-grouse RMPA. (Alliance Br. at 48). The language in question was the Bureau's description of the proposed action alternative that listed the engineering, technical, economic, and operational challenges facing the Project. (App.-III-630). The Bureau's description of the proposed action, however, is relevant to the decision that the phased development alternative was not feasible because the NEPA implementing regulations require the Bureau to "[d]evote substantial treatment to each alternative considered in detail **including the proposed action** so that

26

reviewers may evaluate their comparative merits." 40 C.F.R. § 1502.14(b) (emphasis added). The Bureau's NEPA handbook recognizes that its description of the proposed action should include "project design features, including construction activities, operations, and schedules." (SA-IV-997; *see also* SA-IV-998). The design features section of the Handbook also explains "[b]ecause the formulation of alternatives and the impact analysis is often an iterative process, you might not be able to identify the means, measures or practices until the impact analysis is completed." (SA-IV-998).

The Bureau must "rigorously explore all reasonable alternatives [to the proposed action] in comparative form, and give each alternative substantial treatment in the environmental impact statement." *Colo. Env't Coalition v. Dombeck*, 185 F.3d 1162, 1174 (10th Cir. 1999) (citing 40 C.F.R. § 1502.14(a)) (alteration added). The Bureau's description of the proposed action alternative in the FEIS represents the Bureau's comparative review of all the alternatives and supports its reasoning for why it did not select the phased development approach. *See* 40 C.F.R. § 1502.14(a). Accordingly, the District Court did not err when it cited the technical challenges facing the Project.

The Alliance also argues the District Court "did not grapple" with certain facts that purportedly show the Bureau failed to consider phased development for the site-specific authorizations. (Alliance Br. at 49). But the Alliance misconstrues the

record. The Alliance relies on documents from 2014 when the Bureau was in the midst of deliberating over the feasibility of a phased development approach. (*See* Argument, I.B; *see also* Alliance Br. at 44).

For example, the Alliance cites a December 8, 2014, Bureau meeting summary that purportedly noted which design features were subject to site-specific determinations. (Alliance Br. at 49) (citing App.-I-297–99). The Alliance also cited a Bureau worksheet with comments about how the proposed RDFs may apply to the Project. (Alliance Br. at 49) (citing App.-1-282–96). The Bureau circulated the worksheet for discussion on December 9, 2014. (App.-I-280). But both documents were prepared eight months before the Bureau adopted the phased development RDF in the sage-grouse RMPA and over three years before the Bureau published the FEIS. (*See* App.-III-766; SA-IV-1023) (Sage-Grouse RMPA - September 2015); (*see also* App.-III-617) (FEIS June 2018). Clearly, the two documents from 2014 cannot represent the Bureau's ultimate decision because the discussions took place before the phased development RDF was even adopted.

Instead, the District Court correctly relied on the Bureau's final decision in the ROD and FEIS. (*See* App.-I-244–46). The District Court cited, verbatim, the Bureau's rationale in the ROD for selecting Alternative B over other alternatives including the phased development approach. (App.-I-245) (citing App.-III-576) ("[Alternative B] will allow development on valid existing leases throughout the

NPL Project Area and will best meet *the purpose and need of the project*.")
(emphasis added). The District Court also relied on the relevant portions of the FEIS
which discuss the purpose and need for the project and its deliberation of
alternatives. (App.-I-245) (citing App.-III-630; SA-IV-819). Contrary to what the
Alliance suggests, the District Court did not substitute its reasoning for the
explanation provided in the ROD and FEIS.

## II.    The Bureau took a hard look at impacts to sage-grouse WCAs.

The Alliance contends that the Bureau violated NEPA when it decided to
continue studying sage-grouse WCAs. (Alliance Br. at 50-51). First, the Alliance
argues that the Bureau acted before collecting baseline data in violation of 40 C.F.R.
§ 1502.22(a). Second, the Alliance argues the Bureau violated 40 C.F.R.
§ 1502.22(b) when it acted on the unavailable sage-grouse information. (Alliance
Br. at 57-58). However, the Bureau's decision was not based on a blank slate. The
Bureau used existing data to delineate 27,292 acres of sage-grouse WCAs within the
Project Area. (App.-III-662). The administrative record also demonstrates the
Bureau recognized that certain information was unavailable, explained why that
information was relevant, summarized the existing data, and evaluated potential
impacts using an accepted scientific methodology.

## A.    The Bureau complied with 40 C.F.R. § 1502.22(a).

The Alliance argues that the Bureau violated 40 C.F.R. § 1502.22(a) because the unavailable sage-grouse winter habitat information that it decided to collect through future studies was "relevant to reasonably foreseeable adverse impacts" and "essential" to a reasoned choice of alternatives. (Alliance Br. at 51-52). The Alliance relies entirely on non-controlling authorities to support its argument. (*See id.* at 52-53). In doing so, the Alliance ignored the relevant legal standard for reviewing an agency's compliance with 40 C.F.R. § 1502.22(a), and they fail to meet their burden.

The District Court identified the applicable standard in this Circuit.[5] (App.-I-240). To demonstrate a violation of 40 C.F.R. § 1502.22, the Alliance must show: (1) the missing information is essential to a reasoned decision between alternatives; and (2) that the public was unaware of the limitations of the data the agency did rely on. *Trout Unlimited v. U.S. Dep't of Agric.*, 320 F.Supp.2d 1090, 1111 (D. Colo. 2004) (citing *Colo. Env't Coalition*, 185 F.3d at 1172-73); *see also Rags Over the Arkansas River, Inc. v. BLM*, 77 F.Supp.3d 1038, 1049 (D. Colo. 2015) (applying the same standard).

---

[5] The District Court also distinguished *Northern Plains Resource Council v. Surface Transportation Board*, 668 F.3d 1067, 1084-86 (9th 2011) which the Alliance relied on to support its argument that certain baseline data was essential to a reasoned decision. (App.-I-243 at n.21).

