No. 22-8022

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

---

WESTERN WATERSHEDS PROJECT, et al.,

*Petitioners-Appellants,*
v.

UNITED STATES BUREAU OF LAND MANAGEMENT, et al.,

*Respondents-Appellees,*
and

JONAH ENERGY, LLC and STATE OF WYOMING,

*Respondents-Intervenors-Appellees*

---

On Appeal from the United States District Court for the District of Wyoming,
The Honorable Scott W. Skavdahl, Civil Action No. 2:19-cv-146-SWS

---

### RESPONDENT-INTERVENOR-APPELLEE JONAH ENERGY, LLC'S
### RESPONSE BRIEF

Kathleen C. Schroder
Gail L. Wurtzler
DAVIS GRAHAM & STUBBS LLP
1550 Seventeenth Street, Suite 500
Denver, CO 80202
Telephone: (303) 892-9400
katie.schroder@dgslaw.com
gail.wurtzler@dgslaw.com
*Attorneys for Jonah Energy, LLC*

**ORAL ARGUMENT IS REQUESTED**

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................ i

STATEMENT OF RELATED CASES ............................................... viii

JURISDICTIONAL STATEMENT ...................................................1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ...........................1

STATEMENT OF THE CASE ........................................................1

I.      The NPL Project ...........................................................1

II.     Development Areas Identified in the ROD ..................................4

III.    Greater Sage-Grouse Management in the Project Area .....................8

        A.      Core Area Protection Strategy.....................................8

        B.      Winter Concentration Areas .......................................10

IV.     Proceedings Below ........................................................12

SUMMARY OF THE ARGUMENT ................................................13

STANDARD OF REVIEW ........................................................16

ARGUMENT ..................................................................17

I.      BLM Complied with FLPMA When Approving the NPL ROD. ................17

        A.      Appellants Failed to Raise the Issue of Phased
                Development During NEPA Review. ...............................19

        B.      BLM Reasonably Did Not Require Phased Development
                in the NPL ROD. .................................................21

                1.      The ROD Allows BLM to Apply Required Design
                        Features When Approving Site-Specific Development...........21

                2.      BLM Explained Its Decision Not to Require Phased
                        Development under Alternative A. ...........................25

                3.      BLM Did Not Improperly Treat Required Design Features
                        as "Discretionary."........................................28

II.     BLM Complied with NEPA with Respect to Greater Sage-Grouse Winter
        Concentration Areas. .....................................................29

        A.      Appellants Mischaracterize BLM's Decisions with
                Respect to Winter Concentration Areas.............................30

        B.      Appellants Do Not Seek "Baseline" Data Related to
                Winter Concentration Areas........................................33

C.     BLM Complied with 40 C.F.R. § 1502.22 When Approving the NPL ROD....................................................................36

      1.    BLM Did Not Lack Information Essential to a Reasoned Choice Among Alternatives and the Cost to Obtain Additional Information Was Exorbitant. ...................................38

      2.    The Programmatic Nature of the NPL ROD Allows BLM to Conduct Studies After Its Issuance......................................41

      3.    NEPA Does Not Require BLM to Initiate Studies to Obtain Additional Information Regarding Winter Concentration Areas....................................................................44

III.    BLM Took a Hard Look at Grand Teton Pronghorn-Related Impacts. ........46

    A.     BLM's Consideration of Grand Teton Pronghorn Complied with NEPA............................................................................47

      1.    BLM Considered Grand Teton Pronghorn During the NEPA Process. ............................................................................47

      2.    Appellants Fail to Show that BLM Did Not Take a Hard Look at Grand Teton Pronghorn. ...............................................53

      3.    Appellants' Argument of Potential Indirect Recreational and Ecological Effects in Grand Teton National Park Should be Rejected....................................................................56

    B.     BLM's Analysis is Entitled to Deference. ..........................................58

CONCLUSION ....................................................................................................59

STATEMENT OF COUNSEL AS TO ORAL ARGUMENT ...............................61

CERTIFICATE OF COMPLIANCE ....................................................................62

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Evans*,
 350 F.3d 815 (9th Cir. 2002) ...................................................................53

*Baltimore Gas Elec. Co. v. Natural Res. Def. Council*,
 462 U.S. 87 (1983) ..........................................................................40, 47

*Blue Mountains Biodiversity Project v. Blackwood*,
 161 F.3d 1208 (9th Cir. 1998) ...............................................................53

*Center for Biological Diversity v. U.S. Department of the Interior*,
 563 F.3d 466 (D.C. Cir. 2009) ...............................................................42

*Citizens' Comm. to Save Our Canyons v. Krueger*,
 513 F.3d 1169 (10th Cir. 2008) .............................................................47

*Coal. on Sensible Transp. v. Dole*,
 826 F.2d 60 (D.C. Cir. 1987) .................................................................59

*Custer County Action Ass'n v. Garvey*,
 256 F.3d 1024 (10th Cir. 2001) .............................................................16

*Davis v. Mineta*,
 302 F.3d 1104 (10th Cir. 2002) .............................................................49

*Envtl. Def. Fund, Inc. v. Andrus*,
 619 F.2d 1368 (10th Cir. 1980) .............................................................58

*Forest Guardians v. U.S. Forest Serv.*,
 495 F.3d 1162 (10th Cir. 2007) ...........................................16, 19, 21, 58, 59

*Fund for Animals v. Norton*,
 281 F. Supp. 2d 209 (D.D.C. 2003) ........................................................53

*Japanese Vill., LLC v. Fed. Transit Admin.*,
 843 F.3d 445 (9th Cir. 2016) .................................................................57

*Karst Envtl. Educ. & Prot., Inc. v. Fed. Highway Admin.*,
 559 F. App'x 421 (6th Cir. 2014) ...........................................................20

*Kleppe v. Sierra Club*,
 427 U.S. 390 (1976)........................................................................55

*Lee v. U.S. Air Force*,
 354 F.3d 1229 (10th Cir. 2004) ......................................................44

*Middle Rio Grande Conservancy Dist. v. Norton*,
 294 F. 3d 1220 (10th Cir. 2002) ......................................................53

*National Audubon Society v. Department of the Navy*,
 422 F.3d 174 (4th Cir. 2005) ..........................................................35

*Native Village of Point Hope v. Jewell*,
 740 F.3d 489 (9th Cir. 2014) ..........................................................42

*Northern Plains Resource Council, Inc. v. Surface Transportation
 Board*,
 668 F.3d 1067 (9th Cir. 2011) ..................................................35, 43

*Oregon Natural Desert Association v. Jewell*,
 840 F.3d 562 (9th Cir. 2016) ............................................34, 35, 43

*N.M. ex rel. Richardson v. Bureau of Land Mgmt.*,
 565 F.3d 683 (10th Cir. 2009) ..................................................16, 55

*Robertson v. Methow Valley Citizens Council*,
 490 U.S. 332 (1989)........................................................................46

*San Juan Citizens All. v. Stiles*,
 654 F.3d 1038 (10th Cir. 2011) ..................................................9, 40

*Selkirk Conservation Alliance v. Fosgren*,
 336 F.3d 944 (9th Cir. 2003) ..........................................................55

*Utahns for Better Transp. v. U.S. Dep't of Transp.*,
 305 F.3d 1152 (10th Cir. 2002) ..................................................17, 49

*Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*,
 435 U.S. 519 (1978)........................................................................46

*W. Watersheds Project v. Bernhardt*,
 No. 1:18-cv-00187-REB, 2019 WL 3022188 (D. Idaho July 9,
 2019) (unpublished).......................................................................12

*WildEarth Guardians v. Conner*,
  920 F.3d 1245 (10th Cir. 2019) ....................................................16, 34

*Wildearth Guardians v. Jewell*,
  738 F.3d 298 (D.C. Cir. 2013).............................................................57

*WildEarth Guardians v. Montana Snowmobile Association*,
  790 F.3d 920 (9th Cir. 2015) ..............................................................56

*Wyo. Farm Bureau Fed'n v. Babbitt*,
  199 F.3d 1224 (10th Cir. 2000) ..........................................................59

**Statutes**

5 U.S.C. § 706(2)(A)...............................................................................16

16 U.S.C. §1533 ......................................................................................52

30 U.S.C. § 226(e) ..................................................................................27

42 U.S.C. § 4321(C)
  National Environmental Policy Act
  ...1, 2, 3, 10, 13, 14, 15, 16, 17, 18, 19, 29, 30, 31, 32, 36, 38, 39, 41, 42, 43, 44,
  45, 46, 47, 48, 52, 53, 54, 56, 58, 59

43 U.S.C. §§ 1701–87
  Federal Land Policy and Management Act ............................1, 14, 16, 17, 22, 29

**Other Authorities**

40 C.F.R. part 1500.................................................................................30

40 C.F.R. § 1501.6 (2018) ......................................................................52

40 C.F.R. § 1502.14(e) (2018)........................................................18, 26, 27

40 C.F.R. § 1502.22 (2018) ............................... 15, 30, 33, 36, 38, 41, 42, 43, 44, 45

40 C.F.R. § 1503.1(b) (2018) comments ...............................................57

40 C.F.R. §1506.10(a)(2018)..................................................................56

43 C.F.R. § 24.3(b) .................................................................................52

43 C.F.R. § 1610.5-3(a) ........................................................................19

51 Fed. Reg. 15,625 (Apr. 25, 1986) ....................................................45

76 Fed. Reg. 20,370 (Apr. 12, 2011) ......................................................3

79 Fed. Reg. 77,802, 77,830 (Dec. 24, 2014) ......................................45

80 Fed. Reg. 57,332 ..............................................................................23

81 Fed. Reg. 22,628 (Apr. 18, 2016) ....................................................25

82 Fed. Reg. 31,628 (July 7, 2017).........................................................3

83 Fed. Reg. 29,115 (June 22, 2018) ....................................................56

83 Fed. Reg. 29,135 (June 22, 2018) ...............................................3, 56

85 Fed. Reg. 43,304 (July 16, 2020)......................................................30

88 Fed. Reg. 1196, 1196 (Jan. 9, 2023) ...............................................45

88 Fed. Reg. 1196, 1211 (Jan. 9, 2023) ...............................................45

10th Cir. R. 28.2(C)(3) ........................................................................ viii

10th Cir. R. 32(B) .................................................................................62

Environmental Impact Statement Timelines (2010–2018) (2020),
    https://ceq.doe.gov/docs/nepa-
    practice/CEQ_EIS_Timeline_Report_2020-6-12.pdf .......................41

Fed. R. App. P. 32(a)(5) ........................................................................62

Fed. R. App. P. 32(a)(6) ........................................................................62

Fed. R. App. P. 32(a)(7)(B)(i)................................................................62

Fed. R. App. P. 32(f) .............................................................................62

Wyoming Executive Order No. 2015-4 (July 29, 2015) ...........................8

Wyoming Executive Order No. 2020-1 (Feb. 13, 2020) ........................52

# GLOSSARY

Administrative Procedure Act.................................................................APA

Application for Permit to Drill .............................................................APD

Approved Resource Management Plan Amendments
for Greater Sage-Grouse .........................................................Land Use Plans

Bureau of Land Management.................................................................BLM

Continental Divide-Creston  ..................................................................CD-C

Council on Environmental Quality ........................................................CEQ

Environmental Impact Statement .........................................................EIS

Federal Land Policy and Management Act............................................FLPMA

National Environmental Policy Act.......................................................NEPA

National Park Service.............................................................................NPS

Normally Pressured Lance ....................................................................NPL

NPL Natural Gas Development Project..................................................The Project

Priority Habitat Management Area .......................................................PHMA

Record of Decision.................................................................................ROD

Sage-Grouse Implementation Team ......................................................SGIT

Western Watersheds Project, Upper Green River Alliance, and
Center for Biological Diversity...............................................................Appellants

Wyoming Game and Fish Department ..................................................WGFD

**STATEMENT OF RELATED CASES**

Per 10th Cir. R. 28.2(C)(3), Jonah Energy LLC states that there are no prior or related appeals.