The District Court concluded that the unavailable sage-grouse information was not essential to reasoned decision-making. (App.-I-240–42). First, the District Court found that the Bureau did not act without baseline data. (App.-I-241). The Bureau delineated sage-grouse WCAs based on the definition used by the State of Wyoming. (App.-III-662). Specifically, the Bureau identified 27,292 acres of sage-grouse WCAs in the Project Area and started baseline monitoring in these areas in 2010. (*Id.*). The Bureau also reviewed winter sage-grouse data from radio-collar observations within the Project Area between 2005 and 2011. (App.-III-663); s*ee also* App.-III-756 (Map 40 – Sage-Grouse Observations)). Finally, the Bureau examined the surficial geology of the Project Area and considered the impacts the Project may have on soil resources (or geophagy) of interest to sage-grouse. (SA-IV-788; SA-IV-789–93).

Second, the District Court concluded that it did not appear that the unavailable information was necessary for the Bureau to make an informed decision because the Bureau already explained the Project's potential effects on sage-grouse WCAs. (App.-I-241). The FEIS explained that the Proposed Action would result in short-term and long-term impacts on WCAs because the Bureau authorized higher levels of development in these areas than in PHMAs. (App.-III-687). For example, surface disturbance will decrease the quality of suitable sage-grouse winter habitat. (App.-III-685). The FEIS also explained that the preferred alternative will result in similar

displacement and impacts as the Proposed Action. (App.-III-727). The Bureau made clear in the FEIS that impacts to sage-grouse may include the loss of winter habitat and disruption of existing sage-grouse behavior. (App.III-689).

Finally, the Alliance makes no effort to explain how the public was unaware of the limitations of the data that the Bureau relied on in its FEIS and ROD. (*See* Alliance Br. at 52-57). The Bureau disclosed its concerns about unavailable sage-grouse WCA data in its NEPA analysis. (App.-III-688). Early in its review of the Project, the Bureau also acknowledged it needed to gather information to "refine the sage-grouse winter concentration areas." (SA-I-202). The Bureau began planning winter sage-grouse aerial surveys of WCAs in 2010. (*See* SA-I-101). The Bureau specifically expressed concern at the time that the outer limits of WCAs were changing year to year based on snow and other factors. (*See* SA-II-343).

The Bureau's decision also engaged outside stakeholders. For example, the Governor's Sage-Grouse Implementation Team asked the Wyoming Chapter of the Wildlife Society to review the protocol developed by WGFD and the Bureau for mapping WCAs in the Project Area. (App.-II-348; *see also* SA-II-343). The Wildlife Society convened a Committee of government, private sector, and academic wildlife professionals. (App.-II-348). The Committee provided its recommendations in April 2013. (*See* SA-II-253–72). The Committee also endorsed the Bureau's continued use of aerial sage-grouse surveys given cost and logistical constraints. (SA-II-259).

The Bureau's use of existing sage-grouse data to delineate WCAs did not prevent the Bureau from examining the potential impacts of the Project on sage-grouse. Moreover, the administrative record demonstrates that the Bureau did not conceal the limitations of existing sage-grouse data when it made its decision. *See, e.g.*, *Rags Over the Arkansas River*, 77 F.Supp.3d at 1049 (finding that plaintiffs failed to demonstrate that the public was unaware of the limitations in an agency's data). Thus, the Alliance has failed to demonstrate that the Bureau's decision to perform future studies of sage-grouse WCAs violated 40 C.F.R. § 1502.22(a).

### B.    The Bureau complied with 40 C.F.R. § 1502.22(b).

Even if this Court somehow determines that the unavailable sage-grouse winter habitat information was essential to a reasoned choice of alternatives, the Bureau met its responsibilities under 40 C.F.R. § 1502.22(b). The Alliance argues that the Bureau did not explain its decision to conduct additional studies and failed to use accepted theoretical approaches. (*See* Alliance Br. at 57-59). The Bureau, however, did explain its decision and relied on input from a Committee formed to review the research methods specific to the Project. (*See* SA-II-253–72); *see also Sierra Club v. U.S. Forest Serv.*, 857 F.Supp.2d 1167, 1180 (D. Utah 2012) (finding agency met its responsibilities under 40 C.F.R. § 1502.22).

If an agency cannot obtain information, it is required to provide the following:

(1) A statement that such information is incomplete or unavailable; (2) a statement of the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant adverse impacts on the human environment; (3) a summary of existing credible scientific evidence which is relevant to evaluating the reasonably foreseeable significant adverse impacts on the human environment, and (4) the agency's evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community.

40 C.F.R. § 1502.22(b). However, NEPA does not require the agency to provide a separate, formal disclosure in the EIS. *Colo. Env't Coal.*, 185 F.3d at 1172-73 (rejecting a hyper-technical reading of 40 C.F.R. § 1502.22(b)).

As a preliminary matter, the Alliance suggests that the Bureau violated NEPA by not expressly finding why the costs of studies suggested by Dr. Braun were "exorbitant." (Alliance Br. at 58). But the NEPA regulation does not require the Bureau to make such a finding. *See Oceana v. Bureau of Ocean Energy Mgmt.*, 37 F.Supp.3d 147, 157-58 (D.D.C. 2014) ("§ 1502.22(b) does not impose a requirement that the agency *explain why* the 'the overall costs of obtaining [the missing, essential information] are exorbitant or the means to obtain it are not known' – just that it provide the four enumerated statements of the EIS *if* the costs to obtaining the information are exorbitant.") (emphasis in original) (citation omitted).

The Bureau provided several statements in the FEIS explaining that certain information about sage-grouse WCAs in the Project Area was unavailable. (*See e.g.,* SA-III-739; App.-III-688); *see also* 40 C.F.R. § 1502.22(b)(1). For example, the

34

Bureau explained "[i]t is important to note that there is limited research on Sage-Grouse use of the Winter Concentration Areas in the NPL Project Area (Map 40) and the potential impacts that could occur to Sage-Grouse from development in and around these areas." (App.-III-688).

The Bureau provided a statement on the relevance of the unavailable information as it relates to the reasonably foreseeable significant impacts:

> As a result, the potential impacts on Sage-Grouse resulting from development in the NPL Project Area Winter Concentration Areas is not well understood. The WGFD, BLM, and other appropriate entities are identifying additional research and studies that should be conducted to better understand the use and role of Winter Concentration Areas on Sage-Grouse that use or could potentially use these areas. For all alternatives, the BLM would defer authorizing development in Winter Concentration Areas until additional research is conducted to better inform the appropriate level of development, potential impacts, and appropriate mitigation in Sage-Grouse Winter Concentration Areas.