## JURISDICTIONAL STATEMENT

Jonah Energy does not disagree with the jurisdictional statement appearing on page 13 of Appellants' Opening Brief.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.     Whether BLM reasonably complied with its obligations under the Federal Land Policy and Management Act, 43 U.S.C. §§ 1701–87,  ("FLPMA") by authorizing the project alternative that would best avoid or reduce impacts to wildlife while allowing development to proceed.

2.     Whether BLM's analysis of effects on sage-grouse complied with the National Environmental Policy Act, 42 U.S.C. § 4321(C) ("NEPA"), where the agency conducted an appropriate analysis of those effects at the programmatic stage and reasonably decided to collect additional site-specific information to guide future site-specific reviews.

3.     Whether BLM's analysis of the Project's effects on pronghorn, including Grand Teton pronghorn, satisfied NEPA, where BLM discussed potential effects to pronghorn and pronghorn migration in detail.

## STATEMENT OF THE CASE

### I.     THE NPL PROJECT

Jonah Energy LLC ("Jonah Energy") is the proponent of the Normally Pressured Lance ("NPL") Natural Gas Development Project ("the Project") and

holds federal, state, and private oil and gas leases in a 140,000-acre area in Sublette County, Wyoming, that constitutes the Project Area.  App.-III-618.  The Record of Decision ("ROD") for the Project allows Jonah Energy to submit applications for permits to drill ("APDs") for as many as 3,500 natural gas wells and associated rights-of-way in the Project Area.  App.-III-546.  The ROD contemplates development at a pace of 350 wells per year.[1]  *Id.*

Importantly, the ROD does not authorize immediate development.  It also is "programmatic" in nature because it does not identify the specific locations of individual natural gas wells, related facilities, or rights-of-way.  Before Jonah Energy will begin field-wide development of the Project Area, it will develop "delineation wells" to advance Jonah Energy's understanding of the location and extent of oil and gas resources in previously unexplored portions of the Project Area.  App.-III-558.  Findings from initial delineation efforts will determine if and where further delineation should occur.  *Id.*

Because the locations of surface-disturbing activities are not known, the ROD contemplates that additional, site-specific review and NEPA compliance will

---

[1] Because the Project is within the Green River Basin ozone nonattainment area, however, BLM currently will authorize development of no more than 160 wells per year to remain in conformance with the Wyoming State Implementation Plan.  *See generally* SA-III-635 to 640 (General Conformity Determination).

occur before BLM approves any APDs or grants any rights-of-way. *E.g.*, App.-III-547.

BLM issued the ROD after a rigorous environmental review process required by NEPA that lasted more than seven years at a cost of more than $4.7 million. *See* 76 Fed. Reg. 20,370 (Apr. 12, 2011) (notice of intent); 82 Fed. Reg. 31,628 (July 7, 2017) (Draft EIS); 83 Fed. Reg. 29,135 (June 22, 2018) (Final EIS); App.-III-537; App.-III-545 (issuing ROD in August 2018). The original project proponent, Encana Oil & Gas (USA) Inc. (Encana), submitted a Plan of Development to BLM that became the proposed action for the Project. SA-II-275 to 287. Jonah Energy acquired the leases and interests in the Project Area from Encana.

The Plan of Development proposed an environmentally sensitive development project intended to minimize impacts to a prominent resource within the Project Area—greater sage-grouse and its habitat. *See* SA-II-275 to 287. Multiple natural gas wells would be drilled from single pads within the Project Area, and the density of these pads would be limited to an average of four per 640 acres. SA-II-278. The Plan of Development also proposed a host of operator-committed measures that would protect air quality, cultural resources, soils, water, wildlife, and a variety of other resources. *See* SA-II-286; App.-III-565 to 569.

BLM considered two alternatives to the proposed action, in addition to a no-action alternative.  First, BLM considered Alternative A, which divided the Project Area into seven Development Areas.  App.-III-631; SA-II-346.  Development would occur sequentially across these Development Areas in three phases.  *Id.*  Second, BLM considered Alternative B, which divided the Project Area into three Development Areas.  Different management measures would attach to each Development Area to account for the different resources present therein.

BLM ultimately adopted Alternative B.  App.-III-547; App.-III-574.  Alternative B, as adopted in the ROD, has two key features that are most relevant to the issues that Appellants raise in this litigation.  First, BLM manages the Project Area as three distinct Development Areas, with different management protocols that attach to each to conserve distinct resources.  App.-III-547 to 549.  Second, BLM implements a flexible approach to managing greater sage-grouse wintering habitat within the Project Area, known as "Winter Concentration Areas" that can accommodate and adapt to increasing scientific knowledge about greater sage-grouse and their winter habitats.  App.-III-554 to 556.

## II.    DEVELOPMENT AREAS IDENTIFIED IN THE ROD

The ROD divides the Project Area into three Development Areas, as proposed in Alternative B, and assigns different management measures to each.

The Development Area boundaries and BLM's management of them are driven by the particular resources present in each Development Area.

A central feature of the Project is that it contemplates low density of development in all Development Areas and thus throughout the Project Area. Whereas the nearby Pinedale Anticline and Jonah natural gas fields have tight well spacing, the densest development authorized by the ROD is an average of four disturbance locations per 640 acres, i.e., one square mile.  App.-III-548 to 549.  As a result, BLM estimates that well pads, roads, pipelines, regional gathering facilities, and other infrastructure will yield long-term surface disturbance of only 1,741 acres—approximately one percent of the total Project Area—over the lifetime of the Project.[2]  *See* App.-III-650 to 651.

*Development Area 1.*  Development Area 1 covers approximately 27 percent of the Project Area.  App.-III-548.  The boundaries of Development Area 1 align with BLM's management of environmentally sensitive resources, including greater sage-grouse Winter Concentration Areas, big game habitat, lands with wilderness characteristics, surface waters, and paleontological resources.  *Id.*  BLM authorized development in Development Area 1 at a density averaging one disturbance location per 640 acres.  *Id.*  BLM intended this low density would accomplish two

---

[2] BLM projects less than 6,000 acres in total short-term disturbance.  App.-III-650, App.-III-651.

objectives.  First, it would "incentivize development in less environmentally sensitive areas."  *Id.*  Second, "[t]his pattern of development will conserve larger areas of uninterrupted open space in Development Area 1 to benefit the range of resources present."  *Id.*

*Development Area 2.*  Development Area 2 covers approximately 39 percent of the Project Area and is mostly adjacent to the Jonah Infill Drilling Project. App.-III-548.  Because of the proximity to this existing development, BLM authorized development in Development Area 2 at a density averaging up to four disturbance locations per 640 acres.  *Id.*

*Development Area 3.*  Development Area 3 covers approximately 34 percent of the Project Area and includes priority habitat for greater sage-grouse, which is known as a "Priority Habitat Management Area" or "PHMA."  App.-III-548. Consistent with both its management measures for PHMA and the State of Wyoming's management of Core Population Areas for greater sage-grouse, BLM authorized development in Development Area 3 at an average of no more than one disturbance location per 640 acres and not to exceed 32 acres (5 percent) surface disturbance per 640 acres, inclusive of existing disturbances, calculated using the State of Wyoming's Density Disturbance Calculation Tool.  *Id.*

The Development Areas, as mapped in the ROD, App.-III-551, are set forth on the following page.



By limiting density in each Development Area to low thresholds, BLM

retains management flexibility when site-specific development is proposed.  First,

the low densities inherently conserve sensitive resources by limiting overall surface disturbance and surface fragmentation.  Second, the low densities give BLM the flexibility to site individual disturbances to avoid sensitive resources.

## III.   GREATER SAGE-GROUSE MANAGEMENT IN THE PROJECT AREA

The ROD's greater sage-grouse management measures begin with those measures set forth in the State of Wyoming's Core Area Protection Strategy in Executive Order No. 2015-4 (July 29, 2015) and BLM's Approved Resource Management Plan Amendments for Greater Sage-Grouse (Land Use Plans), which largely adopt the State's Core Area Protection Strategy.  *See* App.-III-777; App.-III-766.

### A.   Core Area Protection Strategy

The Core Area Protection Strategy is based on the identification and protection of greater sage-grouse Core Population Areas.  The State of Wyoming first identified Core Population Areas based on the location of greater sage-grouse leks and data of greater sage-grouse attendance at these leks, as outlined in Attachment A to the Executive Order.  App.-III-786.  Then, within these Core Population Areas, the Core Area Protection Strategy minimizes impacts to greater sage-grouse by imposing two key management measures: (1) a disturbance limit of five percent, and (2) a density limit of an average of one oil and gas well pad per 640 acres.  App.-III-789.  Jonah Energy has embraced Wyoming's lead role in

8

managing for greater sage-grouse and committed to measures in the NPL ROD that adopt and complement the Core Area Protection Strategy.  *See, e.g.*, App.-III-565.

BLM's Land Use Plans incorporate the Core Area Protection Strategy in two significant respects.  First, the Land Use Plans identify PHMAs, which largely mirror the State of Wyoming's Core Population Areas.  *See* SA-IV-1017 to 1018.  Second, the Land Use Plans adopt the same density and disturbance limitations in PHMAs as in Core Population Areas.  *See* SA-IV-1015.

Core Population Areas, however, are distinct from Winter Concentration Areas.  The State of Wyoming defines Winter Concentration Areas as "places where large numbers of Core Population Area Greater sage-grouse congregate and persistently occupy between December 1 and March 14."  App.-III-788.  The State of Wyoming manages Winter Concentration Areas differently than Core Population Areas because the underlying science and management philosophy do not support applying the Core Population Area and PHMA management measures in Winter Concentration Areas.[3]  *See* App.-III-787 to 788.  As a result, neither the

---

[3] Although the "identification of Core Population Areas is intended to capture ***all*** seasonal requirements for Greater sage-grouse," the State of Wyoming has found that some Core Population Areas "may not capture all Greater sage-grouse needs." App.-III-788 (emphasis added). The State of Wyoming has instead recommended that identification of Winter Concentration Areas "be based on habitat features and repeated observations of winter use by biologically significant numbers of Greater sage-grouse . . . using a validated Resource Selection Function (RSF) modeling approach." *Id.*

Core Area Protection Strategy nor the ROD imposes Core Population Area-management measures, such as surface disturbance and density limitations, in Winter Concentration Areas.[4]  *See* App.-III-787 to 788; App.-III-552.

In the Project Area, BLM's management of Winter Concentration Areas is guided by the Land Use Plans and the Core Area Protection Strategy.  *See* App.-II-379; App.-III-777.  The PHMA in the Project Area does not include Winter Concentration Areas.  *See* App.-III-557 (map of PHMA).  Similarly, the Land Use Plans do not restrict density or disturbance in Winter Concentration Areas in the Project Area.  *See* App.-II-380.