(App.-III-688). Because project-level information about sage-grouse in WCAs was unavailable, the Bureau explained it was necessary to conduct additional research to inform site-specific development. *See* 40 C.F.R. § 1502.22(b)(2).

The Bureau summarized the existing credible scientific evidence relevant to evaluating reasonably foreseeable significant adverse impacts. (*See, e.g.,* App.-III-688; App.-III-658–59); *see also* 40 C.F.R. § 1502.22(b)(3). It explained that existing research indicates wintering sage-grouse avoid areas that have high densities of infrastructure, areas within 1.9 km of infrastructure, and areas that have high levels of human activity. (App.-III-688) (citing *Copeland & Holloran* 2015). The Bureau

compared how existing sage-grouse winter studies in the Powder River Basin and the adjacent Pinedale Anticline Project Area differ from the proposed density for the Project. (*Id.*) (citing *Doherty et al.* 2008; *Wyoming Wildlife Consultants* 2012). The Bureau also incorporated, by reference, its analysis on sensitive species which considers statewide sage-grouse population models. (App.-III-658–59).

Finally, the Bureau's decision was consistent with generally accepted research methods. *See* 40 C.F.R. § 1502.22(b)(4). The Alliance insists that the Bureau should have built a new model for evaluating possible impacts to sage-grouse within WCAs. (Alliance Br. at 59) ("As Dr. Braun explains, BLM could have 'used existing data and hired persons with modeling experience to build models that would predict possible outcomes[.]'"). Interestingly, the Alliance does not explain how a non-existent and untested model can possibly constitute an "accepted" research method by the scientific community. Moreover, NEPA does not require an agency to subscribe to a particular methodology, let alone one that does not yet exist. *See WildEarth Guardians v. Bernhardt*, 501 F.Supp.3d 1192, 1209 (D.N.M. 2020) ("But in reading NEPA, nothing in its text and nothing in its associated regulations specifically mandates that agencies perform a particular analysis or subscribe to a particular methodology."); *see also Comm. to Preserve Boomer Lake Park v. U.S. Dep't of Transp.*, 4 F.3d 1543, 1553 (10th Cir. 1993) ("Courts are not in a position to decide the propriety of competing methodologies[.]"). Setting those concerns

36

aside, the Bureau relied on an existing and accepted methodology in the FEIS. (*See* SA-II-260).

The Project Area is "an anomaly" that requires detailed on-site research because of the uniqueness of the sage-grouse habitat. (App.-II-467). Accordingly, the Governor's Sage-Grouse Implementation Team and the Bureau solicited input from a scientific Committee that made Project specific recommendations for mapping sage-grouse WCAs. (App.-II-348–49; SA-II-256–59). The Committee recommended that the Bureau use and refine the existing resource selection function model for mapping sage-grouse locations. (App.-II-348; App.-II-467) (*Id.*). The resource selection function model was previously used in scientific studies. (SA-II-260). Both the FEIS and ROD acknowledge that future WCA studies will be coordinated through this framework and group of stakeholders. (*See* App.-III-554; SA-IV-911).

Under all the alternatives in the FEIS, the Bureau will rely on the results of its future studies to inform site-specific actions within sage-grouse winter habitat. (SA-III-739). The Bureau's delineation of WCAs in the Project Area relied on baseline sage-grouse data collected over the course of several years. Moreover, the Bureau explained what additional information on WCAs it needed and consulted outside experts to confirm its methodology. In this respect, the Bureau's decision complied with NEPA. *See, e.g., WildEarth Guardians v. U.S. Forest Serv.*, 828 F.Supp.2d

1223, 1240 (D. Colo. 2011) (finding agency decision complied with 40 C.F.R. § 1502.22).

## III.   The Bureau's pronghorn analysis complied with NEPA.

The Alliance argues the Bureau failed to take a hard look at the Project's potential impacts to pronghorn by adopting an arbitrary geographic scope of review and not evaluating a particular subset of the pronghorn population within the WGFD-designated Herd Unit 401. (*See* Alliance Br. at 59-69). The Bureau's scope of review was not arbitrary because it focused on the direct impacts within the Project Area and then looked regionally to the pronghorn population within Herd Unit 401. (App.-III-656; SA-IV-994). Additionally, the Alliance has not demonstrated that the subset of pronghorn within Herd Unit 401 warranted special review as "unique" under 40 C.F.R. § 1508.27(b)(3), (5).

### A.   The Bureau took a hard look at impacts to pronghorn populations.

The Alliance argues that the Bureau failed to consider "unique" concerns of a subset of pronghorn within Herd Unit 401. (Alliance Br. at 61). First, the Alliance contends that the Bureau did not explain the geographic scope of its analysis areas for pronghorn. (*Id.* at 66). Second, the Alliance argues that the Bureau violated NEPA because its FEIS did not consider the "context" or the "intensity" of the Project as it relates to the subset of pronghorn that migrate to Grand Teton National Park each summer. (*Id.* at 60) (citing 40 C.F.R. § 1508.27(a)-(b)). Finally, the

Alliance argues that the Bureau failed to identify development thresholds for pronghorn within the Project Area. (*Id.* at 62). The Alliance, however, is wrong. The Bureau relied on the expertise of WGFD to consider local and regional impacts to pronghorn, considered potential impacts to migration bottlenecks adjacent to the Project, and adopted WGFD recommendations for protecting pronghorn habitat.

Importantly, the Alliance does not dispute that Herd Unit 401 includes the pronghorn that reside in southern Grand Teton National Park during the summer months. (*See* Alliance Br. at 63) ("[T]he EIS's discussion of the Project's impacts on the larger Sublette herd—of which the Grand Teton herd is a unique subset— does not mention the Grand Teton herd[.]"). The Bureau's cumulative impact analysis focused on Herd Unit 401 which consequently includes both the Grand Teton pronghorn and their migration route. (SA-IV-846; SA-IV-994). In this respect, the Alliance's claim that the Bureau "ignored" the Grand Teton pronghorn herd is plainly mistaken. (Alliance Br. at 61).