### B.    Winter Concentration Areas

The ROD recognizes the uncertainty in management of Winter Concentration Areas and prescribes an adaptive strategy designed to tailor management of these areas to greater sage-grouse needs as more scientific research

---

[4] Appellants incorrectly assert that BLM and the Wyoming Game and Fish Department "recommended" to the State of Wyoming that the Winter Concentration Areas in the Project Area be designated as Core Population Areas. Appellants' Opening Br. at 32.  This referenced recommendation was not a formal BLM recommendation, nor was it made as part of the NPL NEPA review process. Rather, it was an independent recommendation made jointly by a staff biologist in BLM's Pinedale Field Office and a Wyoming Game and Fish Department biologist as part of the State of Wyoming's revisions to its Core Population Areas.  *See* App.-II-518 to 521.  The State of Wyoming did not adopt this recommendation. *See* App.-III-785.  Further, BLM's Land Use Plans did not designate Winter Concentration Areas as PHMA in the Project Area.  *See* App.-III-772; App.-III-557.

occurs regarding Winter Concentration Areas.  First, the ROD authorizes development in Winter Concentration Areas only "on a limited scale."  App.-III-574.  Second, the ROD provides that a study will be conducted "concurrently with limited development activities" in Winter Concentration Areas "to better understand the impacts of developing in Winter Concentration Areas."  *Id.*  Finally, the ROD outlines two different management scenarios for development in Winter Concentration Areas "to allow appropriate decisions based on the results of the study and use of the most current guidance during site-specific application review."  App.-III-554.

Development Scenario 1 limits the density of development in Winter Concentration Areas to an average of one disturbance location per 640 acres. App.-III-555.  It also prohibits surface disturbing and/or disruptive activities in Winter Concentration Areas from December 1 through March 14.  *Id.* Development Scenario 2 imposes these same density and timing limitations as well as other restrictions.  Development Scenario 2 limits surface disturbance in Winter Concentration Areas to 32 acres per 640 acres (five percent).  *Id.*  It also requires that development in Winter Concentration Areas initially proceed from east to west.  *Id.*  Additionally, Development Scenario 2 requires that above-ground facilities be centralized outside of Winter Concentration Areas and, similarly, limits the number of regional gathering facilities in Winter Concentration Areas.

*Id.*  It also requires buried powerlines and pipelines for produced water and condensate.  App.-III-555 to 556.

The ROD initially authorizes development in Winter Concentration Areas under Development Scenario 1 but provides that BLM may consider applying Development Scenario 2 based on results of the concurrent Winter Concentration Area study and review of site-specific development applications.  App.-III-555. Therefore, by authorizing limited development with a concurrent study, the ROD allows BLM to adjust management measures in response to evolving science.

## IV.    PROCEEDINGS BELOW

After BLM approved the ROD in August of 2018, Appellants Western Watersheds Project and Center for Biological Diversity initially challenged the ROD by amending their complaint in unrelated litigation in the District of Idaho contesting other BLM actions that allegedly affected greater sage-grouse.  *See W. Watersheds Project v. Bernhardt*, No. 1:18-cv-00187-REB, 2019 WL 3022188 (D. Idaho July 9, 2019) (unpublished).  After motions by the Federal Appellees, the State of Wyoming, and Jonah Energy, the District of Idaho court severed the challenge to the NPL Project and transferred those claims to the District of Wyoming in July 2019.  *Id.*; *accord* App.-I-024.

In the District of Wyoming, Appellants, including Upper Green River Alliance, filed an Amended Petition for Review of Agency Action seeking review

of the ROD.  App.-I-023 to 030.  After merits briefing, the district court affirmed BLM's decision to approve the NPL ROD.  The district court found "there is substantial evidence to support the reasoned basis for BLM's decisions in this matter."  Addendum 065.  Further, the district court determined that "BLM took a 'hard look' at the environmental consequence and considered all relevant information when making its ROD and deciding the best alternative to balance the goals of the NPL Project and the potential environmental impacts."  *Id.*

Jonah Energy maintains that the district court's decision is correct.  Jonah Energy respectfully requests that the Court deny Appellants' requested relief and affirm the district court's opinion, order, and judgment upholding the NPL ROD.

## SUMMARY OF THE ARGUMENT

This case reflects Appellants' fundamental disagreement with BLM's decision to approve the NPL ROD and allow the agency to approve permits authorizing natural gas development.  Appellants seek to undo more than seven years of environmental study and NEPA compliance based on their claims that BLM did not consider or adequately manage for greater sage-grouse and pronghorn.  Yet, although Appellants maintain their alleged flaws are fatal to BLM's decision to approve the NPL ROD, Appellants failed to timely present many of their issues to the agency during the NEPA process.

Furthermore, Appellants' allegations of error fundamentally ignore the programmatic nature of the NPL ROD.  The ROD does not allow Jonah Energy to initiate natural gas development.  Rather, the ROD sets forth the general terms by which BLM will authorize natural gas development within the Project Area.  Once Jonah Energy proposes individual wells, roads, and other infrastructure, BLM will evaluate their site-specific impacts and may impose additional terms and conditions.  The NPL ROD provides thoughtful, comprehensive management measures for greater sage-grouse and pronghorn while affording BLM flexibility to impose additional measures on site-specific development, if necessary.

Appellants present three principal challenges to the ROD but fail to establish error in either BLM's or the district court's decision.  *First*, BLM's decision not to apply a Required Design Feature set forth in the Land Use Plans complies with FLPMA.  This Required Design Feature would phase development throughout greater sage-grouse PHMA.  As an initial matter, the Court should not consider Appellants' objection because they failed to present it to BLM during the NEPA process.  Regardless, the NPL ROD conforms to the Land Use Plans because the ROD allows BLM to apply the Required Design Feature when approving site-specific development.  Furthermore, BLM reasonably declined to adopt an alternative in the Final EIS that would have required phased development throughout the entire Project Area.

14

*Second*, BLM complied with NEPA when it allowed approval of "limited" development in greater sage-grouse Winter Concentration Areas concurrently with a study to better understand the impacts of natural gas development in Winter Concentration Areas.  Particularly, BLM complied with the Council on Environmental Quality ("CEQ") regulation addressing "incomplete or unavailable" information identified during a NEPA process.  40 C.F.R. § 1502.22 (2018).  The additional information that Appellants argue BLM should have considered is more complex than mere "baseline data" as they claim.  Accordingly, the additional information was not essential to BLM's choice of reasoned alternatives during the NEPA process and could not be obtained without exorbitant cost.  Furthermore, the programmatic nature of the NPL ROD affords BLM flexibility in obtaining additional information prior to authorizing development.  Moreover, NEPA does not require that BLM obtain this information because BLM must initiate a study to do so.

*Third*, BLM satisfied its obligations under NEPA with respect to pronghorn and, specifically, the Grand Teton herd.  The administrative record demonstrates that BLM considered impacts from the Project on the Grand Teton herd.  Although Appellants did not raise potential indirect recreational and ecological effects in Grand Teton National Park until after BLM completed the Final EIS, BLM's analysis addressed these issues.  BLM's analysis is entitled to deference.

15

For these reasons, the district court's decision should be affirmed.

## STANDARD OF REVIEW

Appellants allege that BLM's approval of the NPL ROD violated FLPMA and NEPA. BLM's compliance with FLPMA is reviewed under the Administrative Procedure Act's ("APA") deferential standard of arbitrary, capricious, or an abuse of discretion. *Richardson*, 565 F.3d at 719. Under this standard, courts evaluate whether a "challenged action 'was based on consideration of the relevant factors and whether there has been a clear error of judgment.'" *Forest Guardians v. U.S. Forest Serv.*, 495 F.3d 1162, 1168 (10th Cir. 2007) (quoting *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989)).

An agency's NEPA process is also reviewed under the APA's arbitrary and capricious and abuse of discretion standard of review. *WildEarth Guardians v. Conner*, 920 F.3d 1245, 1256 (10th Cir. 2019); 5 U.S.C. § 706(2)(A). The process is sufficient unless it "entirely failed to consider an important aspect of the problem," "failed to base its decision on consideration of the relevant factors," or "made a clear error of judgment." *WildEarth Guardians*, 920 F.3d at 1256 (quoting *N.M. ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 704 (10th Cir. 2009)). The "objective is not to fly speck the [EIS], but rather, to make a pragmatic judgment whether the [EIS's] form, content and preparation foster both informed decision-making and informed public participation." *Custer County*

*Action Ass'n v. Garvey*, 256 F.3d 1024, 1035 (10th Cir. 2001) (quoting *Colo.*

*Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1172 (10th Cir. 1999)). A court should

not "second-guess the wisdom of the ultimate decision." *Utahns for Better*

*Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1163 (10th Cir. 2002).

## ARGUMENT

## I.  BLM COMPLIED WITH FLPMA WHEN APPROVING THE NPL ROD.

Appellants' initial challenge to BLM's approval of the NPL ROD is one that

the Appellants never presented to BLM during the NEPA process that spanned

more than seven years: that BLM improperly exempted the NPL Project from a

Required Design Feature set forth in BLM's Land Use Plans that provides for

phased development in greater sage-grouse PHMA. *See* Appellants' Opening Br.

at 42–49. Particularly, Appellants object to BLM's decision not to adopt

Alternative A in the Final EIS, which required phased development throughout the

NPL Project. *See id.* at 44–45. They incorrectly contend that, by selecting

Alternative B in the NPL ROD, BLM "exempted" the NPL Project from the

phased development Required Design Feature without examining criteria set forth

in the Land Use Plans, in violation of FLPMA. *See id.* at 43.

Required Design Features are essentially best management practices. App.-

II-381 ("The following conservation measures have typically been referred to as

best management practices (BMP) or recommended management practices."). The

Land Use Plans set forth more than 90 Required Design Features that BLM must consider when approving projects in greater sage-grouse PHMA. App.-II-381 to 386. One such Required Design Feature directs BLM to phase development with concurrent reclamation. *See* App.-II-383 ("Apply a phased development approach with concurrent reclamation.").

BLM has discretion as to whether and when to adopt Required Design Features when making site-specific permitting decisions. The Land Use Plans recognize that "some [Required Design Features] may not apply to some projects . . . and/or may require slight variations" because of "site-specific circumstances," such as when a resource is not present on a given site or because projects require a larger or smaller protective area. App.-II-381. For a BLM approval to vary from a Required Design Feature, the associated NEPA analysis must demonstrate that one of three criteria is met. *See id.*

In the Draft and Final EISs, BLM analyzed an alternative that would phase development throughout the entire Project Area, including in greater sage-grouse PHMA. App.-III-631. Particularly, Alternative A provided that development throughout the Project Area would proceed in three phases. *See id.* In the Final EIS, however, BLM selected Alternative B as its preferred alternative and adopted Alternative B in the ROD. App.-III-623; App.-III-547; App.-III-573 to 574; *see* 40 C.F.R. § 1502.14(e) (2018). Alternative B did not require phased development

18

throughout the NPL Project but provided that BLM would evaluate Required

Design Features when considering proposed site-specific development.  *See* App.-

III-548; App-III-554.

In the ROD, BLM affirmed that its management decisions, including its

decision to adopt Alternative B, conformed with the applicable resource

management plans, including the Land Use Plans.  *See* 43 C.F.R. § 1610.5-3(a).

BLM expressly determined that "[t]he proposed development of natural gas within

the Project Area is in conformance with the BLM Wyoming Sage-Grouse

[Resource Management Plan] Amendments."  Appellants' App.-III-577.  Because

BLM may adopt Required Design Features when it considers proposed site-

specific development, BLM complied with the Land Use Plans and reasonably

declined to require phased development in the NPL ROD.

> **A.    Appellants Failed to Raise the Issue of Phased Development During NEPA Review.**

Although Appellants now contend that BLM's treatment of phased

development justifies setting aside the entire NPL ROD, *see* Appellants' Opening

Br. at 69–70, Appellants never raised this issue during the more than seven-year

environmental review process.  "Parties generally must structure their participation

so that it alerts the agency to the parties' position and contentions, in order to allow

the agency to give the issue meaningful consideration."  *Forest Guardians*, 495

F.3d at 1170 (quoting *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764 (2004))

(quotations omitted). "The time to complain is at the comment stage, not after the agency has completed its decision making process." *Karst Envtl. Educ. & Prot., Inc. v. Fed. Highway Admin.*, 559 F. App'x 421, 424 (6th Cir. 2014). In this case, Appellants submitted detailed public comments but never raised their concern with phased development in their comments.[5] SA-I-106 to 164; App.-I-264 to 269; SA-II-444 to 498; App.-II-460 to 464; App.-II-490 to 509; SA-III-555 to 574.