The District Court correctly concluded that the FEIS "did consider the potential adverse impacts to pronghorn" because the Bureau "acknowledged the Proposed Action would likely displace or disrupt pronghorn migrations" and the FEIS "mentioned several times that migration routes could face degradation or decreased use." (App.-I-228; App.-I-230). The District Court also properly rejected the Alliance's argument that the Bureau cannot subsume the analysis of the Grand

39

Teton pronghorn into its analysis of Herd Unit 401. (App.-I-231 at n.19) (citing *N.M. ex rel. Richardson*, 565 F.3d at 713).

### 1. The Bureau's scope was not arbitrary.

The Alliance raises a threshold question regarding the Bureau's scope of analysis for evaluating impacts to pronghorn. (Alliance Br. at 66). The Bureau, however, provided reasonable explanations for selecting its direct impact analysis area and its cumulative impact area.

"[A]n agency has the discretion to determine the physical scope used for measuring environmental impacts." *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002). The Bureau explained that its impact analysis areas in the FEIS varied depending on the geographic extent of the resource evaluated. (SA-IV-770). For example, the analysis area for vegetation is the Project Area because that is the extent of the effects of the project on the resource. (*Id.*). In other cases, such as air quality, the analysis area is larger in scope because the effects on the resource extend beyond the Project Area. (*Id.*).

The administrative record refutes the Alliance's argument that the Bureau adopted an arbitrary geographic scope of analysis. Big game species in Wyoming are managed by WGFD. (App.-III-656). WGFD also delineates migration and range designations across the entire state. (*Id.*). With respect to the direct impact analysis area in the FEIS, the Bureau correctly explained that direct impacts "are generally

attributable to implementation of an alternative that affects a specific resource, and generally occur at the same time and place." (SA-IV-820); *see also* 40 C.F.R. § 1508.8 ("direct effects[]are caused by the action and occur at the same time and place."). The Bureau's general wildlife analysis area (Project Area including 1-mile buffer) was based on documented occurrences of the species and relevant WGFD big game range designations relevant to the Project Area. (App.-III-656) (citing WGFD 2012d). The Bureau also relied on pronghorn observation data it collected during winter flights. (App.-III-656). The Bureau then acknowledged that the WGFD data shows pronghorn occur in the analysis area year-round. (*Id.*). The Bureau also explained that its direct impact analysis area overlaps WGFD-designated pronghorn crucial winter habitat and year-long habitat. (*Id.*).

The Bureau's decision to focus on the Project Area for considering direct impacts to pronghorn did not improperly limit the scope of its analysis under NEPA and did not obscure any potential impacts. *See, e.g., Inland Empire Pub. Lands Council v. U.S. Forest Serv.*, 88 F.3d 754, 763-65 (9th Cir. 1996) (rejecting argument that the agency improperly limited the scope of its analysis by focusing on the project area, particularly when the agency considered a broader geographic range for certain species in its cumulative impact analysis). In this case, the Bureau's scope of analysis allowed it to consider potential impacts to 20,668 acres of crucial winter habitat

within the Project Area as well as 104,822 acres of spring/summer/fall pronghorn habitat that may directly impact pronghorn populations. (*See* App.-III-656).

Separately, the Bureau analyzed the cumulative impact of the Project by considering potential regional impacts to pronghorn within the WGFD-designated Herd Unit 401. (*See* SA-IV-843; SA-IV-846). The Bureau explained in the FEIS that Herd Unit 401 "encompass big game population units used by the WGFD to set population objectives for big game." (SA-IV-846). The Bureau also explained that the Project Area falls entirely within Herd Unit 401 and includes "the entire Upper Green River Basin north of I-80, the Upper Hoback drainage, and the Upper Gros Ventre drainage." (App.-III-656). Herd Unit 401 not only includes 6.8 million acres of habitat used by the pronghorn known to move through the Project Area but includes the pronghorn migration route to Grand Teton National Park. (*See* App.-III-656; SA-IV-994). WGFD confirmed that the Bureau's cumulative impact analysis map accurately reflected the range of Herd Unit 401. (SA-II-438).

The Alliance relies on *Utahns for Better Transportation* to support the allegation that the Bureau's selection of Herd Unit 401 for its analysis area was arbitrary and improperly limited the scope of its analysis. (Alliance Br. at 65-66) (citing *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1179-80 (10th Cir. 2002)). But *Utahns* does not support the Alliance's argument because in that case the federal agency in question limited its analysis area to only a 1,000-foot

area on each side of a road which ignored broader ecosystem impacts. *See Utahns for Better Transp.*, 305 F.3d at 1179-80.

Importantly, the federal agency in *Utahns* was also presented with information that roads can cause adverse effects to bird populations as far as 1.24 miles from roadways. *Id.* In the present case, the Bureau's pronghorn analysis looked to both the Project Area and the surrounding 6.8 million acre landscape. The Alliance does not contend that the Bureau failed to consider impacts to pronghorn outside of Herd Unit 401 and does not argue that the Bureau disregarded information that indicated the Project threatened habitat beyond the Herd Unit 401 boundary.

Agencies have to draw a line somewhere, the question for this Court is whether the agency provided a reasonable justification for why it drew the line where it did. *See Friends of the Wild Swan v. Weber*, 767 F.3d 936, 943-44 (9th Cir. 2014) (finding the agency's decision to use a longstanding habitat "analysis unit" for evaluating lynx impacts was not arbitrary). In this case, the Bureau considered impacts within the Project Area and then adopted the WGFD-designated Herd Unit 401 as the outer limit of its analysis. The Bureau's reliance on WGFD data and the selection of Herd Unit 401 was not arbitrary and is a scientific judgment to which this Court normally defers. *See San Juan Citizens All. v. Stiles,* 654 F.3d 1038, 1057 (10th Cir. 2011) ("Setting the boundaries of the region to be analyzed involved

technical and scientific judgments within the Federal Defendants' area of expertise, and … is one to which we defer.").

> **2.    The Bureau adequately considered impacts in both a local and regional context.**

The Alliance argues that Grand Teton National Park presents a "unique context" for the Project. (Alliance Br. at 60-61) ("BLM also failed to study the Project's impacts on the unique context and setting to which they may reach – Grand Teton National Park."). But the Alliance disregards the fact that the Bureau's decision to evaluate Herd Unit 401 as a whole considered the potential impacts to pronghorn populations within the region, including the individual pronghorn that frequent Grand Teton National Park.