On appeal, Appellants not only object to BLM's decision not to require phased development for the entire Project Area as part of the NPL ROD but also object to the precision with which BLM reached its decision. *See* Appellants' Opening Br. at 45, 46 (arguing that "[t]he ROD and EIS do not explain BLM's decision to waive the phasing requirement" and "do not articulate any explanation for BLM's decision not to require a phased development approach for the Project"). Yet had Appellants raised their concerns during the public comment process, BLM could have responded directly to them in the manner that Appellants now seek. *See* SA-IV-921 to 984 (responding to comments on Draft EIS); SA-IV-580 to 617 (responding to comments on Final EIS). In other words, had Appellants raised their concerns during the public comment process, they could

---

[5] The district court found that it could consider this issue because "Jonah Energy and the BLM worked together to discuss phased development, to ensure compliance with the [Land Use Plans]." Addendum 056 (citing exception to administrative exhaustion doctrine for "obvious" issues articulated in *Public Citizen*, 541 U.S. at 765).

have alerted BLM to their "position and contentions," *Forest Guardians*, 495 F.3d

at 1170 (quoting *Pub. Citizen*, 541 U.S. at 764), and prompted BLM to respond

directly to their concerns.

For these reasons, the Court should find Appellants waived their objections.

But, even if the Court reviews BLM's treatment of phased development in the NPL

ROD, it should recognize that Appellants elected not to raise them with BLM and

BLM had no opportunity to respond or further explain its decision.

**B.    BLM Reasonably Did Not Require Phased Development in the NPL ROD.**

Appellants base their objections to BLM's treatment of phased development

in the NPL ROD on two fundamental misconstructions of BLM's decision.  First,

Appellants ignore that the NPL ROD allows BLM to apply the phased

development Required Design Feature when evaluating site-specific development.

Second, Appellants do not acknowledge BLM's explanation as to why it did not

adopt the phased development alternative.

**1.    The ROD Allows BLM to Apply Required Design Features When Approving Site-Specific Development.**

Appellants ignore BLM's ability to apply Required Design Features when

approving site-specific permits and, for this reason, argue that the district court's

decision was in error.  Appellants' Opening Br. at 48–49.  Specifically, Appellants'

statements that BLM "excluded" the Project from the phased development

Required Design Feature and "rejected" a phased development alternative

misinterpret the ROD.  *See* Appellants' Opening Br. at 45, 49.  The ROD expressly

allows BLM to adopt Required Design Features when approving site-specific

development in PHMA, stating:

> The BLM will apply appropriate required design features identified in
> the BLM Wyoming Sage-Grouse [Resource Management Plan]
> Amendments (BLM 2015) as Stipulations/COAs/Terms and
> Conditions within PHMA for all program areas, as applicable.

App.-III-554; *accord* App.-III-610.  Relying on this language, the district court

correctly recognized that BLM's decision to adopt Alternative B conformed to the

Land Use Plans and did not violate FLPMA.  *See* Addendum 061–064.

Appellants sidestep the express language of the NPL ROD by advancing two

flawed arguments.  First, they assert that "the ROD directs that the Project 'is not

required to be sequential or phased over time' and 'authorizes development to

occur in all [Development Areas] simultaneously.'"  Appellants' Opening Br. at

49.  This assertion incorrectly conflates the phased development requirement in

Alternative A with the phased development Required Design Feature.

Alternative A proposed to phase development throughout the entire Project Area

(i.e., in all Development Areas), including PHMA.  App.-III-573 to 574.  By

contrast, the phased development Required Design Feature in the Land Use Plans

only would apply in PHMA, App.-II-381; App.-II-383, which only exists in

Development Area 3, *see* App.-III-548; *compare* App.-III-551 *with* App.-III-557,

App.-III-662.  Thus, Alternative A proposed phased development in a broader area than the Required Design Feature.

The fact that BLM declined to require phased development throughout the entire Project Area, as proposed in Alternative A, and instead allowed "development to occur in all [Development Areas] simultaneously," *see* App.-III-548, does not preclude application of the Required Design Feature at the site-specific permitting stage.  Conceivably, BLM could apply the Require Design Feature to require phased development in PHMA (i.e., in Development Area 3) while development occurs simultaneously in Development Area 1 or 2 (not PHMA).  Appellants' allegation of error misconstrues the NPL ROD.

Second, Appellants rely on a list of Required Design Features in the administrative record to argue that BLM will not consider phased development when approving site-specific permitting.  *See* Appellants' Opening Br. at 49.  BLM drafted this list of Required Design Features in 2014, before it both finalized the Land Use Plans and released the Draft EIS, Final EIS, and NPL ROD.[6]  *See* App.-I-280 (dated Dec. 9, 2014); App.-I-297 (dated Dec. 8, 2014).  And, BLM did not include this list in the NPL ROD but instead included a list of resource protection measures to be applied at the site-specific permitting phase, which include

---

[6] BLM released the ROD for the Land Use Plans in September 2015 and released the ROD for the Project in August 2018.  *See* 80 Fed. Reg. 57,332 (Sept. 23, 2015); SA-II-420.

Required Design Features.  *Compare id. with* App.-III-587 to 613.  A pre-decisional document in the administrative record cannot overcome the express language of the Final EIS or NPL ROD.  Appellants' assertion that BLM cannot or will not consider all Required Design Features at the site-specific permitting stage is unfounded.

BLM's decision to evaluate the phased development Required Design Feature at the site-specific permitting stage, rather than as part of the NPL EIS or ROD, was reasonable.  First, by electing to evaluate and apply the phased development Required Design Feature at the site-specific permitting stage, BLM's treatment of this Required Design Feature was consistent with its treatment of dozens of other Required Design Features identified in the Land Use Plans.  In the NPL ROD, BLM neither evaluated nor adopted each of the more than 90 Required Design Features.  *Compare* App.-II-381 to 386 (listing Required Design Features for priority habitat in Land Use Plans) *with* App.-III-608 to 610 (listing resource protection measures that include Required Design Features identified in Land Use Plans).  Appellants' suggestion that BLM could not later require these Required Design Features would lead to absurd results.  For example, the Land Use Plans include a Required Design Feature to "[c]lean up refuse," *see* App.-II-383.  Although this Required Design Feature appears nowhere in the NPL ROD, it

24

would be illogical to conclude that BLM could not require the cleanup of refuse when authorizing site-specific development.

Second, BLM's treatment of the phased development and other Required Design Features in the NPL ROD is consistent with its decisions authorizing other programmatic oil and gas projects. BLM previously had declined to assess the applicability of Required Design Features when approving the ROD for the Continental Divide-Creston (CD-C) project, which programmatically authorized the development of 8,950 natural gas wells. SA-II-321; *see generally* 81 Fed. Reg. 22,628 (Apr. 18, 2016). BLM reasoned that assessing the applicability of Required Design Features in the programmatic CD-C ROD would be "ineffective or infeasible" because Required Design Features "cannot be fully assessed until the project level when the project location and design are known." SA-II-321. For all these reasons, Appellants' argument that BLM cannot assess or apply Required Design Features when evaluating site-specific approvals fails.

### 2.   BLM Explained Its Decision Not to Require Phased Development under Alternative A.

Appellants' argument that BLM did not adequately explain its decision not to require phased development as proposed in Alternative A is similarly unfounded. *See* Appellants' Opening Br. at 45 ("The ROD and EIS do not explain BLM's decision to waive the phasing requirement."). Appellants ignore BLM's

detailed explanation in the Final EIS of why BLM rejected Alternative A in favor

of Alternative B, as well as supporting information in the administrative record.

In the Final EIS, BLM identified Alternative B as the preferred alternative

because it "conserve[ed] a broad range of resource values and focus[ed]

development in the least environmentally sensitive areas." SA-III-729; *see* 40

C.F.R. § 1502.14(e) (2018) (directing agencies to identify preferred alternatives in

EISs). BLM reasonably declined to adopt Alternative A in favor of Alternative B.

SA-III-729. BLM explained that the management measures in Alternative A

"would be based primarily on wildlife habitat for focus species," while the

management measures in Alternative B "would be based on a broader range of

resources including visual resources, paleontological resources, surface water

features, identified lands with wilderness characteristics, and other resources

(including wildlife habitat)." *Id.*

Then, in the ROD, BLM selected Alternative B over Alternative A.

Consistent with its rationale in the Final EIS, BLM found that "Alternative B will

best avoid or reduce impacts to sensitive resources while still allowing for recovery

of natural gas and condensate resources . . . ." SA-III-633; *see also* SA-IV-927

(noting concern that phased development could make the Project technically and

economically infeasible). Accordingly, BLM explained its decision not to require

phased development in Alternative A.

26

The administrative record further supports BLM's decision not to require phased development as proposed in Alternative A. Jonah Energy provided extensive comments on the Draft EIS that detailed the problems created by phasing development throughout the entire Project Area. Phased development would not allow for efficient development of the Project Area because it would prevent Jonah Energy from delineating geologic formations through the entire Project Area to fully understand the location and extent of hydrocarbons before proceeding to a development phase. SA-II-506 to 507. Without a complete understanding of the resources throughout the Project Area, Jonah Energy could not determine how to efficiently develop the Project Area to maximize the productivity of each well. *Id.* Phased development also would not allow Jonah Energy to revisit a prior phase that, previously, could not have been developed because of technological limitations or changed commodity prices. SA-II-507. In fact, these limitations could yield unnecessary environmental impacts by causing Jonah Energy to drill inefficient wells or to inefficiently site infrastructure.[7] SA-II-507 to 508. For these reasons, BLM's decision not to adopt phased development as proposed in Alternative A is well-explained and supported by the administrative record.

---

[7] Jonah Energy also maintained that phased development was inconsistent with rights under Jonah Energy's federal oil and gas leases, which granted a right to develop oil and gas resources for the duration of the lease, rather than an abbreviated period. SA-II-507; *see* 30 U.S.C. § 226(e).

### 3. BLM Did Not Improperly Treat Required Design Features as "Discretionary."

Appellants incorrectly rely on a statement by a BLM employee, Mr. Phillip Blundell, characterizing Required Design Features as "discretionary" as evidence that the NPL ROD does not conform to the Land Use Plans. *See* Appellants' Opening Br. at 47 (citing App.-II-322 to 23). Appellants fail to establish error for multiple reasons.

First, Appellants incorrectly construe Mr. Blundell's statement as a final decision by BLM. This statement was made early in the environmental review process as part of discussions evaluating whether to incorporate a phased development component into other alternatives. *See* SA-I-234. BLM did not characterize Required Design Features as discretionary to justify adopting Alternative B in ROD. *See id.*

Second, the Required Design Features are discretionary in nature because BLM has flexibility as to when and how to apply them. The Land Use Plans recognize that "some [Required Design Features] may not apply to some projects . . . and/or may require slight variations" because of "site-specific circumstances," such as when a resource is not present on a given site or because projects require a larger or smaller protective area. App.-II-381. Accordingly, even though Mr. Blundell's statement is not a final BLM decision, it is a correct characterization of the Required Design Features.