NEPA regulations define "context" based on the setting of the proposed action. *See* 40 C.F.R. § 1508.27(a). In other words, the "[c]ontext refers to the scope of the proposed action[.]" *Diné Citizens Against Ruining Our Env't v. Klein*, 747 F.Supp.2d 1234, 1249 (D. Colo. 2010) (citing 40 C.F.R. § 1508.27(a)). The Project Area falls entirely within the Herd Unit 401 management area. (App.-III-656). As previously discussed, the Bureau selected Herd Unit 401 as a basis for assessing cumulative impacts because it is the range designation used by WGFD for setting pronghorn population objectives. (*See* SA-IV-846). The Bureau's decision to adopt a state-designated big game management area as its methodology for evaluating potential regional impacts to pronghorn populations resulting from the Project was

within its discretion. *Kleppe v. Sierra Club*, 427 U.S. 390, 414 (1976) (the "determination of the extent and effect of [cumulative environmental impacts], and particularly identification of the geographic area within which they may occur, is a task assigned to the special competency of the appropriate agencies."); *see also San Juan Citizens All.*, 654 F.3d at 1057.

The Bureau also placed the Project in the appropriate local context. "[I]n the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole." 40 C.F.R. § 1508.27(a). The Project Area encompasses a clearly defined site located 35 miles south of Pinedale, Wyoming. (App.-III-618). The Bureau acknowledged that pronghorn occupy the Project Area year-round and identified areas of crucial winter habitat that are essential to the viability of the population. (App.-III-656). The Bureau then explained the potential impacts of each alternative on pronghorn, including the impacts of the proposed action. (App.-III-666 – No Action Alternative; App.-III-673–76 – Proposed Action; App.-III-696–98 – Alternative A; App.-III-710–13 – Alternative B).

Notably, the Bureau identified three pronghorn migration routes that either terminate or bisect the Project Area. (App.-III-657; App.-III-753). One pronghorn migration route bisects the western edge of the Project Area. (App.-III-657; *see also* App.-III-753). The other two pronghorn migration routes terminate at the

northernmost tip and in the eastern portion of the Project Area. (*Id.*). The migration routes identified by the Bureau are not an official WGFD-designation, but the Bureau used the term migration route in its FEIS to identify pronghorn pathways consistently used by wildlife to make seasonal movements between winter and summer ranges. (App.-III-657).

The Bureau also explained that there are no WGFD-designated pronghorn migration corridors in the Project Area. (App.-III-657; *see also* SA-II-435). WGFD defines a migration corridor as an area where a substantial portion of the herd or herd segment consistently move between seasonal habitats. (SA-II-435). Migration corridors are distinguishable from a migration route, which WGFD defines as a specific path used consistently by an individual animal to make seasonal movements. (SA-II-434–35).

But the Bureau's migration analysis did not stop at the edge of the Project Area. The Bureau considered landscape-level management objectives within the governing Pinedale Resource Management Plan (2008a) and the Green River Resource Management Plan (1997a) which both prioritize the protection of big game bottlenecks. (*See* SA-III-724). For example, the Pinedale RMP prescribes no surface occupancy limits within known migration bottlenecks. (SA-IV-1009). In particular, the Pinedale RMP seeks to protect the free movement of big game animals at Trapper's Point and the south end of Fremont Lake. (SA-IV-1008). Neither the

Trapper's Point nor Fremont Lake bottlenecks identified in the Pinedale RMP are located in or adjacent to the Project Area. (*Compare* SA-IV-1011 *and* SA-IV-1010; *with* App.-III-751). The Green River RMP similarly prescribes protections for migration corridors within the Wind River Front Special Recreation Management Area for the purpose of meeting WGFD big game population objectives. (SA-IV-1002). The Bureau explained in the FEIS that the proposed action was unlikely to result in direct adverse impacts to big game migration corridors because the Wind River Special Recreation Management Area (the closest migration bottleneck) was 6.2 miles from the Project Area boundary. (SA-IV-836).

The Alliance argues that the Bureau also failed to consider the context of the Project in regard to the pronghorn migration to Grand Teton National Park. (Alliance Br. at 60-61). In support of this argument, the Alliance cites scientific literature prepared by Dr. Berger in 2006 which finds that the Grand Teton pronghorn's migration route is "invariant" due to distinct geographic bottlenecks. (Alliance Br. at 61) (citing App.-II-437). The literature cited by the Alliance identified three migration bottlenecks (varying in width from 121 to 660 meters) that have been traversed for at least 6,000 years. (App.-II-436). Two of those migration bottlenecks are located deep in the mountains between the Gros Ventre Range and the Wind River Range. (*See id.*) (identifying bottleneck *(a)* 279 meters and bottleneck *(b)* 121 meters). The third bottleneck, located closest to the Project Area is a well-known

geographic feature known as Trapper's Point. (*See id.*) (identifying bottleneck *(c)*, 660 meters).

In the FEIS, the Bureau considered Dr. Berger's study as well as more recent literature on pronghorn migrations and bottlenecks in the region. (*See* App.-III-657) ("Migration studies (Sawyer et al. 2005; Berger et al. 2006; Seidler et al. 2014) in the region have recorded pronghorn seasonal movements between Grand Teton National Park and the Upper Green River Basin of 72 to 160 miles (Sawyer et al. 2005)."). The Bureau explained that the Project will not result in adverse impacts to big game bottlenecks because there are no bottlenecks within or immediately adjacent to the Project Area. (SA-IV-836). The Alliance does not explain how the Project may impair distinct geographical migration bottlenecks located many miles beyond the Project Area. The Alliance similarly does not explain how the presence of these bottlenecks alone required the Bureau to analyze them in greater depth in the context of the Project.