Finally, Appellants' reliance on a single statement by BLM staff ignores that BLM continued to assess the Project's conformance with the Land Use Plans throughout the environmental review process for the Project. After BLM published its RODs for the Land Use Plans, BLM's Washington Office released additional guidance on their implementation. *See* SA-II-293 to 302. This guidance directed that "Conditions of Approval (COAs) attached to the permit should include all appropriate conservation objectives and mitigation requirements, such as required design features (RDF) from the [greater sage-grouse] land use Plans." SA-II-298. BLM reviewed this guidance in September 2016 and "found no issues with the NPL EIS." SA-II-288. Accordingly, Appellants do not demonstrate that BLM relied on an improper factor.

For these reasons, the Court should reject Appellants' contentions and find that BLM's decision to approve the NPL ROD complies with FLPMA.

## II.  BLM COMPLIED WITH NEPA WITH RESPECT TO GREATER SAGE-GROUSE WINTER CONCENTRATION AREAS.

BLM's treatment of Winter Concentration Areas complies with NEPA. The NPL ROD allows BLM to approve "limited" development in Winter Concentration Areas concurrent with a study "to better understand the impacts of development in Winter Concentration Areas." App.-III-554. "The results of the study, current information, and current guidance at the time of site-specific permitting will inform BLM understanding of impacts and subsequent development in Winter

29

Concentration Areas, and analysis during subsequent site-specific NEPA reviews." *Id.*

Appellants argue that BLM violated NEPA by issuing the ROD without a comprehensive understanding of Winter Concentration Areas. Specifically, Appellants contend that 40 C.F.R. § 1502.22 (2018) required BLM to obtain "baseline" data in Winter Concentration Areas prior to issuing the ROD. Appellants' contention fails for several reasons.[8] First, Appellants mischaracterize BLM's decisions with respect to Winter Concentration Areas. Second, Appellants demand nuanced and complex information about Winter Concentration Areas that cannot fairly be characterized as "baseline" data. Finally, BLM complied with 40 C.F.R. § 1502.22 when it approved the NPL ROD.

### A.     Appellants Mischaracterize BLM's Decisions with Respect to Winter Concentration Areas.

At an initial matter, Appellants repeatedly mischaracterize BLM's decisions related to Winter Concentration Areas. First, Appellants ignore that the ROD allowed BLM to approve only "limited" development in Winter Concentration Areas concurrent with a study. App.-III-554. Appellants instead erroneously suggest that the ROD allows Jonah Energy to conduct full-scale development

---

[8] In 2020, CEQ revised its regulations implementing NEPA. *See* 85 Fed. Reg. 43,304 (July 16, 2020). Hereinafter, any references to CEQ's regulations at 40 C.F.R. part 1500 relate to the regulations in effect in 2018, when BLM approved the NPL Project, unless otherwise noted.

throughout Winter Concentration Areas.  For example, Appellants state that "[t]he

ROD authorized Winter Concentration Areas development to proceed

*indefinitely* . . . ," Appellants' Opening Br. at 37 (emphasis added), that "BLM

authorized gas well development across 28 square miles of prime sage-grouse

'Winter Concentration Areas,'" *id.* at 39, and that "BLM irrationally committed to

an experiment of *virtually limitless scope* on wintering populations," *id.* at 59

(emphasis added).  The ROD, however, expressly recognizes that development in

WCAs will be "limited" until completion of the study.  App.-III-554.

Second, Appellants imply that the NPL ROD allows Jonah Energy to

immediately begin development in Winter Concentration Areas.  *E.g.*, Appellants'

Opening Br. at 37 ("The ROD authorized Winter Concentration Areas

development to proceed *indefinitely* . . ." (emphasis added)).  The ROD, however,

requires Jonah Energy to submit, and BLM to approve, APDs prior to commencing

development activities in the Project Area, including in Winter Concentration

Areas.  App.-III-547.  These APDs will be subject to site-specific environmental

review and NEPA compliance.  *Id.*  Therefore, contrary to Appellants' suggestion,

the ROD does not authorize immediate development.

Finally, Appellants incorrectly assert that, in the Final EIS, BLM

"inexplicably" replaced its proposal to defer all development in Winter

Concentration Areas with a proposal to allow "limited" development concurrent

with a study.  Appellants' Opening Br. at 54; *see also id.* at 57–58 ("The EIS does not explain why BLM chose not to collect the missing information regarding sage-grouse winter habitat use.").  In fact, the administrative record explains BLM's decision to allow limited development in Winter Concentration Areas for the purpose of a study.

BLM's management of Winter Concentration Areas evolved during the NEPA process.  In the Draft EIS, BLM proposed to defer authorizing any development in Winter Concentration Areas under all alternatives, including the Preferred Alternative, until additional research was performed.  *See* App.-II-369.  BLM, however, adjusted its position in the Final EIS in response to public comment and the input of wildlife experts.

In its public comments on the Draft EIS, Jonah Energy strongly opposed the proposal set forth in the Draft EIS as arbitrary and inconsistent with the Land Use Plans and the Core Area Protection Strategy.[9]  *See* SA-II-503.  Jonah Energy instead proposed a study to assess the impacts of development on wintering greater sage-grouse populations.  *See* SA-II-503 to 504.  As part of this proposal, limited development could occur but would be confined to the study area.  *Id.*

---

[9] Jonah Energy had voluntarily committed to former Governor Matthew Mead to defer development in Winter Concentration Areas until BLM completed its NEPA review.  SA-III-554.

After close of the comment period on the Draft EIS, a team of experts from BLM, WGFD, and Wyoming's Sage-Grouse Implementation Team (SGIT) revisited a 2015 proposal to study greater sage-grouse use of Winter Concentration Areas within the NPL Project Area.[10]  *See* SA-II-515 to 516.  This team recognized that "development will need to occur in order to study impacts" and ultimately concluded that "some portion of the [Winter Concentration Area] will need to be developed to determine impacts."  SA-II-516.  Consistent with the experts' conclusion, in the Final EIS, the BLM revised its proposal in the Draft EIS to allow "limited" development concurrent with a study to evaluate the impacts of such development and ultimately adopted this approach in the ROD.  App.-III-641; App.-III-554.  Accordingly, the record does not support Appellants' statement that BLM "inexplicably" allowed development to occur in Winter Concentration Areas.

**B.    Appellants Do Not Seek "Baseline" Data Related to Winter Concentration Areas.**

Appellants predicate their argument that BLM violated 40 C.F.R. § 1502.22 on the incorrect characterization that BLM lacks "baseline" data regarding Winter Concentration Areas.  *See* Appellants' Opening Br. at 50 ("BLM violated these standards by approving development in Winter Concentration Areas before collecting and evaluating baseline data"), 52 ("collection of missing baseline

---

[10] The Appellants reference the study on pages 32 and 33 of their Brief but omit that BLM determined that development was necessary to study impacts.

information was 'essential'"), 53 ("additional baseline information . . . was necessary").  In fact, Appellants fault BLM for lacking a sophisticated and comprehensive understanding about greater sage-grouse use of Winter Concentration Areas.

Appellants assert that, prior to authorizing development, BLM must understand "the ***full extent*** of Winter Concentration Areas," the "extent to which birds outside the Project Area use these sites," the timing of movements and corridors used by greater sage-grouse to reach Winter Concentration Areas, and "the location of sage-grouse 'geophagy' sites important for sage-grouse winter nutrition."  Appellants' Opening Br. at 50–51 (emphasis added).  This information cannot fairly be characterized as "baseline" data.  Moreover, BLM did not need this information to assess potential impacts from the Project on Winter Concentration Areas.  This Court has rejected a similar call for additional "baseline" data when an agency reasonably determined it has sufficient information to evaluate the environmental impacts of its authorization.  *See WildEarth Guardians*, 920 F.3d at 1260–61.

Because this information is not "baseline" data, the cases Appellants cite are not analogous.  *See* Appellants' Opening Br. at 52–53.  In *Oregon Natural Desert Association v. Jewell*, 840 F.3d 562 (9th Cir. 2016), BLM lacked basic information about whether or not sage-grouse were actually present at the project site.  *Id.* at

34

568 (noting that BLM only relied on extrapolation from nearby sites to conclude that no winter habitat existed at the project site).  Similarly, in *Northern Plains Resource Council, Inc. v. Surface Transportation Board*, 668 F.3d 1067 (9th Cir. 2011), the agency lacked information about species populations in the project area because the agency had not conducted surveys for greater sage-grouse, their leks, fish, or fish habitat.[11]  *See id.* at 1084.  The narrow, nuanced information gaps in BLM's understanding of Winter Concentration Areas are not comparable to the missing information in *Oregon Natural Desert Association* and *Northern Plains Resource Council*.  In *National Audubon Society v. Department of the Navy*, 422 F.3d 174 (4th Cir. 2005), the court did not even consider a question of the sufficiency of baseline data or a commitment by the agency to continue to study the area at issue.  *See id.* at 187–89.  Accordingly, these cases do not support Appellants' contention that BLM lacks baseline data related to Winter Concentration Areas.

---

[11] Moreover, in *Northern Plains Resource Council*, the authorizing agency had not incorporated comments from BLM and the U.S. Fish and Wildlife Service encouraging more discussion of baseline conditions.  668 F.3d at 1084–85.  By contrast, Appellants did not identify their concerns to BLM during the public comment process.

**C.    BLM Complied with 40 C.F.R. § 1502.22 When Approving the NPL ROD.**

Appellants incorrectly argue that the CEQ regulation addressing "incomplete or unavailable" information, 40 C.F.R. § 1502.22, required BLM to conduct further studies of Winter Concentration Areas before issuing the ROD.  This regulation sets forth a straightforward process to address incomplete or unavailable information identified during a NEPA process.  An agency must "always make clear that such information is lacking."  40 C.F.R. § 1502.22.  Whether an agency must include the information in the EIS depends on, first, whether the information is "essential to a reasoned choice among alternatives" and, second, whether "the overall costs" of obtaining the incomplete information are "exorbitant."  *Id.* § 1502.22(a), (b).  If the information is essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant, then the agency must include it in the EIS.  *Id.* § 1502.22(a).  But when the information cannot be obtained because the overall costs of obtaining it are exorbitant or the means to obtain it are not known, then the agency need not include the information in the EIS but should instead make certain findings as outlined by CEQ.  *See id.* § 1502.22(b).

With respect to the Project, BLM recognized that it had limited and likely incomplete information about WCAs.  Particularly, in the Final EIS, BLM acknowledged that "there is limited research on Sage-Grouse use of the Winter

Concentration Areas in the NPL Project Area . . . and the potential impacts that could occur to Sage-Grouse from development in and around these areas." App.-III-688. As a result, BLM recognized that potential impacts to greater sage-grouse from development of Winter Concentration Areas within the NPL Project Area are "not well understood." *Id.*

BLM, however, also recognized that it had relevant information regarding greater sage-grouse wintering behavior and could forecast potential impacts of development using that information. In the Final EIS, BLM explained:

> Research indicates that wintering Sage-Grouse avoid areas that (1) have high densities of infrastructure, (2) are within 1.9 km of infrastructure, and (3) have high levels of human activity (Copeland and Holloran 2015). For example, in the Powder River Basin of Wyoming and Montana, Sage-Grouse avoided energy development in otherwise suitable winter habitats after adjusting for Sage-Grouse habitat preference (Doherty et al. 2008). Research in the PAPA has shown that Sage-Grouse may avoid suitable winter habitats in areas with high well pad densities regardless of differences in well pad activity levels (Wyoming Wildlife Consultants 2012). However, existing development and the density of development for the NPL Project would be notably less than the density of development in the PAPA where long-term avoidance was observed.

App.-III-688.