In fact, the Bureau relied on literature that considered impediments to long-distance mammal migrations in relation to the Project Area. (App.-III-657) (citing Seidler et al. 2014). The Seidler study documented that the Trapper's Point bottleneck is located over 35 kilometers (21 miles) from the northern most boundary of the Project Area. (*See* App.-II-393). Importantly, the Seidler study revealed that migration stopovers near the Trapper's Point bottleneck were "at least partly

48

impediment driven." (App.-II-397). However, the impediment at Trapper's Point was not the proposed Project, instead, it is U.S. Highway 191 and fencing. (*See id.*; *and* App.-III-657) (recognizing that U.S. Highway 191 "may be a complete barrier to pronghorn migration (Seidler et al. 2014)."). At the landscape level, the cumulative impact analysis in the FEIS recognized ongoing efforts in the region to modify fencing to facilitate big game migration. (SA-IV-847; SA-IV-852–53). At the site-specific level, the Bureau made a mitigation determination that development within the Project Area should avoid activities that create barriers to seasonal big game movements, and when appropriate, Jonah Energy may conduct fence removal and modification projects. (SA-IV-914–15).

The administrative record demonstrates that the Bureau properly analyzed the significance of impacts on pronghorn in context to the Project. *See Powder River Basin Res. Council v. BLM*, 37 F.Supp.3d 59, 83 (D.D.C. 2014) (finding that the Bureau reasonably evaluated impacts to an elk herd within the local context). The Bureau then looked beyond the Project Area when it adopted WGFD's designated Herd Unit 401 (which includes the Path of the Pronghorn) as its yardstick for studying cumulative impacts to pronghorn within the region. (*See* SA-IV-994; SA-IV-851). Finally, the Bureau considered the Project's impacts to migration bottlenecks identified in applicable RMPs and addressed the mitigation needed to avoid creating new obstructions. (*See* SA-IV-836; SA-IV-852–53).

### 3. The Project does not implicate the Section 1508.27(b) intensity factors.

The Alliance argues that the Bureau did not adequately consider the intensity of the Project's impact on the pronghorn that migrate to Grand Teton National Park. (Alliance Br. at 63). NEPA regulations articulate ten factors for evaluating the "intensity" or the severity of an impact. 40 C.F.R. § 1508.27(b). The Alliance relies on the third and eighth "intensity" factors in their argument. (Alliance Br. at 60). The relevant factors provide that the agency should consider:

> (3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

> (8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.

40 C.F.R. § 1508.27(b)(3), (8). With respect to the intensity factors "[t]he relevant analysis is the degree to which the proposed action affects this interest, not the fact that it is affected." *Hillsdale Env't Loss Prevention*, 702 F.3d at 1180.

The Alliance contends that the third factor required the Bureau to consider the effects on a particular subset of pronghorn within Herd Unit 401 because it is allegedly a "unique national-park population." (Alliance Br. at 62) (citing 40 C.F.R. § 1508.27(b)(3)). The Bureau has determined that "unique characteristics of the geographic area" under 40 C.F.R. § 1508.27(b)(3) are "generally limited to those

that have been identified through the land use planning process or other legislative, regulatory, or planning process[.]" (SA-IV-999). The Alliance mistakenly assumes that certain pronghorn demand distinct attention without presenting any argument that this subset of pronghorn within Herd Unit 401 are "unique characteristics" based on any legislative, regulatory, or planning decision. Put simply, the Bureau's NEPA guidance requires a legislative, regulatory, or planning determination that a particular resource possesses "unique characteristics" as opposed to an allegation that something is inherently unique. (*See id.*). The FEIS considered impacts to areas with special designations. (*See* SA-IV-797–800). The Bureau also identified relevant cultural resources in the area. (*See* SA-IV-771–84). Here, the specific pronghorn within Herd Unit 401 that migrate to Grand Teton National Park are not designated as "unique characteristics" by any legislative or regulatory authority.

The Alliance also argues that the migration route to Grand Teton National Park is "unique" under 40 C.F.R. § 1508.27(b)(3). (Alliance Br. at 62). However, even if this migration possesses unique characteristics, courts have made clear that they consider the degree to which the proposed action affects the interest, not the fact that it is affected. *Hillsdale Env't Loss Prevention*, 702 F.3d at 1180; *Klamath Siskiyou Wildlands Ctr. v. Grantham*, 424 F. App'x 635, 638 (9th Cir. 2011) (finding that a project's proximity to a sensitive area alone does not *per se* trigger 40 C.F.R. § 1508.27(b)(3)). Here, the Alliance is stunningly silent on how the Project threatens

to obstruct the pronghorn's "invariant" migration through U.S. Forest Service-administered lands well beyond the boundaries of the Project Area.

The third intensity factor requires "proximity" to park lands or an ecologically critical area. *See* 40 C.F.R. § 1508.27(b)(3). The Bureau explained that some pronghorn within Herd Unit 401 make the 72 to 160 mile seasonal journey from the Upper Green River Basin to Grand Teton National Park. (App.-III-657). But the Project Area does not overlap and is not proximate to any portion of the pronghorn migration to Grand Teton National Park. The Bureau's cumulative impact analysis of Herd Unit 401 mapped the Project Area in relation to the Path of the Pronghorn. (SA-IV-852). Map 42 clearly shows that the Project Area is not within or in the vicinity of the Path of the Pronghorn route leading from Grand Teton National Park and will not obstruct the "invariant" migration route described by Dr. Berger. (*Compare* SA-IV-994 *with* App.-II-436).

The Bureau's cumulative impact analysis is also consistent with its recognition that there are no WGFD-designated pronghorn migration corridors within the Project Area. (App.-III-657). The fact that the Project Area does not encompass or threaten to obstruct the Path of the Pronghorn is sufficient to find that the third intensity factor does not apply. *See Lindberg v. U.S. Forest Serv.*, 132 F.Supp.3d 1255, 1271-72 (D. Or. 2015) (finding that the third intensity factor under 40 C.F.R. § 1508.27(b)(3) did not apply when the project was not located within and

did not implicate a designated wild and scenic river corridor). The administrative record, in this case, demonstrates that the Project does not threaten the pronghorn's route from Grand Teton National Park to any significant degree.