Based on this understanding, BLM adopted an adaptive approach to managing greater sage-grouse that acknowledges scientific unknowns. In the ROD, BLM authorized a study of "limited development activities" in Winter Concentration Areas to further "inform BLM understanding of impacts and

subsequent development in Winter Concentration Areas, and analysis during
subsequent site-specific NEPA reviews."  App.-III-554.  Furthermore, BLM
authorized two alternative development scenarios in Winter Concentration Areas—
one that adopts management measures based on the "current guidance" (i.e., the
Land Use Plans and the Wyoming Core Area Protection Strategy), and one that
"provides additional protection measures that could be applied if determined
necessary based on study results and appropriate review of site-specific
applications."  *Id.*

BLM's decisions with respect to Winter Concentration Areas comply with
40 C.F.R. § 1502.22, and Appellants do not demonstrate otherwise.  First,
additional information regarding Winter Concentration Areas was not essential to a
reasoned choice among alternatives and the cost to obtain this information was
exorbitant.  Second, the additional information Appellants seek would require
BLM to initiate studies, which NEPA does not require.  Finally, the programmatic
nature of the ROD allows BLM to conduct studies after issuance of the ROD
consistent with 40 C.F.R. § 1502.22.

### 1.    BLM Did Not Lack Information Essential to a Reasoned Choice Among Alternatives and the Cost to Obtain Additional Information Was Exorbitant.

Appellants object to BLM's approach by arguing that the incomplete
information was "essential to a reasoned choice among alternatives" and suggest

that the costs of obtaining the information were "not exorbitant."  Appellants'

Opening Br. at 52–58.  The district court, however, correctly recognized that the

additional information was not essential to a reasoned choice among alternatives.

The district court observed that BLM, in the Land Use Plans, had adopted

management measures for activities in Winter Concentration Areas.  Addendum

058–59.  The district court also observed that, in the Final EIS, BLM had sufficient

information to identify potential impacts from oil and gas development on Winter

Concentration Areas and their use by greater sage-grouse.[12]  *Id.* at 059–60.

Appellants point to their own expert's opinion—set forth in a post hoc

declaration developed for the purpose of this litigation and never presented to

BLM during the NEPA process[13]—that concluded that "any development" in

Winter Concentration Areas "would cause 'marked declines in local and regional

sage-grouse populations.'"  Appellants' Opening Br. at 55 (citing App.-I-044); *see*

*also id.* at 56 (citing App.-I-041 to 43).  But the opinion of Appellants' expert

ignores and conflicts with the management measures adopted by the State of

---

[12] The district court also suggested that no development will occur until BLM
additional research occurs in Winter Concentration Areas.  Addendum at 59.  Data
collection, i.e., research, is the first phase of the study referenced in the ROD and
necessary for subsequent phases of the study.  Once this research is complete,
BLM will consider approving some development in Winter Concentration Areas
for the study referenced in the ROD.  App.-III-554; App.-III-574.
[13] Jonah Energy disagrees with the district court's finding that the Appellants'
objections are properly before the agency.  *See* Addendum 54–56.

Wyoming in the Core Area Protection Strategy and BLM in the Land Use Plans, which do not prohibit development in Winter Concentration Areas.[14]  *See* App.-III-788; App.-II-380.  The agencies' scientific opinions and management measures are entitled to deference.  *See, e.g.*, *San Juan Citizens All. v. Stiles*, 654 F.3d 1038, 1045 (10th Cir. 2011) ("The deference we give agency action 'is especially strong where the challenged decisions involve technical or scientific matters within the agency's area of expertise.'") (quoting *Utah Envtl. Cong. v. Russell*, 518 F.3d 817, 824 (10th Cir. 2008)); *Baltimore Gas Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 103 (1983) (finding that when reviewing agencies' scientific determinations, "a reviewing court must generally be at its most deferential").  Therefore, the additional information that Appellants claim BLM should have obtained was not "essential to a reasoned choice among alternatives."

Moreover, the costs of obtaining the additional information were exorbitant.  The studies that Appellants support would take at least two to three years to complete.  *See* App.-I-044 (suggesting that BLM observe greater sage-grouse use

---

[14] Appellants cite a statement by BLM suggesting that development could lead to abandonment of Winter Concentration Areas and/or population level declines.  *See* Appellants' Opening Br. at 55 n.11.  Not only is the quoted language from a pre-decisional version of the Draft EIS, it does not relate to BLM's proposal to allow "limited" development concurrent with a study.  *See* App.-II-489; *accord* App.-II-359.  Moreover, this statement is consistent with the impacts disclosed in the Final EIS.  *See* App.-III-688 ("the Proposed Action could increase the likelihood of displacement and abandonment of Sage-Grouse from Winter Concentration Areas in the Project Area").

of Winter Concentration Areas "over two fall-winter-spring field periods"); App.-II-468 (proposing a three-year study).  Thus, these studies would have increased the NEPA process for the Project from more than seven years to as long as 10 years and added to the $4.7 million cost of the NPL EIS.[15]  *See* App.-III-537.  This delay is unreasonable and constitutes an "exorbitant" cost.  *See* SA-IV-931 (noting proposed restrictions in Winter Concentration Areas in Draft EIS would render the Project technically and economically infeasible).  Thus, 40 C.F.R. § 1502.22 did not require BLM to obtain additional information regarding Winter Concentration Areas.

### 2.    The Programmatic Nature of the NPL ROD Allows BLM to Conduct Studies After Its Issuance.

Because the NPL ROD only authorizes programmatic development of the Project Area and no site-specific activities, BLM properly decided to study greater sage-grouse use of the Project Area after it issued the ROD.  When an agency authorization is programmatic in nature and additional site-specific environmental review will occur, courts have accepted that incomplete or unavailable information

---

[15] By comparison, CEQ has found that federal agencies complete EISs in an average time of 4.5 years and a median time of 3.5 years.  *See* CEQ, "Environmental Impact Statement Timelines (2010–2018) (2020), https://ceq.doe.gov/docs/nepa-practice/CEQ_EIS_Timeline_Report_2020-6-12.pdf.

is not "essential to a reasoned choice among alternatives."  *See* 40 C.F.R. § 1502.22.

For example, in *Native Village of Point Hope v. Jewell*, 740 F.3d 489 (9th Cir. 2014), the United States Court of Appeals for the Ninth Circuit evaluated the sufficiency of NEPA analysis prepared by the Bureau of Ocean Energy Management ("BOEM") for an offshore oil and gas lease sale.  *Id.* at 492.  The court held that it was not essential to obtain incomplete or unavailable information at the leasing phase because BOEM would prepare additional NEPA analysis before authorizing site-specific development.  *Id.* at 496–99.  Further, the court recognized that "missing or incomplete information that has not been 'essential to a reasoned choice among alternatives' at the lease sale stage may later become essential."  *Id.* at 499.

Similarly, in *Center for Biological Diversity v. U.S. Department of the Interior*, 563 F.3d 466 (D.C. Cir. 2009), the court held that the plaintiffs' allegation that the agency violated 40 C.F.R. § 1502.22 when approving an offshore oil and gas development leasing program was not ripe.  *Id.* at 480.  The agency had admitted that gaps existed in the baseline research for the seas in which leasing would occur, and the plaintiffs argued that 40 C.F.R. § 1502.22 obligated the agency to conduct additional research before the sale.  *Id.*  The court held that the claims were "not ripe due to the multiple stage nature of the [l]easing [p]rogram."

*Id.*  The agency had only approved the leasing program but had not conducted any lease sales.  *Id.*  The court reasoned that to require the agency to conduct such research at a preliminary stage, before any rights had been granted, "would impose too onerous an obligation [on the agency] and would require an agency to divert too many of its resources at too early a stage in the decision-making process."  *Id.* at 480–81.

These same considerations exist with respect to the Project.  The ROD does not authorize any site-specific activities or surface disturbance.  Although it outlines a framework under which development activities may occur in Winter Concentration Areas, BLM has yet to determine the location and amount of development to be authorized in Winter Concentration Areas.  App.-III-546.  BLM may only approve such activities after additional, site-specific review and NEPA compliance.  App.-III-547; App.-III-554.  At that time, Appellants will have the opportunity to review such analysis and identify their concerns to BLM. Moreover, the development scenarios outlined in the ROD reinforce that BLM may adjust its management of Winter Concentration Areas as it implements the ROD.  In this respect, the NPL ROD is not comparable to a ROD that immediately authorizes development of a single project like the projects in the two cases relied upon by Appellants.  *See Or. Nat. Desert Ass'n v. Jewell*, 840 F.3d 562 (9th Cir. 2016) (transmission line); *N. Plains Res. Council v. Surface Trans. Bd.*, 668 F.3d at

43

1085 (railroad line).  Therefore, BLM appropriately chose to study greater sage-grouse use of Winter Concentration Areas after issuance of the ROD.

### 3. NEPA Does Not Require BLM to Initiate Studies to Obtain Additional Information Regarding Winter Concentration Areas.

Finally, Appellants' argument that BLM must obtain additional information regarding Winter Concentration Areas fails because Appellants actually ask BLM to prepare studies, which NEPA does not require.  Although Appellants assert that 40 C.F.R. § 1502.22 only requires BLM to "collect" additional data, *see* Appellants' Opening Br. at 57–58, they actually do not seek "collection" of data.  Rather, Appellants demand that BLM study Winter Concentration Areas before authorizing development.  *See* App.-I-044 (asserting that BLM "could have readily conducted field studies").  Appellants' request exceeds what NEPA requires.

Both this Court and CEQ have allowed agencies to rely on existing, best available scientific information instead of requiring agencies to initiate their own scientific studies prior to approving a project.  In *Lee v. U.S. Air Force*, 354 F.3d 1229 (10th Cir. 2004), this Court held that the United States Air Force was not required to conduct its own studies when developing an EIS.  *Id.* at 1244.  The Court reasoned that, instead, "agencies must use the 'best available scientific information' when assessing environmental impacts."  *Id.*

Similarly, CEQ has confirmed that agencies need not undertake their own studies prior to finalizing a NEPA document.  CEQ recently released interim guidance to agencies on how to analyze climate change impacts, which states:

> Agencies should make decisions using current scientific information and methodologies.  CEQ does not necessarily expect agencies to fund and conduct original climate change research to support their NEPA analyses or for agencies to require project proponents to do so.

88 Fed. Reg. 1196, 1211 (Jan. 9, 2023).  Therefore, BLM properly relied on existing scientific information to assess potential impacts to greater sage-grouse use of Winter Concentration Areas.[16]

Finally, Appellants rely on a generic statement by their expert to argue that BLM could have "predicted outcomes based on a review of published studies" or "buil[t] models that would predict possible outcomes."  Appellants' Opening Br. at 59 (quoting App.-I-044).  BLM did, in fact, rely on a review of published studies to identify potential impacts to greater sage-grouse Winter Concentration Areas in the Final EIS.  *See* App.-III-688.  With respect to the option of building models, neither Appellants nor their expert provides any detail of these models and, therefore, the Court cannot assess the feasibility of this option.  *See* Appellants'

---

[16] Before the district court, Appellants maintained that 40 C.F.R. § 1502.22 "clearly" contemplates original "research."  SA-I-55 to 56.  All but one of the cases cited by Appellants, however, construe the version of 40 C.F.R. § 1502.22 that predates CEQ's revision to it in 1986.  *See id.*; 51 Fed. Reg. 15,625 (Apr. 25, 1986).

Opening Br. at 59; App.-I-044.  Therefore, Appellants fail to establish error in

BLM's decision to authorize "limited" development in Winter Concentration Areas

concurrent with a study.