Finally, the Alliance cites 40 C.F.R. § 1508.27(b)(8), as support for their argument that the Bureau was required to take a distinct look at the pronghorn migration from Grand Teton National Park separate from its analysis of Herd Unit 401. (Alliance Br. at 60). But the Alliance fails to explain how the migration implicates the eighth intensity factor. (*See id.*). The Bureau's NEPA guidance recognizes that the eighth intensity factor is a "specific sub-set" of the third "unique characteristics of the geographic area" factor that includes eligible or listed items in the National Register of Historic Places. (SA-IV-1000). The administrative record reveals that the Alliance's argument is meritless. The pronghorn that migrate to Grand Teton National Park and their route are not considered scientific or cultural resources with respect to the National Register of Historic Places. (*See, e.g.*, SA-IV-780–83) (identifying the relevant significant cultural sites to the Project).

This Court has found that the mere existence of an environmental effect does not trigger the factors listed under 40 C.F.R. § 1508.27. *WildEarth Guardians v. Conner*, 920 F.3d 1245, 1261 (10th Cir. 2019). The administrative record does not support the Alliance's argument that pronghorn within Herd Unit 401 possess "unique characteristics" as defined by NEPA regulations and the Bureau's NEPA

guidance. Similarly, the Alliance fails to demonstrate how the "intensity" factor under 40 C.F.R. § 1508.27(b)(3) applies to the "Path of the Pronghorn" given that this particular migration is not proximate to the Project Area and the Project does not threaten to obstruct the route.

### 4. The Bureau considered development thresholds for pronghorn habitat.

The Alliance also alleges that the Bureau failed to identify "threshold levels for well pad densities and roads" within the Project Area that may impact pronghorn. (Alliance Br. at 62). The evidence in the administrative record refutes this argument because the FEIS considered and adopted WGFD's recommendations for protecting pronghorn habitat. (*See* SA-I-65; SA-I-72; App.-III-696). Even so, the Bureau's obligation under NEPA was to consider the likely significant impacts of approving the Project and not to address some pre-determined threshold. *See Biodiversity Conservation All. v. BLM*, No. 09-CV-08-J, 2010 WL 3209444, at *16 (D. Wyo. June 10, 2010) (rejecting argument that the Bureau has an obligation to determine a threshold of impacts of an oil and gas project under Section 102(2)(C) of NEPA).

During the scoping process, the National Park Service commented that pronghorn are currently successful in returning to the Park each year but stated "there may be a threshold of oil and gas development and activity at which they no longer do so because of impaired habitat connectivity or population level demographic impacts related to habitat loss, fragmentation, and/or disturbance." (App.-I-261). In

the FEIS, the Bureau considered WGFD recommendations for oil and gas development within wildlife habitats. (*See* SA-I-65; App.-III-637; App.-III-640). WGFD recommends limiting development to 1-4 wells with less than twenty acres of surface disturbance per square mile in pronghorn crucial winter habitat. (SA-I-73; SA-I-75). The purpose of this recommendation is "to maintain habitat functions by minimizing the intensity of development and associated disturbances by providing effective mitigation for unavoidable impacts." (SA-I-74).

The Bureau adopted the preferred alternative that limited disturbance density to one site per square mile in sage-grouse PHMA. (App.-III-552). The Bureau acknowledged that this decision would mitigate impacts to the pronghorn habitat that overlaps sage-grouse PHMA but may leave areas of pronghorn winter habitat outside PHMA particularly vulnerable because the development would be the greatest in these areas. (App.-III-674). For example, DA 2 will have a higher density of development per square mile but will remain within the WGFD recommendation. (App.-III-548).

WGFD similarly recommends avoiding road construction and human activity within pronghorn winter habitat from November 15 through March 14. (SA-I-76). In order to protect big game, the Bureau prohibited development activities within certain areas during this period. (SA-IV-909). For any development that occurs

beyond these areas, the Bureau considered the potential environmental impacts on pronghorn winter range. (App.-III-674).

Although the Alliance may disagree with the Bureau's decision, the Court looks only to whether the Bureau's determinations were arbitrary, capricious, or an abuse of discretion. *See Ark Initiative v. Tidwell*, 64 F.Supp.3d 81, 99 (D.D.C. 2014) (applying 40 C.F.R. § 1508.27(b)(3) and concluding additional analysis was not warranted). Here, the District Court correctly concluded that the Bureau took the requisite hard look at potential impacts to pronghorn and adopted WGFD mitigation measures for protecting crucial winter habitat. (App.-I-230–31).

### B.    The Bureau took a hard look at the indirect impact to pronghorn migrations.

The Alliance argues that the Bureau failed to disclose the Project's indirect effects on pronghorn. (Alliance Br. at 67). The Bureau, in fact, identified eleven different indirect impacts that the Project will have on big game species, including pronghorn within Herd Unit 401. (App.-III-673–74).

The Alliance cites literature from Dr. Berger that identifies some potential consequences of impaired migration routes and pronghorn populations. (Alliance Br. at 67-68) (citing App.II-437; App.-II-452). The Bureau's indirect impact analysis in the FEIS resulted in similar findings. (App.-III-673–74). Specifically, the Bureau recognized that degradation of seasonal habitat and the disruption of migratory routes are "of particular concern" for pronghorn due to existing and ongoing

disturbance in crucial winter range in surrounding areas. (App.-III-714). The Bureau's indirect impact analysis then concluded that the Proposed Action could result in "[d]ecreased or degrad[ation] of seasonal habitats (including migration routes) that are important in supporting local and regional wildlife populations." (App.-III-673).

The Bureau also explained that the Project could result in "[d]ecreased quality of habitat resulting from habitat fragmentation and increased edge effects." (*Id.*). Under NEPA, this Court examines the administrative record as a whole to determine "whether the [agency] made a reasonable, good faith, objective presentation of those impacts sufficient to foster public participation and informed decision making." *Colo. Env't Coal.*, 185 F.3d at 1177. In this respect, the District Court did not err when it concluded the Bureau did not fail to consider the potential indirect impacts of the Project on pronghorn. (App.-I-230).

Finally, the Alliance argues that the Project will result in "localized effects" on the "unique" Grand Teton National Park landscape.[6] (Alliance Br. at 68). Yet, the Alliance provides no argument for how the intensity factors in NEPA regulation apply to the Bureau's indirect impact analysis. (*See* Alliance Br. at 67) (citing 40 C.F.R. § 1508.27(b)(3), (8)). The Alliance's reliance on *Anderson* and *Fund for*

---

[6] The National Park Service did not raise any concerns relating to potential "localized" recreational impacts that the Project would have on wildlife viewing in Grand Teton National Park. (*See* SA-I-165–69).