### III.  BLM TOOK A HARD LOOK AT GRAND TETON PRONGHORN-RELATED IMPACTS.

Appellants have not established error in BLM's analysis of pronghorn or

Grand Teton pronghorn.  The purpose of NEPA is "to insure a fully informed and

well-considered decision."  *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def.*

*Council, Inc.*, 435 U.S. 519, 558 (1978).  "NEPA itself does not mandate particular

results, but simply prescribes the necessary process."  *Robertson v. Methow Valley*

*Citizens Council*, 490 U.S. 332, 350 (1989).  Agencies are not required "to elevate

environmental concerns over other appropriate considerations" but instead are

required to "take a 'hard look' at the environmental consequences" before taking

an action.  *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97

(1983).  "[O]nce environmental concerns are adequately identified and evaluated

by the agency, NEPA places no further constraint on agency actions."  *Citizens'*

*Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1179 (10th Cir. 2008)

(quoting *Friends of the Bow v. Thompson*, 124 F.3d 1210, 1213 (10th Cir. 1997)).

Although Grand Teton pronghorn are less than one percent of all pronghorn

using the Project Area, App.-I-265; App.-III-656 to 657, BLM reasonably

considered potential impacts to them during the lengthy NEPA process preceding

the ROD that established the framework for BLM to authorize development of the NPL Project on a site-specific basis.  BLM's consideration of impacts to Grand Teton pronghorn is entitled to deference.

### A.     BLM's Consideration of Grand Teton Pronghorn Complied with NEPA.

BLM considered impacts to Grand Teton pronghorn during the NEPA process, and Appellants fail to identify deficiencies in BLM's analysis. Additionally, BLM properly addressed Appellants' belated claims of related potential indirect ecological and recreational effects on Grand Teton National Park.

### 1.     BLM Considered Grand Teton Pronghorn During the NEPA Process.

In the NPL EIS, BLM undertook a lengthy, far-reaching and robust analysis of a wide range of potential environmental impacts.  BLM determined that development in the Project Area would similarly affect all pronghorn among the 30,000 individuals identified as the Sublette Herd—which includes approximately 300 Grand Teton pronghorns.  App.-I-265; App.-III-656 to 657.  But BLM also considered specific impacts on the Grand Teton herd, as addressed in documents provided for BLM to consider and documents BLM generated.

*Preliminary NEPA process.*  Potential impacts to Grand Teton and other pronghorn were identified early in planning for the NEPA process, before BLM

47

published the Notice of Intent for the Project in 2011. *See, e.g.*, SA-I-80; App.-I-254.

*Scoping.* The National Park Service, Intermountain Regional Office (Park Service) was invited by BLM to participate in the NEPA process as a cooperating agency, but it never responded. SA-III-610. Instead, during the EIS scoping stage in May 2011, the Park Service made its sole appearance when it submitted a two-and-a-half page letter to BLM in which it identified pronghorn impacts in a list of possible impacts to several Grand Teton resources.[17] App.-I-261. The Park Service's subsequent silence suggests that it had no objection to BLM's consideration of these issues.[18]

BLM duly noted the Park Service's comments as well as many other comments submitted during the scoping process. Those comments informed

---

[17] Contrary to Appellants' assertion, the Park Service's letter does not say pronghorn are among the "most sought-after animals" in the park and makes no mention of allegedly "cascading consequences." *See* Appellants' Opening Br. at 59. Other commenters were similarly silent.

[18] For this reason, Appellants incorrectly rely on *Utahns for Better Transportation v. U.S. Department of Transportation*, 305 F.3d 1152 (10th Cir. 2002). *See* Appellants' Opening Br. at 62. In that case, multiple agencies filed comments disagreeing with the Department of Transportation's analysis published in a draft EIS. *Id.* at 1179–80; *see also Davis v. Mineta*, 302 F.3d 1104, 1123 (10th Cir. 2002) (observing that the Environmental Protection Agency filed critical comments on a draft environmental assessment). Here, by contrast, the Park Service chose not to become a cooperating agency and did not object to BLM's pronghorn analysis in the Draft EIS—implicitly affirming the propriety of BLM's analysis.

BLM's identification of twenty-nine issue areas, one of which was "wildlife" and included Grand Teton and other pronghorn.  SA-I-178 to 184.  The draft scoping report's comment summary expressly noted Grand Teton pronghorn.  *See, e.g.*, SA-I-176 to 177; SA-I-184; SA-I-185; SA-I-186; SA-I-187; SA-I-188; SA-I-189; SA-I-190; SA-I-191 to 195; SA-I-196; SA-I-197 to 200; SA-I-201.

*Alternatives development.*  In a workshop to develop alternatives to be analyzed in the EIS, BLM stated that issues to be considered included pronghorn migration routes and winter range and that possible options could include avoiding sensitive wildlife habitats and barring drilling or road corridors where the Grand Teton pronghorn migrate.  SA-II-341 to 342; SA-I-172 to 174.

*Drafts of the EIS.*  In a preliminary draft of Chapter 4 of the EIS, BLM noted the potential that the "proposed action alternative" could disrupt pronghorn habitat and migration routes, SA-I-216 to 218, and observed that even the "no action alternative" could have similar impacts.  SA-I-215; SA-I-219 to 221.  BLM considered the effect of different development timing to allow for pronghorn migration.  SA-I-238.  BLM continued to refine a discussion of Grand Teton and other pronghorn migration patterns and habitat in preliminary drafts of the EIS and the published Draft EIS.  *See* SA-II-518 to 520; SA-II-522 to 525; SA-II-527 to 530; SA-III-547 to 553; SA-I-210 to 211; SA-I-212; SA-I-213; SA-II-348 to 349; SA-II-350 to351; SA-II-355 to 356.

*The Final EIS.*  In the Final EIS, BLM acknowledged that direct and indirect impacts to pronghorn, including mortalities due to traffic collisions or loss and degradation of habitats, will be greatest if development overlaps with migration routes.  App.-III-666.  BLM expressly addressed elimination of herd memory, breaking of the tradition of migration, and "reducing the viability of pronghorn Herd Unit 401 in perpetuity."  App.-III-674.  When evaluating the alternative of Jonah Energy's proposed action (which the ROD did not select), BLM recognized potential impacts to pronghorn migration and considered mitigation measures.  App.-III-673 to 676.  BLM undertook a similar analysis for the preferred alternative (Alternative B).  Under Development Scenario 1, "the types of direct and indirect impacts . . . would be similar to the Proposed Action, but the severity and extent of these impacts would be reduced . . . due to the reduced density of development and surface disturbance in this area."  App.-III-710 to 713.  BLM disclosed the potential for adverse cumulative impacts under all action alternatives.  *See* SA-IV-850 to 852; SA-IV-854 to 856.  Importantly, BLM determined that the ROD approving the Project would have a limited scope and require BLM to conduct further site-specific analysis to address pronghorn impacts.  SA-III-608.

In the Final EIS, BLM expressly acknowledged seasonal movements of Grand Teton pronghorn between Grand Teton National Park and the Project Area.  App.-III-656 to 657 (citing Berger and Sawyer studies); see also SA-I-89

(referencing Berger study); SA-I-97 (referencing Sawyer study). BLM then assessed potential impacts from the Project on seasonal movements to, and seasonal use of, the Project Area by pronghorn and big game. App.-III-653 to 654. BLM also summarized public comments on the Draft EIS's discussion of pronghorn and how the Final EIS addressed them. SA-IV-980 to 981. After the Final EIS was published, BLM tracked new public comments and determined whether they had been considered. SA-III-589 to 590; SA-III-604 to 615. Given BLM's express recognition of Grand Teton pronghorn in the Final EIS, BLM's analysis of impacts to pronghorn necessarily encompassed impacts to Grand Teton pronghorn.

In addition, BLM consulted extensively with Wyoming Game and Fish Department (WGFD), a cooperating agency during the NEPA process. *See, e.g.*, SA-I-203; 40 C.F.R. § 1501.6 (2018). WGFD manages all pronghorn in the State of Wyoming, including any Grand Teton pronghorn found within the Project Area, App.-III-656 to 657, and designates pronghorn migration corridors.[19] *See* Wyoming Executive Order No. 2020-1 (Feb. 13, 2020); *id.* app. B. (designation signifies that "limitations of human use [are warranted] to conserve those corridors"). WGFD has collected substantial data and performed or commissioned

---

[19] The Project Area contains no WGFD-designated pronghorn migration corridors. App.-III-657. BLM did consider three non-designated migration routes that actually cross the Project Area. *Id.*

multiple studies concerning pronghorn migration and habitat. *See, e.g.*, SA-I-69;

SA-III-542; SA-II-428. BLM considered WGFD data and maps of migration

routes and winter habitat. SA-II-308; SA-I-203; App.-III-656 to 657; SA-I-86 to

87; SA-I-88. Use of WGFD's expertise was appropriate, if not required.

Pronghorn are not listed, or candidates for listing, as threatened or endangered

under the Endangered Species Act, 16 U.S.C. § 1533, and have not been

designated by BLM as a sensitive species subject to heightened federal

management, SA-IV-804 to 806; SA-II-357 to 409, so Wyoming has the basic

authority to manage them. 43 C.F.R. § 24.3(b) (Congress "reaffirmed the basic

responsibility and authority of the States to manage . . . resident wildlife on Federal

lands").

 BLM's multi-year, comprehensive development of the NPL EIS reflects a

more thorough analysis of environmental matters than the agency efforts courts

found to be insufficient in the NEPA cases Appellants cite.[20] The record

demonstrates that BLM considered impacts from the Project to pronghorn and,

particularly, the Grand Teton herd. Appellants fail to show otherwise.

---

[20] *See, e.g.*, *Middle Rio Grande Conservancy Dist. v. Norton*, 294 F. 3d 1220, 1225 (10th Cir. 2002) (rejecting agency finding of no significant impact); *Anderson v. Evans*, 350 F.3d 815, 823 (9th Cir. 2002) (finding agency required to prepare EIS); *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1210 (9th Cir. 1998) (finding agency required to prepare EIS); *Fund for Animals v. Norton*, 281 F. Supp. 2d 209, 216, 233 (D.D.C. 2003) (rejecting agency finding of no significant impact).

### 2.    Appellants Fail to Show that BLM Did Not Take a Hard Look at Grand Teton Pronghorn.

Appellants tether their argument that BLM failed to meet its NEPA obligations to only five record documents.  None of these documents demonstrates a deficiency in BLM's analysis.

The first document is the May 2011 National Park Service letter which, as noted above, is the only evidence of that agency's participation in the NEPA process.  Appellants' Opening Br. at 61.  That letter suggests that BLM consider fragmentation of habitat, habitat connectivity, impacts to migratory movement, impacts to crucial seasonal ranges, cumulative impacts, and impacts to Grand Teton and Jackson Hole pronghorn, all of which BLM considered.  App.-III-628 to 629; App.-III-656 to 657; App.-III-672 to 676; SA-IV-847 to 853; App.-III-753 to 755; SA-IV-994.  The Park Service also suggested limits on the amount of disturbance and development and their timing as protective measures.  BLM included these types of limits in the Final EIS.  SA-IV-909; SA-IV-913 to 916.

The other documents Appellants cite are four articles provided to, and considered by, BLM during the NEPA process.  Appellants' Opening Br. at 61, 62, 63, 65.  *See, e.g.*, SA-II-499; SA-II-500; SA-II-501; App.-III-656 to 657; SA-IV-872; SA-IV-889.  These articles warn of existing impacts of natural geographic bottlenecks and potential impacts of human-created impediments to pronghorn

migration including highways, fences, and various types of development.[21]  *See* App.-II-435; App.-II-43; App.-II-439; App.-II-443; App.-II-397 to 398.  BLM, however, addressed and accommodated these concerns by restricting the density of development within the Project Area.  *See, e.g.*, App.-III-645 to 646.  Moreover, once site-specific development is proposed, Jonah Energy and BLM will account for impacts to pronghorn migration.  *See* App.-III-608.