*Animals* is also misplaced. (Alliance Br. at 68) (citing *Anderson v. Evans*, 350 F.3d 815, 833-34 (9th Cir. 2002), *amended and superseded*, 371 F.3d 475 (9th Cir. 2004); *Fund for Animals v. Norton*, 281 F.Supp.2d 209, 233 (D.D.C. 2003)). The cited portions of *Anderson* involve two entirely different intensity factors that the Alliance did not raise in this appeal. *See Anderson*, 350 F.3d at 832-33 (citing 40 C.F.R. § 1508.27(b)(4) (highly controversial factor), 40 C.F.R. § 1508.27(b)(5) (highly uncertain factor)). Similarly, *Fund for Animals* involves three intensity factors not relevant to the Alliance's argument. *See Fund for Animals*, 281 F.Supp.2d at 233-35 (citing 40 C.F.R. § 1508.27(b)(4) (highly controversial factor), 40 C.F.R. § 1508.27(b)(5) (highly uncertain factor), 40 C.F.R. § 1508.27(b)(6) (precedent for future actions)). In sum, the Bureau's indirect impact analysis explained the potential impacts to pronghorn within Herd Unit 401 and the Alliance has not demonstrated how the Project, located some 100 miles from Grand Teton National Park, will result in "unique" "localized" impacts.

## CONCLUSION

For the forgoing reasons, the State of Wyoming asks this Court to affirm the District Court opinion, order, and judgment that affirmed the Project authorization in the Bureau's ROD and accompanying FEIS.

Dated this 24th day of January, 2023.

/s/ *Travis S. Jordan*
Travis S. Jordan
D. David DeWald
Senior Assistant Attorneys General
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, Wyoming 82002
(307) 777-7895
travis.jordan@wyo.gov
david.dewald@wyo.gov

*Counsel for Intervenor-Respondent-Appellee, State of Wyoming*

**STATEMENT OF COUNSEL AS TO ORAL ARGUMENT**

Appellants have requested oral argument. The State of Wyoming defers to the Court's judgment in this matter but it believes that argument will assist the Court in resolving this appeal. Specifically, the State of Wyoming can provide additional factual context into its management of sage-grouse and pronghorn in the region as well as the WGFD measures that the Bureau adopted for the Project.

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,876 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word 13 and Times New Roman 14-point font.

Date: January 24, 2023.

/s/ *Travis S. Jordan*
Travis S. Jordan
D. David DeWald
Senior Assistant Attorneys General
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, Wyoming 82002
(307) 777-7895
travis.jordan@wyo.gov
david.dewald@wyo.gov

*Counsel for Intervenor-Respondent-Appellee, State of Wyoming*

## CERTIFICATE OF SERVICE

I hereby certify that on the 24th day of January, 2023, I electronically filed the foregoing using the Court's CM/ECF system which will send notification of such filing to the following:

Wendy Park
Center for Biological Diversity
wpark@biologicaldiversity.org
*Attorney for Appellants*

Edward B. Zukoski
Center for Biological Diversity
tzukoski@biologicaldiversity.org
*Attorney for Appellants*

Sarah Stellberg
Advocates for the West
sstellberg@advocateswest.org
*Attorney for Appellants*

Sommer H. Engels
U. S. Department of Justice
Sommer.Engels@usdoj.gov
*Attorney for Respondents-Appellees*

Thomas W. Ports, Jr.
U.S. Department of Justice
Thomas.ports.jr@usdoj.gov
*Attorney for Respondents-Appellees*

Kathleen C. Schroder
Gail L. Wurtzler
Davis Graham & Stubbs LLP
katie.schroder@dgslaw.com
gail.wurtzler@dgslaw.com
*Attorneys for Intervenor-Appellee*
*Jonah Energy, LLC*

/s/ *Travis S. Jordan*
Travis S. Jordan

# ADDENDUM

Except for the following, all applicable statutes and regulations are contained in the Addendum of the Alliance's Opening Brief.

40 C.F.R. § 1502.22 (2018) ........................................................................1a

40 C.F.R. § 1508.8 (2018) ..........................................................................3a

40 C.F.R. § 1508.27 (2018) ........................................................................4a

**40 C.F.R. § 1502.22**

§ 1502.22  Incomplete or unavailable information.

When an agency is evaluating reasonably foreseeable significant adverse effects on the human environment in an environmental impact statement and there is incomplete or unavailable information, the agency shall always make clear that such information is lacking.

(a)  If the incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant, the agency shall include the information in the environmental impact statement.

(b)  If the information relevant to reasonably foreseeable significant adverse impacts cannot be obtained because the overall costs of obtaining it are exorbitant or the means to obtain it are not known, the agency shall include within the environmental impact statement:

(1)  A statement that such information is incomplete or unavailable;

(2)  a statement of the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant adverse impacts on the human environment;

(3)  a summary of existing credible scientific evidence which is relevant to evaluating the reasonably foreseeable significant adverse impacts on the human environment, and

(4)  the agency's evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community. For the purposes of this section, "reasonably foreseeable" includes impacts which have catastrophic consequences, even if their probability of occurrence is low, provided that the analysis of the impacts is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason.

*  *  *

**40 C.F.R. § 1508.08**

§ 1508.8 Effects.

*Effects* include:

(a)  Direct effects, which are caused by the action and occur at the same time and place.

(b)  Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

Effects and impacts as used in these regulations are synonymous. Effects includes ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social or health, whether direct, indirect or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.

**40 C.F.R. § 1508.27**

§ 1508.27 Significantly.

*Significantly* as used in NEPA requires consideration of both context and intensity:

    (a) ***Context.*** This means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole. Both short- and long-term effects are relevant.

    (b) ***Intensity.*** This refers to the severity of impact. Responsible officials must bear in mind that more than one agency may make decisions about partial aspects of a major action. The following should be considered in evaluating intensity:

* * *

    (3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

4a

(4)  The degree to which the effects on the quality of the human environment are likely to be highly controversial.

(5)  The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

(6)  The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

\* \* \*

(8)  The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.

\* \* \*