Appellants also assert incorrectly that BLM limited the geographic scope of its pronghorn analysis to the Project Area and a one-mile buffer based on a single sentence in the Final EIS.  Appellants' Opening Br. at 66 (citing App.-III-664).  But that sentence actually says "[t]he general wildlife and special status species analysis area ***includes*** the Project Area and a one-mile buffer around the Project Area."  *Id.* (emphasis added).  Other discussion, notably Map 42 which Appellants ignore, in the Final EIS shows that the analysis area was much broader and included migration routes.  *See, e.g.*, SA-IV-994 (Map 42 identifying extent of cumulative impacts analysis); SA-IV-846 (cumulative impacts).

Moreover, BLM has discretion to determine the physical scope for measuring environmental impacts.  "The task of selecting the geographic boundaries of an EIS requires a complicated analysis of several factors, such as the

---

[21] Berger et al. (2013), App.-II-451, argues in favor of a National Park system migratory species initiative to respond to these impediments.

scope of the project considered, the features of the land, and the types of species in the area." *Selkirk Conservation Alliance v. Fosgren*, 336 F.3d 944, 958 (9th Cir. 2003). "[D]etermination of the extent and effect of these factors, and particularly identification of the geographic area within which they may occur, is a task assigned to the special competency of the appropriate agencies." *Kleppe v. Sierra Club*, 427 U.S. 390, 414 (1976).

Finally, Appellants focus on a footnote in the District Court's opinion that they assert supplies an improper post-hoc rationalization. Appellants' Opening Br. at 66 (citing Addendum at 49 n.19). But, the footnote only rejects their argument that BLM improperly subsumed the Grand Teton analysis within the larger pronghorn analysis and states that the legal standard under *New Mexico ex rel. Richardson v. Bureau of Land Management*, 565 F.3d 683, 713 (10th Cir. 2009), does not require BLM to individually analyze every possible subgroup. Addendum at 49 n.19. That is still the standard, and Appellants cite no case to the contrary.[22] Moreover, BLM did consider the Grand Teton herd.

---

[22] The only case Appellants cite, *WildEarth Guardians v. Montana Snowmobile Association*, 790 F.3d 920 (9th Cir. 2015), is inapposite because it has nothing to say about subgroups of a species. Instead, it concerns use of a wolverine habitat prediction map as a proxy for big game winter range when the NEPA agency itself conceded that the map did not accurately depict big game winter range. *Id.* at 925-26.

### 3. Appellants' Argument of Potential Indirect Recreational and Ecological Effects in Grand Teton National Park Should be Rejected.

The Court should not consider Appellants' allegations related to potential indirect recreational and ecological effects in Grand Teton National Park because Appellants waited to raise these issues until after the seven-year NEPA process had concluded and BLM had published notice of Final EIS availability.  83 Fed. Reg. 29,135 (June 22, 2018).  That notice did not provide a formal public comment period and instead only stated that BLM would not issue its ROD until thirty days after EPA published its notice of Final EIS availability.[23]  *Id.*  After this thirty-day period ended, Appellants sent BLM a letter criticizing the Final EIS.  App.-II-490 to 509.  That letter raised for the first time potential indirect recreational and ecological effects in Grand Teton National Park.  App.-II-504.

BLM was not required to provide a public comment period for the Final EIS or respond to Appellants' untimely comments.  40 C.F.R. § 1503.1(b) (2018) ("agency *may* request comments on a final environmental impact statement" (emphasis added)); *see also Japanese Vill., LLC v. Fed. Transit Admin.*, 843 F.3d 445, 467 (9th Cir. 2016) (agency not required to accept public comments after publishing Final EIS); *Wildearth Guardians v. Jewell*, 738 F.3d 298, 321–22 (D.C.

---

[23] CEQ regulations require the Environmental Protection Agency to publish notice of EISs.  40 C.F.R. §1506.10(a)(2018).  For the NPL Project, this notice was published on the same day as BLM's notice.  83 Fed. Reg. 29,115 (June 22, 2018).

Cir. 2013) (post-EIS comments criticized as "sandbagging").  Nonetheless, BLM

did review them and determined that potential indirect recreational and ecological

effects were addressed in several sections of the Final EIS.  SA-III-609 to 610*; see

also* SA-IV-839; SA-IV-994.  And, as BLM noted, the Park Service had been

invited to participate as a cooperating agency and never responded.  SA-III-610.

Moreover, as BLM states multiple times, Appellants' untimely comments

fail to acknowledge that

> [t]he NPL EIS provides a programmatic level analysis and does not
> provide a site-specific level of analysis.  Site-specific analysis would
> be conducted subsequently prior to any approval of development. . . .
> BLM approval of facility siting during site-specific permitting would
> consider pronghorn habitat, migration, and impacts.  During site-
> specific permitting, the resource protection measures in Appendix B
> and Appendix N, in addition to other potential measures/mitigation
> would be applied based on site-specific development proposals and
> site-specific environmental review.

SA-III-609.[24]  Before Jonah Energy begins any surface disturbing activity, it must

first obtain site-specific approval from BLM.  SA-III-632.  Appellants may then

---

[24] Additional protections for all pronghorn including Grand Teton pronghorn are
built into the Final EIS and ROD.  Development density is restricted to protect
pronghorn habitat and migration routes.  *See, e.g.*, SA-III-629 to 631.  No measures
for protection of pronghorn including imposition of buffer zones are precluded.
Also: (i) migration routes are to be preserved where possible through stakeholder
coordination; (ii) Jonah Energy will avoid activities or facilities that create barriers
to seasonal wildlife movements; (iii) Jonah Energy may conduct or fund barrier
removal and modification; (iv) Jonah Energy's activities and surface use will be
prohibited in pronghorn winter habitat and birthing areas during key periods; and
(v) Jonah Energy will avoid activities in crucial habitats when practicable.  *See*
SA-IV-914 to 916; SA-III-634.

comment and BLM may impose further measures to protect Grand Teton

pronghorn or related resources.  Agency approval of an action in a ROD that

provides for ongoing, site-specific impact studies sufficiently complies with the

requirements of NEPA.  *Envtl. Def. Fund, Inc. v. Andrus*, 619 F.2d 1368, 1382

(10th Cir. 1980).

### B.     BLM's Analysis is Entitled to Deference.

BLM's analysis of potential Grand Teton pronghorn impacts was reasonable

and is entitled to deference.  NEPA does not require an agency to "discuss every

impact in great detail"; the agency only needs to provide "a reasonable, good faith,

objective presentation of the topics, such that it 'fosters both informed decision-

making and informed public participation.'"  *Forest Guardians*, 495 F.3d at 1172

(quoting *Custer Cty. Action Ass'n v. Garvey*, 256 F.3d 1023, 1035 (10th Cir.

2001)) (alteration incorporated).  Further, NEPA analyses "involve[ ] an almost

endless series of judgment calls," and "[t]he line-drawing decisions necessitated by

[the NEPA process] are vested in the agencies, not the courts."  *Coal. on Sensible

Transp. v. Dole*, 826 F.2d 60, 66 (D.C. Cir. 1987)).

The deference afforded agencies does not change when others disagree with an

agency's decision.  *See, e.g.*, *Wyo. Farm Bureau Fed'n v. Babbitt*, 199 F.3d 1224,

1240 (10th Cir. 2000) (finding plaintiffs' claims "boil down to a disagreement over

scientific opinions and conclusions" and not a NEPA violation).  NEPA does not

require that an agency give any particular weight to environmental considerations. That is, it "merely prohibits uninformed – rather than unwise – agency action." *Forest Guardians*, 495 F.3d at 1172 (quoting *Robertson*, 490 U.S. at 351).

In light of this record, Appellants have not met their burden to show that BLM failed to take the requisite "hard look" at impacts on Grand Teton pronghorn, ecology or recreation. Their challenge is essentially a challenge to the substance of BLM's decision, but NEPA does not mandate particular results. Appellants' Grand Teton pronghorn-based challenge to the Final EIS and ROD should be rejected.

## CONCLUSION

For these reasons, Jonah Energy requests that the Court affirm the District Court opinion, order, and judgment that upheld BLM's approval of the NPL ROD.

Dated this 24th day of January, 2023.

DAVIS GRAHAM & STUBBS LLP


*/s/ Kathleen C. Schroder*

Kathleen C. Schroder
Gail L. Wurtzler
1550 17th Street, Suite 500
Denver, Colorado  80202
Tel: 303.892.9400
Katie.Schroder@dgslaw.com
Gail.Wurtzler@dgslaw.com

*Counsel for Intervenor Respondent-*
*Appellee Jonah Energy LLC*

## STATEMENT OF COUNSEL AS TO ORAL ARGUMENT

Jonah Energy requests oral argument because of the technical nature of the arguments presented.

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and 10th Cir. R. 32(B), this document contains 12,976 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in Microsoft 365 Apps for enterprise, Word version 2212 Build 15928.20216, in 14-point Times New Roman font.

Date: January 24, 2023

DAVIS GRAHAM & STUBBS LLP


*/s/ Kathleen C. Schroder*
Kathleen C. Schroder
Gail L. Wurtzler
1550 17th Street, Suite 500
Denver, Colorado  80202
Tel: 303.892.9400
Katie.Schroder@dgslaw.com
Gail.Wurtzler@dgslaw.com

*Counsel for Intervenor Respondent-Appellee Jonah Energy LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on January 24, 2023 I electronically filed the foregoing RESPONDENT-INTERVENOR-APPELLEE JONAH ENERGY, LLC'S RESPONSE BRIEF using the court's CM/ECF system which will send notification of such filing to the following:

Sommer H. Engels, Esq.
Respondent - Appellee
United States Department of Justice &
Natural Resources
Division Ben Franklin Station
P.O. Box 7415
Washington, DC 20044
Sommer.Engels@usdoj.gov
*Counsel for Respondents - Appellees*

Travis S. Jordan, Esq.
Respondent-Appellee
Office of the Attorney General for the
State of Wyoming
2320 Capitol Avenue
Cheyenne, WY 82001
travis.jordan@wyo.gov
*Counsel for State of Wyoming, Intervenor
Respondent-Appellee*

Thomas W. Ports, Jr.
Respondent - Appellee
U.S. Department of Justice
Environment & Natural Resources Div.
P.O. Box 7611
Washington, D.C. 20044-7611
202/514-2748
thomas.ports.jr@usdoj.gov
*Counsel for Respondents - Appellees*

Jeremy A. Gross
Respondent - Appellee
United States Attorney's Office Civil
Division
2120 Capitol Avenue, Room 4000
Cheyenne, WY 82001
jeremy.gross@usdoj.gov
*Counsel for Respondents-Appellees*

Wendy Park
Center for Biological Diversity
1212 Broadway, Suite 800
Oakland, CA 94612
wpark@biologicaldiversity.org
*Counsel for Petitioners-Appellants*

David Dewald
Office of the Attorney General for the
State of Wyoming
Natural Resources Division
109 State Capitol
Cheyenne, WY 82002
307-777-6199
david.dewald@wyo.gov
*Counsel for State of Wyoming, Intervenor
Respondent-Appellee*

Sarah Stellberg
Advocates for the West
P.O. Box 1612
Boise, ID 83701-0000
sstellberg@advocateswest.org
*Counsel for Petitioners-Appellants*

Edward B. Zukoski
Center for Biological Diversity
1536 Wynkoop Street, Suite 421
Denver, CO 80202
tzukoski@biologicaldiversity.org
*Counsel for Petitioners-Appellants*

Date: January 24, 2023

/s/ *Kathleen C. Schroder*
Kathleen C. Schroder